**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TELEBRANDS CORPORATION, | ) | Case No. 1:23-cv-00631-BMB |
| | ) | |
| Plaintiff, | ) | Judge Bridget Meehan Brennan |
| | ) | |
| v. | ) | |
| | ) | |
| WINSTON PRODUCTS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEFENDANT WINSTON PRODUCTS LLC'S</u>**
**<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ..................................................................................................1

II.  BACKGROUND ....................................................................................................1

    A.  The Patents-in-Suit and Asserted Claims ..................................................1

    B.  Disputed Terms and Proposed Constructions ...........................................3

III.  LEGAL STANDARDS FOR CLAIM CONSTRUCTION ...................................3

IV.  ARGUMENT .........................................................................................................5

    A.  Level of Skill in the Art ............................................................................5

    B.  Group A .....................................................................................................6

    C.  Group B.....................................................................................................18

    D.  Group C.....................................................................................................19

    E.  Group D ....................................................................................................21

V.  CONCLUSION.....................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

<u>**Cases**</u>

*Alloc, Inc. v. Int'l Trade Comm'n,*
    342 F.3d 1361 (Fed. Cir. 2003) ........................................................................... 5, 17

*AstraZeneca AB v. Mut. Pharm. Co., Inc.,*
    384 F.3d 1333 (Fed. Cir. 2004) ................................................................................. 3

*Astrazeneca LP v. Apotex, Inc.,*
    633 F.3d 1042 (Fed. Cir. 2010) ............................................................................... 12

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
    388 F.3d 858 (Fed. Cir. 2004) ........................................................................... 5, 16

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG,*
    224 F.3d 1308 (Fed. Cir. 2000) ......................................................................... 5, 7, 9

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002) ................................................................................. 5

*Dyfan, LLC v. Target Corp.,*
    28 F.4th 1360 (Fed. Cir. 2022) ................................................................... 22, 23, 24

*Edwards Lifesciences LLC v. Cook Inc.,*
    582 F.3d 1322 (Fed. Cir. 2009) ............................................................................... 13

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.,*
    64 F.3d 1553 (Fed. Cir. 1995) ............................................................................. 5, 7

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
    383 F.3d 1295 (Fed. Cir. 2004) ............................................................................... 10

*Littelfuse, Inc. v. Mersen USA EP Corp.,*
    29 F.4th 1376 (Fed. Cir. 2022) ................................................................................. 9

*Markman v. Westview Inst., Inc.,*
    517 U.S. 370 (1996) ............................................................................................. 3, 4

*Network Com., Inc. v. Microsoft Corp.,*
    422 F.3d 1353 (Fed. Cir. 2005) ............................................................................... 16

*Nystrom v. TREX Co.,*
    424 F.3d 1136 (Fed. Cir. 2005) ................................................................................. 9

*Ortho-McNeil Pharm. v. Mylan Lab'ys, Inc.,*
    520 F.3d 1358 (Fed. Cir. 2008) ................................................................................. 9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................. 4, 9, 10, 12

*Ravin Crossbows, LLC v. Hunter's Mfg. Co., Inc.*,
    No. 5:23-CV-598, 2024 WL 895156 (N.D. Ohio Mar. 1, 2024) ............................. 17

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013) ................................................................................ 16

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) .............................................................................. 10

*Terlep v. Brinkmann Corp.*,
    418 F.3d 1379 (Fed. Cir. 2005) .............................................................................. 14

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ............................................................................................... 3

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ........................................................................... 3, 17

*Varma v. Int'l Bus. Machs. Corp.*,
    816 F.3d 1352 (Fed. Cir. 2016) ......................................................................... 20, 21

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .................................................................................. 4

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017) .............................................................................. 13

*Watts v. XL Sys., Inc.*,
    232 F.3d 877 (Fed. Cir. 2000) ................................................................................ 23

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) .............................................................................. 23

**Statutes**

35 U.S.C. § 112 ............................................................................................... 22, 23

**Other Authorities**

*Oxford Thesaurus of English* (3d ed. 2009) ........................................................... 6, 13

*Color Oxford English Dictionary* (3d ed. reissued 2011) .......................................... 13

*Concise Oxford English Dictionary* (2008) ............................................................. 13

*Oxford English Dictionary* (2d ed. reprinted 1991) .................................................. 13

iii

**<u>Rules</u>**

L.P.R. 4.2 ............................................................................................................................... 3

L.P.R. 4.4(a) .......................................................................................................................... 1

## I.    INTRODUCTION

Pursuant to L.P.R. 4.4(a), Defendant Winston Products LLC ("Winston") submits its Opening Claim Construction Brief. Claim construction defines the meaning and scope of the patent claims at issue so the fact-finder can later make a decision on non-infringement and invalidity. Accordingly, Winston identified multiple terms and phrases (the "Disputed Terms") found in the asserted patent claims that require construction in order to overcome the claims' ambiguities. *See* Section II.B. Plaintiff Telebrands Corporation ("Telebrands") argues that none of the Disputed Terms require construction by the Court. Instead, Telebrands argues they should be given their "plain and ordinary meaning," but refuses to explain what that "plain and ordinary meaning" is.

The Asserted Claims in the Patents-in-Suit repeatedly utilize synonymous words ("secured to" and "to couple"/"coupled to"), yet Telebrands does not explain the differences between them. Telebrands asserts the Disputed Terms should be given their "plain and ordinary meaning"—and thus should not be construed by the Court—yet, at the same time, it submits expert testimony, along with various handbooks and dictionaries containing a wide variety of contradictory definitions. This approach is nonsensical and provides no clarity for the fact-finder. By contrast, Winston has provided clarifying constructions that are consistent with how the patentee used and implicitly defined the Disputed Terms in the Patents-in-Suit. The Court should adopt Winston's proposed constructions, which are based on the intrinsic evidence and supported by the extrinsic evidence. These constructions shed light on the proper meaning and scope of the asserted claims for purposes of determining non-infringement and invalidity of the Patents-in-Suit.

## II.    BACKGROUND

### A.    The Patents-in-Suit and Asserted Claims

Telebrands alleges Winston infringes the following patent claims:

- Claims 1, 3, 5-7, 10, 12, 13, and 15 of U.S. Patent No. 10,174,870 ("the '870 patent");

1

- Claims 1, 3, 5-7, 10, and 12-14 of U.S. Patent No. 10,890,278 ("the '278 patent"); and

- Claims 1, 2, 4-6, 9, and 11-13 of U.S. Patent No. 11,608,915 ("the '915 patent")

(collectively, the "Patent-in-Suit" and the "Asserted Claims") (attached as **Exhibits A, B & C**).[1]

The Patents-in-Suit are all entitled "Expandable and Contractible Garden Hose" and generally relate to expandable hoses for transporting fluids, such as garden hoses. The Patents-in-Suit all have a priority date of November 4, 2011, are members of the same patent family, and have virtually identical specifications.[2] Although the patents' claims have differences, they are substantially similar and are described collectively for purposes of this brief, except where noted.

The Patents-in-Suit claim an expandable hose having a flexible fabric outer tube and a flexible elastic inner tube. '870 Patent Claim 1. In their respective relaxed states, the length of the elastic inner tube is substantially less than the maximum length of the outer tube. *Id.* At a first end of the hose, the expandable hose includes a first coupler that is secured to first ends of the inner and outer tubes. *Id.* The first coupler is constructed to couple the hose to a source of pressurized liquid, such as a water spigot on the side of a house. *Id.* At a second end of the hose, the expandable hose includes a second coupler that is secured to second ends of the inner and outer tubes. *Id.* The inner and outer tubes are unsecured between the inner and outer ends such that the outer tube can move freely along the length of the inner tube. *Id.* The second coupler is configured to couple to a flow restrictor like a nozzle or even to another hose. *Id.*; *Id.* at 8:51-54.

The expandable hose has a relaxed condition and extended condition. *Id.* Claim 1; *Id.* at 9:10-14. When the hose is in the relaxed condition, the elastic inner tube is relaxed, and the outer

---

[1] All exhibits cited herein are attached to the Declaration of Jeffrey C. Sindelar Jr., which is being filed with this brief.

[2] Generally, for ease of reference, this Brief cites primarily to the '870 patent and its specification. Although the claims differ slightly between the three Patents-in-Suit, the '278 and '915 patents have substantively identical specifications to the '870 patent.

fabric tube is folded, compressed, and gathered relatively evenly along the length of the inner tube. *Id.* at 11:33-39; *Id.* Fig. 8. When the first coupler is coupled to a source of pressurized fluid, the fluid is introduced into the hose through the first coupler, the fluid is restricted from flowing out of the hose by the flow restrictor, and water pressure increases inside of the inner tube. *Id.* Claim 1. As the water pressure increases, the inner tube begins to expand radially and longitudinally until it has reached the maximum diameter and length allowed by the fabric outer tube. *Id.* When the water exits the tube, the hose contracts when the elastic tube returns its relaxed state. *Id.*

### B. Disputed Terms and Proposed Constructions

Pursuant to L.P.R. 4.2, Telebrands and Winston (together, "the Parties") exchanged Preliminary and Final Claim Constructions of the Disputed Terms. Because the Asserted Claims contain substantially the same language, the Parties agreed to group the Disputed Terms, as set forth in **Exhibits D–G**. *See* **Exhibit D** (summary of claims containing the Disputed Terms); **Exhibit E** (highlighting each instance of the Disputed Terms in the Asserted Claims). The Disputed Terms and the parties' respective proposed constructions are set forth in **Exhibit F**. The parties agreed on several constructions, which are set forth in **Exhibit G**.

## III. LEGAL STANDARDS FOR CLAIM CONSTRUCTION

The purpose of claim construction is "to *clarify* and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). The goal of claim construction is to determine how "an ordinary artisan" would understand the invention claimed by the patent "taking the claims together with the rest of the specification." *AstraZeneca AB v. Mut. Pharm. Co., Inc.*, 384 F.3d 1333, 1337 (Fed. Cir. 2004); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839 (2015). Claim construction is a matter of law exclusively within the province of the court. *See Markman v. Westview Inst., Inc.*, 517 U.S. 370, 372 (1996). "It is a bedrock

principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim construction first looks at the "intrinsic evidence, *i.e.,* the patent itself, including the claims, the specification, and the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Markman*, 517 U.S. at 979-80).

The claim language itself is where the claim construction inquiry begins. *Vitronics*, 90 F.3d at 1582. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Id.* at 1313 (citation & quotation omitted); *see also Vitronics*, 90 F.3d at 1582 ("[C]laims must be read in view of the specification, of which they are a part."). The specification is "the single best guide to the meaning of a disputed term" and is "[u]sually dispositive." *Phillips*, 415 F.3d at 1315.[3]

Extrinsic evidence "consists of all the evidence external to the patent and prosecution history including expert and inventory testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. While extrinsic evidence "may be useful," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1318-19.

Although Telebrands argues for giving plain and ordinary meaning to the Disputed Terms, courts recognize that construing a claim term using the ordinary meaning is not always appropriate:

---

[3] The prosecution history, not cited by the parties here, is the third piece of intrinsic evidence that is often of critical significance in determining the meaning of claims. *Vitronics*, 90 F.3d at 1582.

> [A] court may restrict the ordinary meaning of a claim term in one of four ways. First, a claim term will not receive its ordinary meaning if the patentee acted as his or her own lexicographer and clearly set forth a definition of the disputed term in either the specification or prosecution history. Second, a claim term will also not receive its ordinary meaning if the term "chosen by the patentee so deprives the claim of clarity" as to require resort to other intrinsic evidence for a definite meaning. Third, if the patentee phrased a claim term in means-plus-function format, the term will only cover the corresponding structure disclosed in the specification, as well as equivalents thereto. Finally . . . a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee limited the scope of the claims.

*Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1377 (Fed. Cir. 2003) (Schall, J. dissenting) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002)).

A court "must give meaning to all words in [the] claims." *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995). "In the absence of any evidence to the contrary, [courts] must presume that the use of . . . different terms in the claims connotes different meanings." *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000). In addition, courts refuse constructions that simply rephrase the language of the claim with synonyms because "merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004).

## IV.  ARGUMENT

### A.  Level of Skill in the Art

Winston asserts that a person of ordinary skill in the art ("POSITA") is someone possessing a Bachelor's Degree in Mechanical Engineering or a closely related technical field and having at least four years of experience in the manufacture, design, and/or application and use of hoses for various types of liquids. The POSITA would be capable of performing various design tasks and understand the basic mechanical and fluid features and the operation of expandable and contractible hoses. The POSITA would also have at least a basic knowledge of fluid mechanics,

solid mechanics, and materials science and engineering relating to hoses and how hoses generally function to convey fluids from one place to another. The POSITA would also have an understanding of how to design components of both rigid and elastomeric polymers, including the requirements to design for injection molding of rigid polymers, the selection of elastomers, and the design of components utilizing those elastomers. The POSITA also has an understanding of cast metal manufacturing and post process machining of metal components made with this process. Additionally, the POSITA needs to understand how to specify and source fabrics to manufacture the outer hose, which is made by weaving, knitting, or braiding. Finally, the POSITA would need to understand how to design, manufacture, and utilize manufacturing jigs required to secure the components for scale manufacturing of the hoses. Rebuttal Expert Decl. of John M. Feland, III, Ph.D. ("Feland Decl.") ¶ 44 (attached as **Exhibit H**).

> **B.**    **Group A: "secured to"; "to couple"; "coupled to"**

This Court should adopt Winston's proposed constructions for the Group A terms. Winston's constructions provide clarity to the claims and are consistent with how the patentee used "secured to", "to couple", and "coupled to" in the claims and throughout the specification. Winston proposes "secured to" means "affixed or attached firmly so it cannot be readily removed from" and "to couple"/"coupled to" means "to removably connect"/"removably connected to." *See* Feland Decl. ¶¶ 58-81; Suppl. Rebuttal Expert Decl. of John M. Feland, III, Ph.D. ("Supp. Feland Decl.") (attached as **Exhibit I**).

Group A primarily involves the distinction between "secured" and "coupled." These terms are both used as verbs and are synonyms related to joining items together. *See* excerpts from *Oxford Thesaurus of English* (3d ed. 2009) (attached as **Exhibit J**). Both "secured to" and "to

couple"/"coupled to" are present repeatedly in Claim 1 in each of the Patents-in-Suit.[4] For instance, claim 1 of the '870 Patent recites:

> a first coupler *secured* to said first end of said inner and outer tubes, said first coupler constructed to *couple* said hose to a source of pressurized fluid; a second coupler *secured* to said second end of said inner and outer tubes, . . . [and] a flow restrictor *coupled* to said second coupler . . . .

Claim 1 of the '278 Patent and claim 1 of the '915 Patent include virtually identical limitations. The terms "secured to" and "to couple" appear only seventeen words apart from each other in the claim, referencing how the first coupler is "secured to" the inner and outer tubes and how the first coupler is constructed "to couple" the hose to a fluid source (*e.g.*, a spigot). *See* '870 Patent Claim 1. Significantly, while these terms are synonyms related conceptually to joining, the Court "must give meaning to all the words in [the] claims." *Exxon Chem. Pats.*, 64 F.3d at 1557. Further, "in the absence of any evidence to the contrary, [the Court] must presume that the use of these different terms in the claims connotes different meanings." *CAE Screenplates*, 224 F.3d at 1317. As discussed in greater detail below, it is clear from the claims and specification that the patentee did not intend "secured to" and "to couple"/"coupled to" to mean the same thing. Accordingly, the Court should construe "secured to" and "to couple"/"coupled to" as having different meanings.

It is apparent that the patentee appreciated the difference between "secure" and "couple" based on the context of the claims, which shows that "secured to" means "affixed or attached firmly so it cannot be readily removed from" and "to couple"/"coupled to" means "to removably connect"/"removably connected to." In all of the claims, the patentee consistently uses "secured" or a variation of "secure" to describe the joining of the hose materials to the first or second coupler. *See* '870 Patent Claims 1, 5, 7, 16, 18. A POSITA would understand that the joining of the hose

---

[4] Similarly, because claims 2 through 15 of the '870 Patent are dependent claims that depend from claim 1, claims 2 through 15 necessarily incorporate these terms "couple" and "secure" in them.

material to the coupler is not intended to be removable and should be considered a permanent or semi-permanent attachment. *See* Feland Decl. ¶¶ 68-78; Supp. Feland Decl. ¶¶ 3-4. In other words, because the coupler is "secured to" the inner and outer tubes (not "coupled to"), the coupler should not be readily removable from the hose tubes once it is attached. Given the importance of a water-tight connection between the inner and outer tubes and the first coupler—so there are no leaks and no damage to the tube material—it is essential that this connection not be readily removable.

On the other hand, the patentee consistently uses "to couple"/"coupled to" to describe the joining of the hose to a water source via the first coupler and the joining of a flow restrictor to the second coupler. *See* '870 Patent Claims 1 and 16.[5] Once again, a POSITA would understand that these connections are typically readily and repeatedly removable. *See* Feland Decl. ¶¶ 64-67; Supp. Feland Decl. ¶¶ 3-4. It is common knowledge that garden hoses of the type described in the Patents-in-Suit are frequently used with different water sources (*i.e.*, different water spigots) and with different flow restrictor devices (*e.g.*, different nozzles, sprinklers, or attachments for dispensing water). Indeed, nothing in the patents suggests that the inventor intended for this "coupled" connection to be permanent. Accordingly, the meaning of "to couple"/"coupled to" as used in the Patents-in-Suit is properly defined as "to removably connect"/"removably connected to."

If the drafter of the patent had intended for "secured to" to mean the same thing and have the same scope as "to couple"/"coupled to", as Telebrands suggests, there would have been no reason to use different terms to describe a single type of connection present in the hose. Put another way, if the patentee wanted the type of connection between the coupler and the water source to be the same as the type of connection between the coupler and the inner and outer tubes, then the

---

[5] In claim 16, the patentee used "connecting" instead of "couple." This does not change the analysis because Telebrands' own construction of "to couple" is "to connect," so Telebrands clearly considers the terms to be equivalent.

patentee could have used one word consistently throughout the patent or acted as their own lexicographer and explicitly defined the words to all have the same meaning. But the patentee did not do so. Telebrands cannot overcome the presumption that "the use of these different terms in the claims connotes different meanings." *CAE Screenplates Inc.*, 224 F.3d at 1317.

Claim 11, which depends from claim 1, further evidences the difference in the meanings of these terms. Claim 11 recites that the flow restrictor "is a nozzle which is removably secured to" the hose. Telebrands' expert, Dr. Glancey, incorrectly asserts that this "expressly contradicts" Winston's offered constructions. Sur-Rebuttal Decl. of Dr. James L. Glancey ("Glancey Sur-Rebuttal") ¶ 45 (attached as **Exhibit K**). Dr. Glancey further asserts that "'secured' can be either a removable or permanent attachment, and that 'couple' can be any of a removable, semi-permanent, or permanent connection." *Id.* ¶ 65.[6] But taking the context of the claim and the specification into consideration, Dr. Glancey is clearly incorrect. Under the principle of claim differentiation, every claim is presumed to have a different meaning. "The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). "When different words or phrases are used in separate claims, a difference in meaning is presumed." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). Courts "strive to reach a claim construction that does not render claim language in dependent claims meaningless." *Ortho-McNeil Pharm. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008); *see Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) (*rev'g* claim construction that

---

[6]The overlapping nature of Dr. Glancey's descriptions confirms the ambiguity in his use of the "plain and ordinary meaning" for these terms and confirms the need for claim constructions from the Court.

rendered dependent claims "not merely" superfluous, but also meant that they "have no scope at all, a result that should be avoided when possible").

Claim 11 is merely about the flow restrictor, specifically a "nozzle." While claim 1 says flow restrictors are "coupled" to the second coupler, in dependent claim 11 the drafter got cute and used "removeably secured" to describe the nozzle's connection, which obviously has to be removable. Because claim 1 requires that it be "coupled," claim 11 just rewrote that as "removeably secured" as the lexicographer's modification to the word "secured." Everywhere else in the claims, "secured" describes the connections between couplers and tubes, which for all of the reasons described herein means "affixed or attached firmly so it cannot be readily removed from." But the use of "removeably secured" in claim 11 does not mean Winston's proposed scope of the word "secured" as used throughout the rest of the claims to describe the connection between the couplers and the tubes is wrong. To the contrary, it confirms Winston is right.

The specification demonstrates the patentee appreciated the difference between "secure" and "couple," thus supporting Winston's proposed constructions. It is "the single best guide to the meaning of a disputed term" and is "[u]sually dispositive." *Phillips*, 415 F.3d at 1315. The specification "can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). "[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1683 (Fed. Cir. 2004).

Claim 1 of each of the Patents-in-Suit requires the coupler to be "secured" to the inner and outer tubes, and, in dependent claims, the Patents-in-Suit require the restrictor sleeve to be "secured" to the inner and outer tubes. The patentee uses "secure" or "secured" in every instance

10

where the connection between the first or second coupler and the inner tube, the outer tube, and the restrictor sleeve is described. '870 Patent Abstract, 7:5-10, 7:62-67, 8:44-50, 8: 61-64, 10:57-59, 10:65-67, 11:13-16, 11:20-22, 11:31-33, 11:45-47, 12:49-52, 12:58-64.[7] A POSITA would understand, without any explicit instruction saying otherwise, that this connection between the coupler, the tubes, and the restrictor sleeve is not intended to be readily removable. *See* Feland Decl. ¶¶ 68-78; Supp. Feland Decl. ¶¶ 3-4. The specification and claims describe the connection between the couplers and the inner tube, outer tube, and/or restrictor devices over 25 times using "secure". It never indicates that these connections are removable, let alone readily removable.

In contrast to the use of "secured" in the claims, claim 1 of each of the Patents-in-Suit requires the first coupler to be constructed "to couple" the hose to the water/liquid source and requires the flow restrictor to be "coupled to" the second coupler. Typically, this connection is "threaded." *See* '870 Patent 8:45-55. A POSITA reading the specification would understand the connection between the hose and the source of water or a flow restrictor (via the first or second coupler) is intended to be removably connected. The patentee plainly states that an objective of the patent is to create a hose that can be "readily coupled and uncoupled to a source of water." '870 Patent 7:34-36. Further, "couple" or "connect" is used in a majority of the instances where the connection between the hose and the water source and/or attachments is discussed. *Id.* at 7:34-

---

[7] As discussed in more detail below, there are several instances where the specification also uses the word "secured" to refer to connections that in the claims are always required to be "coupled." '870 Patent 10:1-4 ("For example, when the hose 10 of the present invention is utilized as a garden hose around a house, couple 18 is secured to a faucet or water outlet on an exterior wall of the house."); 10:11-12 ("A nozzle or other distributor can be secured to male coupler 16 at the opposite end of hose."); 12:28-33 ("A user of the present invention can take hose 10 from a stored condition, secure a nozzle or other flow restrictor on one end of the hose, secure the hose 10 to a water faucet and turn on the water …"). These anomalies do not change the fact that when describing the connection between the coupler, the tubes, and the restrictor sleeve, the claims and the specification always uses "secured" in the context of a connection that is affixed or attached firmly so it cannot be readily removed, as proposed by Winston.

36, 8:51-54, 8:54-57, 8:58-61, 11:23-26. The patentee intends for this connection to be readily coupled to and uncoupled from the source. The specification is replete with examples of "coupled" in reference to connections that are removable, and *none that are permanent*.

Therefore, the intrinsic evidence confirms that "to couple"/"coupled to" refers to removable connections and provides an implicit definition of the term consistent with Winston's proposed constructions. "The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). In these instances, "the inventor's lexicography governs." *Id.* Moreover, "[t]he specification need not reveal such a definition explicitly," but may do so "by implication." *Astrazeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051–52 (Fed. Cir. 2010).

Telebrands may try to discredit this argument by arguing that the patentee uses "secure" and "couple" interchangeably. Telebrands may point to instances where "secured" is used to describe the connection between the hose and a flow restrictor like a nozzle. *See* '870 Patent 10:11-12, 12:28-33, claim 11. But, as described above regarding claim 11, the flow restrictor is "removably secured" in claim 11, which illustrates the patentee's understanding that the flow restrictor is generally a removable connection. Similarly, Telebrands may point to isolated instances where the specification (but, importantly, **none** of the claims) uses "secured" to describe the connection between the hose and the water source. *See* '870 Patent 10:1-4, 12:28-33. Importantly, however, the claims require this connection to be "coupled/"couple," which means removably connected. As previously described, "secured" is used pervasively and consistently in the claims and specification to describe the connections between the coupler, the inner and outer tubes, and the restrictor sleeve, which are not readily removable.

The isolated uses of "secured" in the specification to describe the connection between the hose and the water source are more likely due to sloppy patent drafting, rather than intentional use

of "secure" and "couple" interchangeably. Courts have generally found interchangeable use between terms when the patentee has used the terms interchangeably *throughout* the claims and specification or where the patentee has acted as a lexicographer and used the terms in a manner that is "akin to a definition equating the [terms]." *See e.g.*, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1282 n.6 (Fed. Cir. 2017); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) (equating "graft" and "intraluminal graft" where patentee used the same reference numeral to refer to both terms). Here, the patentee did not use the terms "secure" and "couple" interchangeably throughout the specification and claims, nor did the patentee define these terms to mean the same thing. Rather, the patentee did the exact opposite.

In addition to the detailed intrinsic evidence cited by Winston, its constructions have further support from extrinsic evidence. Dictionaries available prior to the priority date confirm that the verb form of "secure" means "firmly fix or fasten," "fixed or fasten securely," "to make fast or firm," and "firmly fastened." *See Secure*, *Color Oxford English Dictionary* (3d ed. reissued 2011); *Secure*, *Concise Oxford English Dictionary* (2008); *Secure*, *Oxford English Dictionary* (2d ed. reprinted 1991) (attached as **Exhibits L, M & N**, respectively). Further, if something is "secure," it is "fixed or fastened so as not to give way, become loose, or be lost." *See Secure*, **Exhibit M**. From a plain reading of these definitions, it is clear that "secure" means something more fixed and firm than just merely connected or joined.

Moreover, dictionaries also provide the plain and ordinary meaning of "couple." Specifically, "couple" means "connect or combine," "connect (a railway vehicle or piece of equipment) to another," and "to fasten or link together (properly in pairs); to join or connect in any way." *See Couple*, *Color Oxford English Dictionary* (3d ed. reissued 2011); *Couple*, *Concise Oxford English Dictionary* (2008); *Couple*, *Oxford English Dictionary* (2d ed. reprinted 1991) (attached as **Exhibits L, M & N**, respectively). These definitions indicate that while "couple" may

13

overlap with the definition of "secure," it also can be used much more broadly. Indeed, the *Oxford Thesaurus of English* (3d ed. 2009) confirms that the verb forms of "couple" and "secure" can have many overlapping meanings to the extent that both words are synonyms of the verb form of other words like "affix," "attach," "connect," "fast"/"make fast," and "tie." *See* **Exhibit J**.[8]

This overlap between the verb forms of "couple" and "secure" provides yet another reason the Court should adopt Winston's constructions. Dictionaries and thesauruses can indicate the plain and ordinary meaning of words, but do not necessarily provide clarity on the scope of their meaning in the claims. Because the Disputed Terms use words derived from synonyms like "couple" and "secure," the Court should construe them in light of how they are used in the claims and how the patentee implicitly defined them in the specification, as Winston suggests. "The distinction between these synonyms cannot be ignored." *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1384 (Fed. Cir. 2005) (noting the distinction between synonyms both in written description of the patent and extrinsic dictionary definitions cannot be ignored when construing claims).

More importantly, this overlap in the Group A Terms highlights an ambiguity in the claims that even a POSITA, like Telebrands' expert Dr. Glancey, could not explain. Dr. Glancey, a self-declared POSITA at the time of the invention, demonstrated confusion between the meaning of "coupled" and "secured" as they are used in the Patent-in-Suit. At his deposition, he was presented with the following photograph from page 19 of his Sur-Rebuttal Declaration (**Exhibit K**), showing a standard home faucet/spigot with a threaded connection and a hose attached to it:

---

[8] Telebrands' expert Dr. Glancey refused to define what the plain and ordinary meaning is for each Disputed Term. *See* Deposition of James L. Glancey, Ph.D. ("Glancey Dep.") 86-87 (attached as **Exhibit O**). Even though Winston's expert Dr. Feland said in his report that the terms "secured" and "coupled" were overlapping, Dr. Glancey refused to provide any opinion explaining the difference between the terms. *See* Glancey Dep. 112-113.

14



When asked, "is that hose coupled or secured to that faucet," Dr. Glancey stated, **"[i]t is coupled."** Glancey Dep. 177:11-179:10 (emphasis added). Then, when asked, "how do you know that?", Dr. Glancey answered it is coupled because "[i]t is using a threaded connection to make that attachment of the hose to that spigot." *Id.* at 179:11-14. Next, Dr. Glancey was asked about the following excerpt from the '870 patent describing a coupler that "is secured to a faucet . . . on an exterior wall of a house":

**10**

For example, when the hose **10** of the present invention is utilized as a garden hose around a house, coupler **18** is secured to a faucet or water outlet on an exterior wall of the house. The faucet is turned on or opened so that water under

*Id.* at 179:15-180:6. Asked if this description was "not the exact same thing" as the photo above from his report, Dr. Glancey *changed his position* and stated that the same coupler in the picture was "**secured to the faucet or water outlet**." *Id.* Dr. Glancey then stated that the hose was not both coupled and secured, but clarified that it was "a coupler that is secured. It is not coupled to. It is a coupler that is secured." *Id.* Dr. Glancey's own confusion (evidenced by his inconsistent and wavering description of a hose shown in his own Declaration) reinforces why the Court should

15

construe the Group A terms. Unlike Plaintiff, Winston offered proposed constructions that provide clarity and address the ambiguity inherent in the patents' use of very similar, overlapping terms within a single claim.

As explained in detail by Dr. Feland, Winston's claim construction expert and a POSITA at the time of the invention, a person of ordinary skill in the art at the time of the invention, after reviewing the Patents-in-Suit's specifications, would understand that "secured to" means "affixed or attached firmly so it cannot be readily removed from" and "to couple"/"coupled to" means "to removably connect"/"removably connected to." Feland Decl. ¶¶ 68-78; Supp. Feland Decl. ¶¶ 3-4. This construction of the Group A terms is correct because it reflects the patentee's "[e]xtensive, consistent usage" of those terms in the specification. *Saffran v. Johnson & Johnson*, 712 F.3d 549, 560 (Fed. Cir. 2013); *Network Com., Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1360 (Fed. Cir. 2005) (confirming claim scope based on term's consistent usage in specification). Dr. Feland extensively discusses how the consistent usage of "secure" and "couple" throughout the specification would be understood by a POSITA. *See* Feland Decl. ¶¶ 64-78; Supp. Feland Decl. ¶¶ 3-4.

Telebrands initially stated that all disputed claim terms should be given their plain and ordinary meaning with no explanation as to what should be the plain and ordinary meaning of the terms. Telebrands' expert subsequently cited certain dictionary definitions and thesaurus examples, although it was not clear whether Telebrands was actually proposing these definitions or thesaurus examples as constructions or definitions of the plain and ordinary meaning of the Disputed Terms. *See* Glancey Sur-Rebuttal at 14-16 (discussing various sources, some of which post-dated the 2011 priority date of the Patents-in-Suit). To the extent that Telebrands offered synonyms as constructions, it seems to indicate that all of the terms mean the same thing. Courts have refused similar constructions because "merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction." *C.R. Bard,*

16

*Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004). This Court recently refused to construe terms where the offered constructions were mere substitutions of synonyms because "it does nothing to assist the jury in deciding whether the claim has been infringed." *Ravin Crossbows, LLC v. Hunter's Mfg. Co., Inc.*, No. 5:23-CV-598, 2024 WL 895156, at *12 (N.D. Ohio Mar. 1, 2024) (refusing to construe "mounted to" as "connected to, either directly or indirectly"). Courts can restrict the ordinary meaning of a term if the term chosen by the patentee so deprives the claim of clarity. *Alloc*, 342 F.3d at 1377 (Schall, J. dissenting). Telebrands' claim constructions (either its undefined "plain and ordinary meaning" or the various definitions/synonyms presented by its expert) for the Group A terms deprive the claims of clarity and do nothing to assist the jury in deciding whether the claims have been infringed. Therefore, this Court should reject Telebrands' constructions.

Dr. Feland, a POSITA at the time of the invention, reviewed the Patents-in-Suit and discusses in his report the distinction between "secure" and "couple" in light of how the patentee uses the Group A terms. *See* Feland Decl. ¶¶ 64-78; Supp. Feland Decl. ¶¶ 3-4. His report illustrates the meaning of the terms to a person of skill in the art and supports Winston's proposed constructions. Winston's proposed constructions are consistent with how the patentee used "secured to", "to couple", and "coupled to" throughout the claims and specification. Further, Winston's constructions clarify what the claims actually cover and instructs a POSITA in how to practice the invention disclosed by the Patents-in-Suit. Most importantly, they will provide guidance regarding the meaning and scope of the Patents-in-Suit to the trier of fact to use when deciding infringement and invalidity. The purpose of claim construction is "to *clarify* and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

To the extent Telebrands now construes the terms of Group A with synonyms or intends to use that evidence to explain the plain and ordinary meaning of the Disputed Terms, Telebrands' approach fails to resolve the ambiguities in Asserted Claims arising from the use of similar, overlapping Group A terms and does nothing to help the jury decide the case. Accordingly, the Court should accept Winston's proposed constructions of the terms in Group A.

**C.      Group B:**

> **"said inner and outer tubes unsecured between said first and second ends so that said outer tube is not held in frictional contact with said inner tube so that said outer tube can move freely along said inner tube"**
>
> **"said inner tube is unsecured to said outer tube between said first and second ends so that said outer tube can move freely over said inner tube"**
>
> **"said flexible inner tube unsecured to said flexible outer tube between said first and second ends so that said flexible outer tube can move freely over said flexible inner tube"**

This Court should adopt Winston's proposed constructions of the Group B terms. Winston's constructions provide clarity to the claims and are consistent with how the patentee used "unsecured", or the negative of "secured" which was discussed in the previous section.

Claim 1 of the '870 Patent recites:

> . . . a second coupler secured to said second end of said inner and said outer tubes, said inner and outer tubes unsecured between said first and second ends so that said outer tube is not held in frictional contact with said inner tube so that said outer tube can move freely along said inner tube . . . .

Claim 1 of the '278 Patent and claim 1 of the '915 Patent include virtually identical limitations. Notably, claim 1 uses both "secured" and "unsecured." Logically, "unsecured" should mean the negative of "secured." Therefore, Winston's proposed construction is "the inner and outer tubes are not affixed or attached firmly except at their first and second ends so that the outer tube can move freely along the inner tube between the couplers." This construction is consistent with the claims and the specification because the outer hose is consistently described as being

18

"unconnected, unattached, *unsecured*, or unbonded to the inner tube along the entire length of the hose between the first and second end." '870 Patent 7:10-15, 9:4-9, 12:7-9, 12:64-13:2, 13:10-22, Claim 1, Claim 16. This allows the outer tube to move "freely with respect to the inner tube 14 along the entire length of the hose between the couplers on the first end and the second end." *Id.* at 9:4-9. Conversely, as previously described, the first and second ends are secured to the first and second couplers of the hose. The first and second ends of the hose are never described as having free movement. Therefore, if "secured" means "affixed or attached firmly so it cannot be readily removed from," as proposed by Winston, it logically follows that "unsecured" means "not affixed or attached firmly." Winston's constructions allow that the outer hose can move freely as claimed and described in the specification. Under Winston's constructions, "unsecured" is construed in a logically consistent way with how the patentee uses "secured" throughout the specification and the claims.

For the reasons stated, this Court should adopt Winston's proposed constructions for the Group B terms.

### D.     Group C:

**"a first restrictor sleeve secured to said first end of said inner and said outer tubes" / "a first restrictor sleeve secured to said first end of said flexible inner tube and said flexible outer tube"**

**"a second restrictor sleeve secured to said second end of said inner and said outer tubes" / "a second restrictor sleeve secured to said second end of said flexible inner tube and said flexible outer tube"**

This Court should adopt Winston's proposed constructions of the Group C terms because they provide clarity to the claims and are consistent with how the patentee used "secured" with respect to the claimed first and second restrictor sleeves. "The principle that the same phrase in different claims of the same patent should have the same meaning is a strong one, overcome only if 'it is clear' that the same phrase has different meanings in different claims." *Varma v. Int'l Bus.*

19

*Machs. Corp.*, 816 F.3d 1352, 1363 (Fed. Cir. 2016). As such, the same arguments made for the construction of "secure" in Group A are equally applicable to the terms in Group C.

The specification and claims provide additional evidence that supports Winston's constructions. Claim 5 of the '870 Patent recites "The hose of claim 1 including a first restrictor sleeve secured to said first end of said inner and said outer tubes, and a second restrictor sleeve secured to said second end of said inner and said outer tubes . . . ." Claim 5 of the '278 Patent and Claim 4 of the '915 Patent include virtually identical limitations. The purpose of the first and second restrictor sleeves is clear from the context of the claims and the specification. The restrictor sleeve restricts the expansion of the inner and outer tubes at the point where the inner and outer tubes are secured to the first or second coupler. *See* '870 Patent 11:4-9.

The patentee uses "secure" in every instance where the patentee describes attaching the inner hose, the outer hose, and the restrictor sleeve to the first or second coupler. *Id.* at 8:44-50, 8:61-64, 10:60-67, 11:27-33, 12:49-52, 12:58-62, Claim 5, Claim 7, Claim 18. The specification provides "[w]ithout the sleeve 26, the inner tube would immediately expand outwardly in a step function and probably rupture." *Id.* 11:9-11. It further provides that depending on how these parts are secured together, "an expansion restrictor sleeve may not be *needed*." *Id.* at 11:17-19. In other words, according to the specification the restrictor sleeve is *needed* to prevent the inner tube from rupturing. A POSITA would understand that a device that is "needed" to prevent damage to the hose, which would otherwise make the hose inoperable, would not be readily removable to prevent inadvertent damage to the hose. Feland Decl. ¶ 97; Supp. Feland Decl. ¶¶ 3-4. Rather, this part would be "affixed or attached firmly to the hose so it cannot be readily removed" from the respective first or second coupler, as Winston proposes with its construction of Group C.

For similar reasons as described for Group A, Telebrands is incorrect for insisting that no construction is necessary for the Group C terms. These terms also depend on the distinction

between "secured to" and "coupled to." The specification only describes the connection of the restrictor sleeve as "secured" and further emphasizes that the restrictor sleeve is a necessary component. The plain and ordinary meaning that Telebrands suggests allows for a broader definition of the terms that is inconsistent with how the Group C terms are used in the claims and how the patentee implicitly defined them in the specification. This would make the claims more ambiguous and do nothing to assist the jury in deciding if the claims have been infringed.

The Court should adopt Winston's construction of Group C because Winston's construction provides clarity to the claims and is consistent with how the patentee used "secured" with respect to the claimed first and second restrictor sleeves.

**E.    Group D:**

**"a first securing device securing said first restrictor sleeve, said outer tube, and said inner tube to said first coupler" / "a first securing device securing said first restrictor sleeve, said flexible outer tube, and said flexible inner tube to said first coupler"**

**"a second securing device securing said another expansion restrictor sleeve, said outer tube, and said inner tube to said second coupler" / "a second securing device securing said second expansion restrictor sleeve, said flexible outer tube, and said flexible inner tube to said second coupler"**

This Court should adopt Winston's proposed constructions of the Group D terms. Winston's constructions provide clarity to the claims and are consistent with how the patentee used "secured" with respect to the claimed first and second securing devices. "The principle that the same phrase in different claims of the same patent should have the same meaning is a strong one, overcome only if 'it is clear' that the same phrase has different meanings in different claims.'" *Varma*, 816 F.3d at 1363. As such, the same arguments made for the construction of "secure" in Group A are equally applicable to Group D. Further, "securing device" should be interpreted under 35 U.S.C. § 112, paragraph 6, because it is a nonce term made up of a combination of functional language and a generic term and there is no corresponding definite structure in the claim.

21

Claim 7 of the '870 Patent recites "a first securing device securing said first restrictor sleeve, said outer tube, and said inner tube to said first coupler, and a second securing device securing said another expansion restrictor sleeve, said outer tube and said inner tube to said second coupler." Claim 7 of the '278 Patent and Claim 6 of the '915 Patent includes virtually identical limitations. As described in the claims, the first and second securing devices are how the inner tube, the outer tube, and the restrictor sleeve are secured to the first and second couplers. The securing devices are only described as securing these parts together. '870 Patent 10:65-67, 11:31-33. As described with respect to Group A, considering the patentee's consistent use of secure throughout the specification in this context, a POSITA would understand that the patentee did not intend this connection of parts to be readily removable. Therefore, this Court should construe the terms in Group D as follows:

> "a device encompassing and affixing or attaching firmly the first restrictor sleeve, the first end of the outer tube, and the first end of the inner tube to the first coupler so they cannot be readily removed" / "a device encompassing and affixing or attaching firmly the first restrictor sleeve, the first end of the outer tube, and the first end of the inner tube to the first coupler so they cannot be readily removed"

> "a device encompassing and affixing or attaching firmly the second restrictor sleeve, the second end of the outer tube, and the second end of the inner tube to the second coupler so they cannot be readily removed" / "a device encompassing and affixing or attaching firmly the second restrictor sleeve, the second end of the outer tube, and the second end of the inner tube to the second coupler so they cannot be readily removed."

Further, "securing device" should be construed under 35 U.S.C. § 112, paragraph 6. Section 112, paragraph 6 provides that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112, para. 6 (1994). The analysis under § 112, paragraph 6 is a two-step process. *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). The first step is to determine whether a claim limitation is drafted in means-plus-function

format, which requires [the court] to construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art. *Id.* While § 112, para. 6 is most commonly invoked with means-plus-function language, the mean-plus-function analysis can still be applied to claim terms lacking the word "means." When "means" is not used in the claim, there is a rebuttable presumption that § 112, para. 6 does not apply to construe the claim. *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000). However, "the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (quoting *Watts*, 232 F.3d at 880).

In claim 7 of the '870 Patent, claim 7 of the '278 Patent, and claim 6 of the '915 Patent, "securing device" is a nonce term made by the combination of functional language "securing" and a generic term "device." There is no definite corresponding structure in the claims or in the independent claims. "Generic terms such as "mechanism," "element," "*device*," and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word "means" because they "typically do not connote sufficiently definite structure" and therefore may invoke § 112, para. 6." *Williamson*, 792 F.3d at 1350 (emphasis added) (citations omitted); *see generally* M.P.E.P. § 2181). In the claims here, "device" is used in exactly this manner. "Securing device" has no special meaning to a POSITA. *See* Feland Decl. ¶¶ 108-112. The element can be rewritten as "a device for securing . . . ." As such, there is no definitive structure in the claim and means-plus-function analysis is appropriate.

Once the Court determines that the limitation is in means-plus-function format, it performs the second step of the § 112, para. 6 analysis which comprises, "determining what structure, if any, disclosed in the specification corresponds to the claimed function." *Dyfan*, 28 F.4th at 1365

23

(internal citations omitted). In other words, here "securing device" can only be construed to be structures that correspond to the claimed function that are described in the written specification. The written specifications of the Patents-in-Suit do not describe the structure of the securing device 34 or the securing device 40. Rather, the written specification simply restates the function of the securing device. *See* '870 Patent 10:65-67, 11:31-33. The only indication of any structure for the "securing devices" is found in Figures 7 and 8 of the Patents-in-Suit, which are reproduced below. The "first securing device" is shown as reference numeral 40 in Figure 8 below. The "second securing device" is shown as reference number 34 in Figure 7 below.



From these figures, one skilled in the art could only understand the claimed first securing device as a narrow, annular, or ring-shaped retaining ring that encompasses the outer sleeve 26, the outer tube 12, and the inner tube 14 as illustrated in Fig. 7. *See* Feland Decl. ¶ 119. Similarly, one skilled in the art could only understand the claimed second securing device to mean a narrow, annular, or ring-shaped retaining ring that encompasses the outer sleeve 27, the outer tube 12, and the inner tube 14 as illustrated in Fig 8. *See* Feland Decl. ¶ 119.

## V. CONCLUSION

For the above reasons, Defendant Winston Products respectfully requests that the Court adopt its proposed constructions for the Disputed Terms in the Asserted Claims of the Patents-in-Suit.

Respectfully submitted,

/s/ Nicholas Clifford
Nicholas Clifford (*pro hac vice*)
TUCKER ELLIS LLP
100 South Fourth Street – Suite 600
St. Louis, MO 63102-1822
Telephone:  314-256-2550
Facsimile:   314.256.2549
Nicholas.Clifford@tuckerellis.com

Jeffrey C. Sindelar Jr. (0084252)
TUCKER ELLIS LLP
950 Main Avenue – Suite 1100
Cleveland, OH 44113-7213
Telephone:  216.592.5000
Facsimile:   216.592.5009
Jeffrey.Sindelar@tuckerellis.com

*Attorneys for Defendant Winston Products LLC*

6413329

25