# Exhibit H

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TELEBRANDS CORPORATION, | ) | Case No. 1:23-cv-00631-BMB |
| | ) | |
| Plaintiff, | ) | Judge Bridget Meehan Brennan |
| | ) | |
| v. | ) | |
| | ) | |
| WINSTON PRODUCTS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**REBUTTAL EXPERT DECLARATION OF JOHN M. FELAND, III, PH.D**

1.      My name is John M. Feland, III, and I have been retained as an expert by Tucker Ellis LLP  on behalf of Defendant Winston Products LLC ("Winston") in the above-captioned lawsuit.

2.      I provide this declaration in response to the "Declaration of Dr. James L. Glancey Regarding Claim Construction of U.S. Patent Nos. 10,174,870; 10,890,278; and 11,608,915" (the "Glancey Declaration").  In this declaration I respond to Dr. Glancey's opinions about how one of ordinary skill in the art would interpret the following disputed claim terms and phrases from U.S. Patent Numbers 10,174,870 ("the '870 Patent"), 10,890,278 ("the '278 Patent"), and 11,608,915 ("the '915 Patent") (collectively, the "Patents-in-Suit") which I understand Plaintiff asserts against Defendant:

GROUP A:

**"secured"**

**"to couple"**

**"coupled to"**

GROUP B:

1

**"said inner and outer tubes unsecured between said first and second ends so that said outer tube is not held in frictional contact with said inner tube so that said outer tube can move freely along said inner tube"**

**"said inner tube is unsecured to said outer tube between said first and second ends so that said outer tube can move freely over said inner tube"**

**"said flexible inner tube unsecured to said flexible outer tube between said first and second ends so that said flexible outer tube can move freely over said flexible inner tube"**

GROUP C:

**"a first restrictor sleeve secured to said first end of said inner and said outer tubes"**

**"a first restrictor sleeve secured to said first end of said flexible inner tube and said flexible outer tube"**

**"a second restrictor sleeve secured to said second end of said inner and said outer tubes"**

**"a second restrictor sleeve secured to said second end of said flexible inner tube and said flexible outer tube"**

GROUP D:

**"a first securing device securing said first restrictor sleeve, said outer tube, and said inner tube to said first coupler"**

**"a first securing device securing said first restrictor sleeve, said flexible outer tube, and said flexible inner tube to said first coupler"**

**"a second securing device securing said another expansion restrictor sleeve, said outer tube, and said inner tube to said second coupler"**

**"a second securing device securing said second expansion restrictor sleeve, said flexible outer tube, and said flexible inner tube to said second coupler"**

(collectively, the "Disputed Claim Terms").

3. I understand that the parties reached agreement on construction of the following claim terms:

- "first coupler" means "a first connecting device/fitting"

2

- "second coupler" – "a second connecting device/fitting"

- "extend around an outer circumference of said hose" means "extend around the outside of the hose"

(collectively, the "Agreed Claim Terms").

4.　　In reaching my opinions expressed in this declaration, I have reviewed and considered the Glancey Declaration and the materials cited therein, as well as the Patents-in-Suit, their file histories and the dictionaries cited herein.

5.　　My opinions are independent and are based upon my professional knowledge and experience.

## I.　　BACKGROUND AND QUALIFICATIONS

6.　　As described more fully in my curriculum vitae attached as Appendix B, I received my Bachelors of Science in Mechanical Engineering from the Massachusetts Institute of Technology in 1994.　Thereafter, in 1996, I received my Masters of Science in Mechanical Engineering from Stanford University in Stanford, California. In 2005, I received my Ph.D. in Mechanical Engineering from Stanford University in Stanford, California.

7.　　I am currently a Principal Strategic at CableLabs, a non-profit think tank for the broadband industry.　I pursue a mixture of quantitative and qualitative research on consumer behaviors and preferences.　I also coach innovation teams and work extensive in Artificial Intelligence Strategy.

8.　　I also maintain Argus Insights Inc. While initially started to commercialize my PhD research connecting good design to good business, the company has pivoted in the last six years to be a market research and expert witness consulting firm.

9.　　I have been practicing as an engineer since 1991 across a range of industries and roles.　While working at Dart Container Corporation in Mason, Michigan, I was involved in testing

3

and evaluating a hydraulic press designed to aid in the recycling of polystyrene in quick serve restaurants.  I also worked on paper cup printers which also contained hydraulic subsystems.  These hydraulic systems required me to work with high pressure hydraulic hoses in the design, operation and evaluation of these systems.

10.     During my time working at Symyx Technologies, I was responsible for designing fluid condition sensors using MEMS technology for various applications.  These applications included measuring the oil condition within automotive engines, assessing the ratio of lubricant and coolant for large HVAC systems, and assessing oil condition within hydraulic systems. Part of my responsibility was the design of the sensor housing that could couple into fluidic systems for fluid condition assessment, including the design of threaded couplers similar to the Patents-in-Suit.

11.     As a design engineer at IDEO Product Development, I worked on the design and testing of multiple fluid management systems, including urinalysis equipment, fluid controllers for a blood testing device, and bioreactors for growing artificial skin for burn victims.

12.      While CEO of Argus Insights Inc. I created and utilized consumer analytics tools that ingested millions of consumer reviews across a broad swath of consumer products, including smart home devices.  Some these products were for controlling or sensing fluidic systems, such as smart sprinkler systems from companies like Rachio or smart water cutoff valves from companies such as Moen.  In the analysis of these products, I was able to develop an understanding how consumers interface with home fluidic systems, where they found challenges and where there were opportunities.

13.     I have also been a professor of mechanical engineering at the United States Air Force Academy and Stanford University.  I taught courses in mechanical design, solid mechanics,

design process, as well as capstone sequence. While at the Air Force Academy, I also was the advisor of the Formula SAE Mini Baja which included the design, testing and implementation of hydraulic braking systems.

14. As a high school teacher at the Nueva School, I taught an introduction to mechanical engineering course that covered topics in mechanical systems, solid mechanics, thermodynamics, and fluid mechanics. The section on fluid mechanics included the design and analysis of simple water transport systems.

15. Prior to my time as a practicing engineer, I worked extensively on the family farm in rural Arkansas. We had an almost one-acre garden, almost one hundred head of cattle, three horses, and two chicken houses in which we raised, from baby chicks, almost 30,000 chickens every six weeks for Tyson Foods. We routinely used garden hoses to irrigate the garden and fill water troughs for cattle and horses. Within the chicken houses, garden hoses are used throughout the lifecycle. When chicks are young, they cannot drink from the same watering system that is used by adolescent chickens. These smaller watering systems are attached to sources of water using garden hoses and temporarily dispersed through the chicken houses. These were used only for a few days during each batch of chickens and required that we couple and uncouple multiple lengths of garden hose. Additionally, the watering systems used by the adolescent chickens would be lowered from the ceiling. These watering troughs were connected to water sources by hoses as well. We would also use garden hoses to clean out the feeding and watering equipment used by baby chicks as well as other routine tasks around the chicken houses.

16. Since leaving the family farm, I have continued, with a few gaps based on living situations, to be involved in some sort of yard work or garden tending that required the use and maintenance of garden hoses. Additionally, I have developed skills within home plumbing,

5

including methods of securing both plastic and copper pipes for fluid transport.

17.     I also have experience as an inventor. I have been granted 5 U.S. and related foreign patents relating to the use of MEMS sensors to assess the viscosity and density of fluids used in various industrial contexts, including HVAC systems, hydraulic systems and automotive engines, as well as patents related to the design and use of capacitive sensors that are user interface elements in consumer electronics.

18.     My current professional affiliations include the MIT Alumni Group, the MIT Club of Northern California.  In the past, I have been affiliated with the MIT-Stanford Venture group as an Executive board member.  In the past, I was also active in the American Society of Mechanical Engineers, the American Society of Engineering Education and was a founding member of the International Design Society.  Additionally, I was also on the board of advisors of the Stanford Center for Critical Foresight.

19.     The following is a list of key awards and honors throughout my career.

- Red Dot Design Concept Award winner for the Onyx Mobile Phone Concept, world's first functioning multitouch mobile phone experience (2006)
- Guest Editor of Special Issue on Innovation for the International Journal of Engineering Education (2004)
- ASEE Apprentice Faculty Grant Winner (2003)
- ASME Curriculum Innovation Award, Honorable Mention (2002)
- Air Force Commendation Medal, First Oak Leaf Cluster (2001)
- Top Junior Faculty of USAFA School of Engineering (2001)
- Who's Who in the World and America
- Instructor of the Quarter, Department of Engineering Mechanics (2000)
- Joint Achievement Medal (1999)
- Air Force Commendation Medal (1999)
- Joint Analysis Center Most Valuable Contributor Award during week 5 of Operation Allied Force in Kosovo (1999)
- Merit Award, Lincoln Foundation Design Competition (1996)
- Professor of Aerospace Studies Award for Top Senior Air Force ROTC Cadet from MIT, Harvard, Tufts, & Wellesley (1994)

20.     My publications in the last ten years were mostly research reports and marketing

pieces for Argus Insights.  A full list of publicly available publications is available upon request.

21.     During the previous four years, I have testified as an expert by deposition or trial in the following matters:

- *Nine Stars Group USA Inc. v. Factory Direct Wholesale, LLC*, Case No. 2:18-cv-06471-PSG-PJW, (US District Court, Northern District, CA)
- *ANCORA TECHNOLOGIES, INC., v. LG ELECTRONICS INC. and LG ELECTRONICS U.S.A., INC.,* Civil Action No. 1:20-cv-00034-ADA (United States District Court For The Western District Of Texas Austin Division)

22.     I am being compensated at the rate of $500 an hour for my work on this matter, and $250 per hour for travel time.  It is my understanding that IMS Expert Services, through which I was engaged for this matter, receives an administrative and finder's fee but I am not aware of the amount.  My compensation has not influenced my view on any of these matters and does not depend in any way on the outcome in this case.

## II.     LEGAL PRINCIPLES

23.     I am not an attorney, but for purposes of this declaration I have been apprised by Defendant's counsel of certain legal principles that are relevant to my analysis and opinions.

24.     First, I understand that before a determination on infringement or validity of a patent can be made, the claims themselves must be construed by the Court in a process called claim construction. I understand that the purpose of claim construction is for the Court to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.

25.     I understand the claim construction analysis begins with the ordinary meaning of the disputed term or phrase, and that there is a presumption that claim terms carry their accustomed meaning to persons of ordinary skill in the art.  I have been informed that the ordinary meaning of a claim term is determined by reviewing a variety of sources that make the claim  construction

hierarchy.   In particular, one looks to the claims themselves, then the specification and the patent's prosecution history.  I understand these sources constitute the intrinsic evidence.

26.     I further understand that the intrinsic evidence is the single best guide to a claim term or phrase's meaning as it can clarify what meaning the patentee intended a term or phrase to have.  That being said, I understand that generally, limitations from the specification, such as certain embodiments, cannot be imported into the claims.

27.     I have been apprised that courts can look next to extrinsic evidence which includes dictionaries and treatises as well as expert testimony, such as my own.  Dictionary definitions may help establish the plain and ordinary meaning of claim terms, but reference should also be made to the intrinsic record to determine which dictionary definitions are most appropriate in light of the use of the terms or phrases by the inventor.  I also understand that extrinsic evidence is given less weight than the intrinsic record in construing claims.

28.     I understand that while interpreting patent claims, every word and every provision is to be given effect. In other words, terms and phrases within the same claim are presumed to have different meanings to avoid redundancy. Further, I understand that the meaning of every word and phrase is presumed to be consistent between the all of the patent claims. Finally, I understand that different claims are presumed to have different meanings and therefore cover alternative or more narrow embodiments of the claimed invention.

29.     I understand that a patent is required to include a written description using full, clear, concise, and exact terms consistently throughout the written description so that the invention is communicated to the interested public in a meaningful way. Further, the written description must enable a person of ordinary skill in the art (a "POSITA") to make or use the invention. In other words, the written description of the patent must include enough detail such that a POSITA is

sufficiently enabled to practice the invention without undue experimentation.

30. Finally, I understand that claim terms may need to be interpreted under 35 U.S.C. § 112(f) (or pre-AIA 35 U.S.C. § 112 sixth paragraph). This provision may be invoked when a claim limitation includes a means for performing a specified function without the recital of structure. Claim limitations are most commonly construed under § 112(f) when they specifically include means-plus-function language. Claim limitations can also be construed under this provision, however, if they include a generic placeholder that is coupled with functional language without reciting sufficient structure to perform the recited function and the generic placeholder is not preceded by a structural modifier. When a claim limitation is interpreted under 35 U.S.C. § 112(f) (or pre-AIA 35 U.S.C. § 112 sixth paragraph), the limitation can be construed to cover only the corresponding structure(s) that is described in the written description of the patent and equivalents thereof.

## III. LEVEL OF ORDINARY SKILL IN THE ART

31. I understand that my assessment of the Disputed Claim Terms must be conducted from the perspective of what would have been known or understood by a POSITA reading the patent on its relevant filing date and in light of its prosecution history. I understand the priority date for the Patents-in-Suit is November 4, 2011.

32. To determine the appropriate level of skill for a POSITA, I understand the following factors may be considered: (1) the types of problems encountered by those who work in the field and prior art solutions thereto; (2) the sophistication of the technology in question and the rapidity with which innovations occur in the field; and (3) the education level of the workers in the field as well as the inventor.

33. Dr. Glancey opines that a POSITA as of the priority of the Patents-in-Suit would,

9

in effect, be a relatively novice engineer, i.e., one who "would hold a Bachelor's Degree in Mechanical Engineering or a closely related technical field and would have at least two years of experience in the manufacture, design and/or the application and use of hoses for various types of fluids." (Glancey, Para 39).  He goes on to describe that this person would be "capable of performing various design tasks and would understand the basic mechanical and fluid features and operation of expandable and contractible hoses; this hypothetical person would also have at least a basic knowledge of fluid mechanics, solid mechanics, and materials science and engineering as they relate to hoses and how hoses generally function to convey fluids from one place to another." (Glancey, Para 39).

34.     Given the typical lifecycle involved in the design, manufacturing and sales of consumer products, Dr. Glancey's POSITA would likely have only a single product lifecycle of experience regarding this technology, lacking the benefit of learning from mistakes with prior product launches or having sufficient knowledge of how consumers are using this technology. Additionally, Dr. Glancey describes the necessary skills in broad, vague terms, taken from a generic mechanical engineering curriculum and then rapidly narrowing to the field of hoses without detailing the types of knowledge necessary for this technology.

35.     In my opinion, a POSITA would require more skills and knowledge than what is indicated by Dr. Glancey's proffered definition of a POSITA to be able to effectively practice the techology taught by the Patents-in-Suit. For example, the knowledge required to select the right material and thickness for the inner tube requires the POSITA to understand in depth the field of elastomeric polymers, specifically polymer compounds that meet the requirements taught in the patent to expand laterally by six times its original length while sustaining the flow of liquid at pressure.  Additionally, since this technology is designed to be reusable, a POSITA would have to

understand how to select a material that can be repeatedly elastically deformed without degrading to the point of failure. While Dr. Glancey's relatively recent mechanical engineering graduate might understand the theory behind solid mechanics that governs these necessary skills regarding the technology in the Patents-in-Suit, it is only with more experience beyond undergraduate and two years of experience, directly with elastomers that a POSITA would be sufficient skilled to reduce this technology to practice.

36. Dr. Glancey also neglects to detail the differences between the hose types disclosed in the Patents-in-Suit and his generic treatment of hoses. For example, the design and use of high pressure hydraulic hoses, used in such systems as earth moving equipment, farm machinery, and waste compactors in the retail and restaurant industries, require a very different set of engineering skills than for the hoses taught in these patents. The specification focuses on the transport of water in garden hoses or for fire hoses and suggest pressures around 60 psi from household sources of pressurized fluid. Industrial hydraulic systems require hoses that can transport fluids at thousands of psi, often 100 times greater than the example 35 psi at said second end cited in the specifications. These high-pressure hoses, while designed to be flexible along rotational degrees of freedom so that the fluid can be routed around the hydraulic system with minimal pressure loss, are designed to minimize lateral and longitudinal flexibility, given the high pressures and requirements to design for factors of safety of 4 to 1. If the hydraulic system is supposed to transport hydraulic fluid at 6000 psi, then the hose must be able to withstand pressures of up to 24,000 psi, which is 400 times higher than that of the household source of pressurized fluid cite in the specification. Dr. Glancey's POSITA, having only spent their two years working experience on hydraulic hoses (which are explicitly required to minimize expansion laterally and longitudinally), would not have the experience with the materials or manufacturing of what is

11

required for the technology disclosed in the Patents-in-Suit.  As such, Dr. Glancey's definition of a POSITA "would have at least two years of experience in the manufacture, design and/or the application and use of hoses for various types of fluids" is too broad for purposes of accurately characterizing a POSITA capable of reducing the technology disclosed in the Patents-in-Suit to practice.  (Glancey, Para 39).

37.     Aside from hydraulic hoses, Dr. Glancey's broad, imprecise descriptor of experience with "various types of fluids" in his definition of POSITA would appear to include gases such as those used in semiconductor manufacturing, or even compressed air hoses used in machine shops.  Handling gases is very different than handling liquids.  In the area of industrial gases used in semiconductor manufacturing, the hoses must be designed to be utilized in a clean room environment, where materials must be selected based on their ability not to shed excess particles which could contaminate the semiconductor manufacturing process.  Within the design of compressed air hoses for used in shop situations, similar to the design of hydraulic hoses, minimizing the lateral and longitudinal elastic deformation is critical to the operation of tools. Hoses used in these rugged environments such as machine shops prioritize wear and crush resistance over repeated expansion or contraction.  A person with only two years designing hoses for the transport of fluids in a gaseous state would not have sufficient skill to reduce this technology disclosed in the Patents-in-Suit to practice.

38.     Dr. Glancey paints broad strokes in his description of the manufacturing skills required, describing a POSITA needing to "have at least two years of experience in the manufacture, design and/or the application and use of hoses for various types of fluids".  (Glancey, Para 39).  As detailed above, for these Patents-in-Suit, a POSITA would have to understand the design, selection and manufacturing of elastomers.  Additionally, in order to couple to standard

sources of pressurized fluids, the "first coupler" and the "second coupler" described in the Patents-in-Suit would typically be made from metal in order to not only match the material they are coupling to but also hold up to the rigors of use.  Typically, these are made of brass but can also be made of multiple types of metals that are both able to sustain the design requirements and low cost enough to be manufactured in scale for consumer products.  The normal method of manufacturing these metal components is casting, which requires pouring metal in a liquid state into a mold, allowing it to cool, and then performing some post processing machining to ensure the interfaces, such as threads on the first coupler or the tube extension taught in both the first and second coupler, are within the design tolerances. As the couplers taught in these patents are likely custom manufactured, the POSITA reducing this to practice would require knowledge of metal casting and metal machining to properly select, design and manufacture the components required for this claimed hose.  Dr. Glancey makes no mention of these critical skills in his definition of a POSITA.

39.     Should the POSITA choose to use rigid polymers instead of metal for the design of the couplers, then the POSITA would need a depth of knowledge of polymer materials, manufacturing methods such as injection molding, and the types of additives necessary to ensure the rigid polymers perform to the level of the metals they are replacing.  Given the embodiments mentioned in the specification, namely use as a garden hose or fire hose, these are both outdoor use cases, the polymers selected would have to be UV stabilized as most polymers degrade with exposure to the sun.  Additionally, as plastics tend to have lower yield strengths than metal, many engineers would consider reinforcing the polymers with fiber glass or carbon fiber to boost the yield strength of the material.  Dr. Glancey cites none of this necessary knowledge of rigid polymers.  Furthermore, once the rigid polymer is selected, a POSITA would have to understand

how to design the injection mold to craft such a component as the "first coupler."  Threads can be added to casted metal parts by machining the part after it is casted.  To do so with rigid polymers after molding would be both cost prohibitive as fiber reinforce polymers are both difficult and dangerous to machine.  The best method of ensuring the required features, such as the female threads on the "first coupler" or the "male threads on the "second coupler," would be to design the mold so that these features are molded at the time of injection instead of post molding machining.  These features require complex mold design, requiring multiple pieces, intricate pulls, and rotating elements that unscrew from the finished component so that it can be ejected.  Dr. Glancey's broad requirement to understand manufacturing of hoses ignores the critical knowledge of rigid polymers and how to manufacture components with these polymers.

40.     The specification describes the assembly process by which the various components are put together. This assembly process details a complex set of steps in which the POSITA would need to design the manufacturing jigs necessary to complete the process as specified below and to do so in a manner that reduces the cost of assembly, potentially through automation.

- "During the assembly of the hose in the preferred embodiment a ten-foot elastic inner tube 14 in its relaxed or contracted condition is inserted into the hollow interior of a 50-foot non-elastic outer tube 12. The ten-foot inner tube 14 and the 50-foot outer tube 12 and the expansion restrictor sleeve 27 are then all attached and secured together on a coupler at the first end. The ten-foot inner tube is then stretched or expanded through the hollow interior of the outer tube 12 until the elastic inner tube 14 is expanded to 5 times its relaxed or contracted length. At this point in the assembly process the expanded elastic inner tube 14 and the non-elastic outer tube 12 are both clamped down and the inner tube 14 and the outer tube 12 are both 50 feet long. The inner tube 14, and the outer tube 12 and the expansion restrictor sleeve 27 are then attached and secured together to the coupler at the second end while the hose is still in the expanded condition. As previously stated, the elastic inner tube 14 and the non-elastic outer tube 12 are only attached and secured together at the first end and the second end. The inner tube 14 and the outer tube 12 are unattached, unbonded, unconnected and unsecured along the entire length of the hose between the first end and the second end so as to allow the inner and outer tubes to move relative

to each other between the couplers. This allows the non-elastic **outer tube 12** to move freely with respect to the **inner tube 14** along the entire length of the hose between the couplers on the first end and the second end." ('870 Patent [12, 46 – 13, 5]).

41.     The assembly process requires first that the "first coupler," an expansion restrictor sleeve, and the first end of both the inner tube and the outer tube to be affixed or attached firmly so they cannot be removed from each other.  This process likely requires a manufacturing jig to temporarily hold the components together while this securing process is taking place. Manufacturing jigs are devices used to temporarily fixture components together during manufacturing and assembly processes to both reduce the assembly time and to ensure the tolerance requirements are met, such as how much of the inner and outer tubes overlap with the tubular extension in the first coupler.  During the next step, where the inner tube is stretched to fifty feet before the second coupler can be attached, the inner tube must be coupled to another jig in such a way that when the second coupler, expansion restrictor sleeve, and the second end of both the inner tube and outer tube are affixed or attached firmly so they cannot be removed from each other.  The patents claim a single "securing device" that is used to secure the components of both the first end and the second end.  When the components of the first end are secured together, the inner tube is in an unstretched state according to the specification cited above, where the wall thickness of the tube is the greatest.  As the inner tube is elongated during the second step, the wall thickness decreases as it is stretched to fifty feet.  This creates additional requirements for the stretching tooling.  The mechanism by which the inner tube is stretched from 10 feet to 50 ft has to simultaneously ensure a portion of the inner tube at the second end remains unstretched so that the same "securing device" used to secure the components of the first end can be used to secure the components of the second end.  As the details of these manufacturing jigs and stretching tooling are not detailed anywhere in the patent, a POSITA would also need to be skilled, under Dr.

15

Glancey's broad view of being skilled in the "manufacture, design and/or the application and use of hoses for various types of fluids" (Glancey, Para 39), in the design, manufacture and use of the necessary manufacturing jigs and tooling.  However, Dr. Glancey's proposed definition is not specific enough to describe how a person with only two years of experience would have such skills.

42.     While the Patents-in-Suit do not identify the material used in expansion restrictor sleeve, it is likely made from polymers or metal, given the needs for mass production.  Similar to the design of the first and second coupler, an expansion restrictor sleeve made from polymers would likely be made by injection molding, using polymers that have been modified to be more UV resistant.  If an expansion restrictor sleeve is made from metal, there are multiple manufacturing methods that could be used to create the tapering shape described in the Patents.  A larger tubular piece of metal could have material removed from both the interior of the tube and the exterior of the tube to create the proper profile required.  This material removal could be accomplished on a lathe, manual or computer numerically controlled (CNC).  There is a specialized high speed manufacturing method called a screw machine, that consists of multiple material remove or material deformation stages, typically used in the manufacturing of screws, that could produce components meeting the profile requirements.  Another method would be the use of swaging, or plastically deforming a tube of metal to meet the desired taper profile.  Whether polymer or metal, these are specialized manufacturing methods not common nor required in mechanical engineering curriculums but are critical knowledge in reducing these patents to practice.  Dr. Glancey fails to address this skill gap in his definition of a POSITA.

43.     Claim 1 of the '870 Patent and claim 1 of the '278 Patent require the outer tube to be made of fabric.  A typical mechanical engineering curriculum does not include coursework on the design, manufacturer and or use of fabric.  Dr. Glancey neglects to mention this critical skillset

required by Claim 1 in his definition of a POSITA. Fabric is generally made by integrating fibers in one of four ways. Other means of manufacturing fabric may be used, but the following methods are the most used. First is weaving fibrous material orthogonal to each other, intertwining weft fibers between repeated lengths of warp fibers. Second is the creation of fabric by knotting a continuous strand of fiber, typically knitting or crocheting. Third is braiding multiple continuous strands in a pattern that resists unraveling, typically used for making rope or cordage. Finally, is felting, in which fibers, such as wool, are agitated together to encourage the fibers to fluff and intertwine in manner not easily reversed, forming a mat of fabric. These methods can be used with natural fibers, polymers or even metals. The material selection has a significant impact on which fabric manufacturing method is used and how the resulting fabric performs in the application taught in these patents. Dr. Glancey's POSITA would be unable to reduce even the first claim to practice because his definition lacks the critical knowledge of fabric.

44. In light of the broad and vague description of Dr. Glancey's POSITA, I propose that a POSITA in connection with the Patents-in-Suit would hold a Bachelor's Degree in Mechanical Engineering or a closely related technical field and would have at least four years of experience in the manufacture, design and/or the application and use of hoses for various types of liquids. This hypothetical person would be capable of performing various design tasks and would understand the basic mechanical and fluid features and operation of expandable and contractible hoses; this hypothetical person would also have at least a basic knowledge of fluid mechanics, solid mechanics, and materials science and engineering as they relate to hoses and how hoses generally function to convey fluids from one place to another. This hypothetical person would also have an understanding of how to design components of both rigid and elastomeric polymers, including the requirements to design for injection molding of rigid polymers, and selection of

17

elastomers and the design of components utilizing those elastomers. This hypothetical person also requires an understanding of cast metal manufacturing along with post process machining of metal components made with this process. Additionally, this hypothetical person would have to understand how to specify and source fabrics for the manufacturing of the outer hose, made by weaving, knitting, or braiding. Finally, this hypothetical individual would need to understand how to design, manufacture and utilize manufacturing jigs required to secure the components together for scale manufacturing of the hoses.

45.     I was at least a POSITA as of the priority date of the Patents-in-Suit (i.e., 2011).

46.     My opinions concerning the claim terms of the Patents-in-Suit are from the perspective of a POSITA, as set forth above, at the time of the invention.

## IV.    THE PATENTS-IN-SUIT

47.     Each of the Patents-in-Suit professes to teach a POSITA how to create an expanding hose and a method of creating and using an expanding hose. The first independent claim in all three patents details a hose, constructed by securing an "inner tube" and an "outer tube" to a "coupler." The "inner tube" is elastic such that it stretches when filled with pressurized fluid, up to six times its original length.

48.     The "inner tube" is analogous to the balloons used to create balloon animals. As they are filled with a pressurized fluid, in this case air from the lungs of the balloon artist, these balloons can expand laterally (in diameter) and longitudinally (in length). The balloon artist has to be careful not to over pressurize the balloons with pressurized fluid as the wall may burst from being too thin or the securing knot at the end of the balloon could be destroyed by the pressure. When balloons, like the "inner tube" of this hose, are pressurized and are free to expand laterally and longitudinally, the wall thickness reduces along the length of the pressurized elastic tube. This

thinning of the tube's wall is not always uniform based on variation and defects within the manufacturing of elastic tubes.

49.　　The primary claim contains two elements purported to keep the elastic "inner tube" from bursting under high pressure—an outer tube and restrictor sleeves. The first claim details a requirement for an "outer tube" that is "secured to" a "first coupler" and a "second coupler" or fittings at both ends of the hose and that slides or moves freely over the "inner tube."  This "outer tube" acts as a limitation on the expansion of the "inner tube," both laterally and longitudinally. As the "inner tube" becomes filled with pressurized fluid, it eventually expands until it contacts the "outer tube's" inner diameter.  In other words, the "inner tube" expands to the limits of the "outer tube's" inner diameter and beyond, depending on the material of the "outer tube."  The Patents-in-Suit teach that the "outer tube" is fabric, which depending on the construction, can stretch laterally and longitudinally.  For the hose to function properly, the flexible nature of the fabric "outer tube" would need to be such that the expansion and elongation of the "inner tube" would be limited by the outer tube so that the wall thickness of the pressurized inner tube would be well below the yield or failure point of the material.  The "outer tube," when assembled according to the claim, prevents the "inner tube" from bursting when under pressure during normal use.

50.　　Oddly, all three patents use phrases such as "said inner and outer tubes unsecured between said first and second ends so that said outer tube is not held in frictional contact with said inner tube so that said outer tube can move freely along said inner tube" '870 Claim 1, or "said inner tube is unsecured to said outer tube between said first and second ends so that said outer tube outer tube can move freely over said inner tube" '278 Claim 1, and finally "said flexible inner tube unsecured to said flexible outer tube between said first and second ends so that said flexible outer

tube can move freely over said flexible inner tube." '915 Claim 1. A POSITA would understand all of these phrases to mean the same thing—that the outer tube that is not held in frictional contact (can move freely) on top of the inner tube.  Yet for the strain relief benefits of the outer tube to be realized when the inner tube is filled with pressurized fluid, then the outer tube is in frictional contact with the inner tube and prevents the outer tube from moving freely over the elastic inner tube.

51.    The Patents-in-Suit also teach that the first end has to be "coupled to" a source of pressurized fluid to be filled with pressurized fluid.  In the main embodiment represented in the Patents-in-Suit, this "first coupler" is a threaded fitting (Figs 1, 3, 8) that couples to the source of pressurized fluid.  If the coupler is not removably connected to the source of pressurized fluid, then the hose would be attached firmly so it cannot be removed to the source of pressurized fluid. Otherwise, if the couplers were removably connected to the inner and outer tubes, this would reduce the utility of the hose.  This "first coupler" is attached firmly so it cannot be removed from the "inner tube" and the "outer tube."  Unlike the description of the coupling of the "first coupler" to the pressurized fluid source being threaded, there is no mention as to how the "first coupler" is "secured" to the inner and outer tubes, other than by a "securing device" (a nonce term).  This is important to the claimed hose because methods known to a POSITA for securing a coupler and two tubes, such as clamping or swaging, rely on the materials being secured to be of a uniform thickness.  As we established above, the "inner tube" is elastic and as it is pressurized, the tube wall thickness decreases as the pressure increases. This is a dynamic situation that requires either a known securing method or a novel securing device at the first and second ends that teaches the means to maintain a secure connection that is robust and able to adapt to changes in wall thickness. Additionally, if this connection between the "first coupler," the "inner tube" and the "outer tube"

was merely "coupled," that is to say, removably connected like the "first coupler" is to the source of pressurized fluid, it would be difficult for an ordinary hose user to consistently and repeatedly couple these three different components, while preserving the ability of the hose to perform as taught because of the dynamic character of the wall thickness of the "inner tube" through successive expansion and contraction cycles.

52.     The second end of the claimed hose also has a "coupler."  The first claim also teaches that there is a "flow restrictor" "coupled" with the "second coupler."  Because words used in claims need to maintain the same meaning throughout the claims, this suggests that the "flow restrictor" is removably connected to the "second coupler."

53.     The "flow restrictor" is critical to the operation of the hose as taught.  Without the "flow restrictor," the inner tube may not be sufficiently pressurized to elongate and/or expand during use.   If there is no "flow restrictor" such as a nozzle at the second end of the hose, opposite of the first end where the "first coupler" is removably connected to the source of pressurized liquid, the Bernoulli Principle suggests that there would be insufficient pressure drop across the hose for the hose to elongate.  While there is a pressure drop along the length of the hose due to head loss, effectively friction between the fluid and the hose itself, this pressure drop does not exert itself on the walls of the "inner tube."  Returning to our balloon analogy above, if the balloon had a hole at one end, it would not inflate.  The balloon inflates because the internal pressure is greater than atmospheric pressure, creating a force that pushes on the internal surface of the balloon, hence the units for pressure, pounds per square inch or in the metric system, Newtons per square meter.  The elastic nature of the skin of the balloon resists this force, causing the balloon to expand or elongate laterally and longitudinally.  A balloon stops expanding when the combination of atmospheric pressure pushing back on the external surface of balloon and the contracting force of the elastic

material of the balloon balance the internal pressure of the balloon.  If there was then a sudden opening of the balloon, all of the captured air under pressure would rapidly escape, finding its equilibrium with the atmosphere, resulting in either the deflation or contraction of the balloon or the yield or popping of the balloon material.

54.     This claimed hose, during normal use, is like a balloon with openings at both ends. When coupled to the source of pressurized fluid, the "flow restrictor" has to drop the pressure so that the difference between the input pressure from the source and the output pressure at the second end is sufficient to inflate the inner tube.  Some balloons are harder to inflate than others, because they have thicker walls, or are made of different materials with varying elastic materials.  The "inner tube" of this claimed hose is constrained by the same challenge, where the choice of material, the contracted wall thickness, and its modulus of elasticity are critical to successfully reducing this to practice.  Select a material that has extensive hysteresis after being inflated and deflated multiple times and the hose will fail to contract to its original length.  Pick a wall thickness that is too thick, and the source pressure will be insufficient to elongate the hose.   Should the wall prove to be too thin, then the "inner tube" may burst before reaching the diameter of the "outer tube."  Select a material with a modulus of elasticity that is too large and the hose may not elongate enough for the stated purpose of the claimed hose.

55.     Additionally, the design of the "flow restrictor" is critical.  The example given in the specification of coupling the hose to a household pressure at 60 psi, with an assumed flow rate of 2.2 gallons per min, and expanded inner tube inner diameter of 0.609 in, would result in a flow velocity of 2.4 ft per sec.  The description of a coupled nozzle suggests that device reduces the outlet pressure to 35 psi.  Using Bernoulli's equations, assuming the flow rate is maintained at 2.2 gallons per min, and the outlet pressure is 35 psi, then the flow restrictor diameter would have to

drop to 0.121 in, with a resulting flow velocity of 61.1 ft per sec, almost 25 times faster.

56.     The specification suggests that the "flow restrictor" detailed in the figures is separate from "Other types of flow restrictors, such as hose nozzles, sprayers, etc. can also be employed. Anything that controls the release of the liquid exiting the hose can be employed." ('870 [11, 1-3]).  Nowhere does it teach how the flow restrictor specified differs from a nozzle or what is the target pressure drop generated by that nozzle.  Nor does it detail the impacts of narrow flow restrictors on the performance of other attachments to the male end of the hose, such as nozzles or sprayers.

57.     Additionally, the language of the method claim on all three patents teach that the "first coupler" is "secured to" the first end of the inner and outer tubes.  Similarly, the "second coupler" is "secured to" the second end of the inner and outer tubes.  It goes on to teach that the inner and outer tubes are "secured" to "each other" at the first and second ends, and "unsecured" between the first and second ends.  This contrasts with the terms used to describe how the first end is coupled to the source of pressurized fluid; "connecting said first coupler to the source of pressurized fluid;" ('870 Patent Claim 16, '278 Patent Claim 15, '915 Patent Claim 14). It is interesting that for the language used in both independent claims is consistent with "securing" while the language of how the first coupler is connect to the source of pressurized fluid uses synonyms, "coupling" and "connecting."

## V.     RESPONSE TO GLANCEY OPINIONS CONCERNING CLAIM CONSTRUCTION

58.     Dr. Glancey believes that the claim terms under consideration do not require a construction because, to his mind, their usage in the patent is "unambiguous and would have all been easily understood by a POSITA at the time of the invention."  (Glancey, para 43).

59.     I disagree with this statement.  Dr. Glancey fails to explain what the ordinary

meaning of the Disputed Terms is, as understood by a POSITA, taking into consideration the claims, specification, and prosecution history of the Patents-in-Suit.  He would have this Court abdicate its role in construing the claims so that every claim term and phrase is used consistently and avoids redundancy.

60.     In my analysis below, I demonstrate how the Patents-in-Suit use the Disputed Terms in very specific ways that are not consistent with Dr. Glancey's claim that the Disputed Terms do not require construction.

61.     As discussed more fully below, because of the overlapping nature of terms like "secured" and "couple" if the Court were not to construe them, as suggested by Dr. Glancey, this would lead to an inherent ambiguity regarding their meaning and scope in the Patents-in-Suit, even to a POSITA at the time of invention.

62.     Furthermore, I illustrate how Dr. Glancey's own analysis generates ambiguity on these terms that are critical in understanding how to reduce this claimed hose to practice. (Glancey, para 43).

63.     The GROUP A terms are "secured to," "to couple," and "coupled to."  The definitions of these terms are critical to understanding what is being taught by the claims.  As the words used in claims are meant to have distinct and important meanings to help those seeking to reduce the claimed hose to practice, these terms cannot have the overlapping meaning suggested by the words' plain and ordinary meaning, as proposed by Dr. Glancey.  The following analysis details the distinct meaning of these words as taught by their use and context in the claims themselves, as well as what is taught in the specification.

64.     Contrary to what Dr. Glancey argues, the inventor uses the terms "to couple" and "coupled to" throughout the entire patent to represent interfaces where the components of the

interface removably connect to each other.  The inventor describes in the specification the coupling of the claimed hose to sources of pressurized fluid, the coupling of one hose to another, even the coupling of a nozzle to the second end of the hose.  In each of these uses of "to couple" or "coupled to", they represent a removable connection.  Without these connections being easily removed and replaced by the user, the utility of the claimed hose is defeated.  As will be detailed below, the Patents-in-Suit teach that "to couple" and "coupled to" is used only for removable connections.

a) "It is still further objective of the present invention to provide a hose that can be readily coupled and uncoupled to a source of water such as a faucet on a house." ('870 [34-36]).

   i. The use of "coupled" and "uncoupled" suggests a temporary and reversible connection to the water source, as is common and obvious with garden hoses.  A hose "secured to" (i.e., affixed or attached firmly so it cannot be removed from) the faucet would have limited utility to the user in comparison to a hose that couples and uncouples from the home.

b) "The threaded portion **28** is constructed to receive the male threads **20** and enable coupling of one hose to another" ('870 [8, 52-54]).

   i. The coupling of garden hoses is such that it allows two hoses to be removably connected to each other, as enabled by the threaded portions on the male and female couplers.

c) "Most conventional garden hoses or other hoses are provided with a standard size female coupler or fitting which will engage and couple the hose **10** to the faucet or water outlet" ('870 [8, 58-61]).

   i. As mentioned above, the assumed standard hose configuration is of a standard female coupler that removably connects the hose to the faucet or water outlet.

d) "said first coupler constructed to couple said hose to a source of pressurized liquid;"

25

('870 [15, 12-13]).

    i.    Even within the language of Claim 1, the term couple is used to describe removably connecting the hose to a source of pressurized liquid.

e)  "a flow restrictor coupled to said second coupler" ('870 [15, 21]).

    i.    Similarly, Claim 1 teaches that a flow restrictor, described as a nozzle or other restrictor earlier in the patent, is coupled to, i.e., removably connected to, a second coupler.

65.    Throughout the Patents-in-Suit, the terms "to couple" and "coupled to" are used exclusively to describe connections between interfaces that are removably connected.  I disagree with Glancey's assertion that defining "couple" as "removably connected" unnecessarily limits on the inventor's language choice. To the contrary, Glancey's misleading reference to the Webster's definition of the noun "coupling" ("1. n. a joining together") (Glancey, para 47-48, citing Webster's New World Dictionary and Thesaurus) ignores the fact that "coupling" is not used in the claims of the Patents-in-Suit at all and further ignores the extensive use of "to couple" and "coupled to" in the claims of the Patents-in-Suit as a verb.

66.    It is the action of removably connecting the interfaces of the hose, to and from a faucet, to and from another hose, that Glancey fails to address in his arguments.  Without the specific context and meaning taught by the Patents-in-Suit (i.e., that "to couple" means to removably connect), the claimed hose would be limited in its utility, potentially including permanent attachment to a faucet or other hose.  The very utility of the hose of Claim 1 and the method of fluid transport taught in Claim 16 rely on "to couple" and "coupled to" meaning "removably connected."

67.    Similarly, there are numerous dictionary definitions from 2011 or before that are

consistent with construing "to couple" and "coupled to" as meaning "removably connected."  The Color Oxford English Dictionary, 2011 (attached as Exhibit 1) defines the verb definition of couple to be "To connect or combine".  An earlier edition of the Concise Oxford English Dictionary, 2008, (attached as Exhibit 2) defines the state of being coupled to or with as "connect (a railway vehicle or piece of equipment) to another."  An even earlier edition of the Oxford English Dictionary, Second Edition Volume III (1989) (attached as Exhibit 3) defines the verb use of couple with respect to mechanical systems as "to connect (railway carriages) by a coupling."  These definitions are consistent with the proposed definition that "to couple" to be "to removably connect" and "couple to" to mean "removably connected to".  In the Oxford definitions "couple" as a verb is routinely defined as being "connect."  Oxford English (1989) and Oxford Concise (2008) go on to use an example of a removable connection to define couple as a verb, how one railway car can "couple to" or be "removably connected to" another car.  Can you imagine the railway industry if rail cars could not be "removably connected to" each other? Rail freight would cease to function as designed as cars would be limited to connect to the trains they are already connected to, requiring freight to be moved between cars rather than uncoupling and recoupling cars between trains.  This does not, as Dr. Glancey opines, limit the scope but instead allows a POSITA to distinguish in the claim language the use of "to couple" or "coupled to" from the use of "secured to."  To a POSITA, items using "couple" as its root term, are items designed to removable connected to other items.

68.     Dr. Glancey's reference to extrinsic evidence of definitions for "secure" seem to be bent on obfuscating the distinction between "to couple" and "secure" and would create further ambiguity. This would call into question the choice of the terms within the claims, suggesting that the inventor mistakenly did not draft the claims with sufficient clarity to teach the claimed hose.

Dr. Glancey refers to how Webster's New World Dictionary and Thesaurus "defines the word 'secure' to mean 'to fasten' or 'tighten." (Glancey, para 48). Dr. Glancey's incomplete statement mischaracterizes the actual definition and synonyms provided this Webster's reference, which actually states as follows.  First, Webster's dictionary definition of "secure" is:

> **se·cure** (si kyoor′) *adj.* [< L *se*-, free from + *cura*, care] **1** free from fear, care, etc. **2** free from danger, risk, etc.; **safe 3** firm, stable, etc. *[make the knot secure]* —*vt.* -**cured′**, -**cur'ing 1** to make secure; protect **2** to make certain, as with a pledge **3** to make firm, fast, etc. **4** to obtain or bring about —**se·cure'ly** *adv.*

Ex. B to Glancey Decl.

Second, Webster's thesaurus description is:

> **secure** *v.* **1** [To fasten] settle, lock, bind; see FASTEN, TIGHTEN 1. **2** [To obtain] achieve, acquire, grasp; see GET 1.

*Id.*

69.     Dr. Glancey omits any discussion of the most applicable Webster definition of "secure", which is "to make firm, fast, etc." and the most applicable synonyms of "secure" from the Webster's thesaurus, which are "[to fasten] settle, lock, bind".

70.     The claims in all three asserted patents mention in claim one that "said inner and outer tubes unsecured between said first and second ends."  This differs extensively from the use of "couple" elsewhere in the claims.  Here, the inventor uses the term "unsecured" to describe a situation where the inner tube and outer tube are not affixed or firmly attached to each other between the first and second ends.  The claims go on to describe this "unsecured" state as "said outer tube is not held in frictional contact with said inner tube so that said outer tube can move freely along said inner tube." ('870 Claim 1), "said outer tube outer tube can move freely over said inner tube" ('278 Claim 1) and "said flexible outer tube can move freely over said flexible inner

tube" ('915 Claim 1). This aligns with the proposed definition in terms of NOT "being affixed or attached firmly."

71.     With respect to the term "secured to," the Patents-in-Suit carefully separate the concepts of securing components together from the notion of removably connecting components or coupling these components.  The following examples from the '870 Patent show how it teaches that secured components are not meant to be removed from each other.

i)      "FIGS. **7** and **8** illustrate how male and female couplers **16** and **18** respectively are secured to the hose of a preferred embodiment of the present invention." ('870 [10, 57-59]).

    i.  If the male and female couplers were removably connected to the hose, the patent fails to teach how that would be accomplished, given the male coupler **16** is an assembly that includes a threaded portion **20**, a mid portion **22**, tubular extension **32**, and a portion **24** onto which are *secured* the inner tube **14**, the outer tube **12**, and the expansion restrictor sleeve **26**.  The only description of how the inner tube, outer tube and expansion restrictor sleeve are secured is a securing device **40** on the on the male coupler.  Other than the securing device, methods such as "clamping or swaging" could be used to secure the couplers to the inner tube, outer tube and expansion restrictor sleeve. ('870 [11, 13-16]). A POSITA would know that these methods would require some portion of the coupler or securing device to be deformed irreversibly.  Moreover, the Patents-in-Suit do not teach where that deformation takes place and how it is used to secure the inner tube, outer tube, and expansion restrictor sleeve to the coupler.

ii)  Within the prosecution history of the '870 Patent, the examiner takes issue with the lack of definition of how the couplers are secured to the inner tube, outer

29

tube, and expansion restrictor sleeve.  He cites McDonald, et al as an example

that the use of a securing device is obvious at the time of invention.

    a. "In regard to the limitation recited in claims 7 and 12, the restrictor sleeves are crimped onto the ends and therefore do not require additional securing means. It would have been obvious to one of ordinary skill in the art at the time the invention was made to substitute for crimping, a securing device that extends around the outer circumference of the hose wherein it is known in the art that a securing ring is an alternative means of securing a restrictor sleeve onto ends of flexible hoses." – Office Action, dated 9 Feb 2018, para 5, pg 8 (attached hereto as Exhibit 4).

   iii) Crimping, like swaging, requires plastic deformation of the components being secured.  As well understood by a POSITA, crimping is not a removable connection, as repeated deformation is likely to result in the failure of the connection, especially when the connection is under pressure as in the hose.

72.     Accordingly, the claims are clear that the inner and outer tubes must be "secured to" the first end and the second end of the hose.  As taught above, this connection is secured when the coupler is secured to all three components, the inner tube, the outer tube and the expansion restrictor sleeve.

    a. "The outer tube is secured to the inner tube only at the first end of the inner and outer tubes and at the second end of the inner and outer tubes." ('870 [Abstract, 11]).

    b. "The hose includes an expandable inner tube made from an elastic material and a separate, distinct outer tube made from an non-elastic material, positioned around the outer circumference and length of the inner tube and *secured* to the inner tube only at the first and second end." '870 [7, 5-9]

73.     If these connections were removably connected, the patent does not teach how to accomplish this feat with such a complicated assembly of rigid materials and elastic materials that change thickness during use.  The patent mentions "clamping and swaging" as methods "to secure

the male coupler to the inner tube 14, the outer tube 12, and the sleeve 26." ('870 [11, 14-16]).  A POSITA would readily understand that such methods are not removable connections.

74.     For example, swaging requires the components being swaged to deform plastically, not elastically, in order to maintain a seal during use.  The most common use of swaging is with copper pipe for household plumbing.  The soft copper plastically deforms, create a larger diameter outer pipe for the inner pipe to be joined to.  These swage joints require soldering to seal the joint against the pressure of the liquid inside.  This results in a secure joint where the two pipes are "affixed" and "cannot be removed."

75.     Hose clamps are another common method of connecting hoses for fluid transport. Most common are the type where a screw head is connected to a worm gear that then tightens or loosens a band of stainless steel around the pipes and/or hoses being secured.  Hose clamps of this variety are meant to be permanent attachments and require specific tools to loosen the clamp.  They are not designed for repeated coupling and uncoupling of components but for initial securing of components intended only to be separated when extensive repair is required. These clamps tighten around the outside of the two hoses and/or pipes being connected.  Because the clamping force is determined by the interior diameter of the clamp once it is in place, if the wall thickness of an elastic hose being clamped changes substantially, then there is a significant chance the joint will fail.

76.     This invention requires the inner tube to elastically deform as it becomes filled with water (i.e., pressurized fluid).  This deformation manifests as an expansion both laterally and longitudinally that results in a substantial thinning of the wall of the elastic inner tube.  In the example embodiment detailed in the specification, the unpressurized wall thickness of the elastic inner tube is 0.125 inches. ('870 Patent [14, 2]).  The specification also provides a sample wall

thickness in the expanded state of 0.031 inches. ('870 Patent [13, 54-55]).  At full expansion, the wall thickness of the elastic inner tube is less than 25% of the original unpressurized wall thickness. Using a traditional stainless steel hose clamp, there is a risk that over clamping is likely to cut into the inner tube at the interface of the clamped and unclamped sections of the inner elastic tube, resulting in a failure of the joint.  If the hose clamp is undertightened, then the elastic inner hose, when stretched to less than 25% of the original wall thickness, is likely to be pulled out of the clamp, resulting in the unsecuring of the inner tube, the outer tube, and the coupler associated with that end of the hose.   As can be seen from these examples of swaging and clamping, it is imperative that this ambiguity needs to be resolved by defining "secured" as "affixed or attached firmly so it cannot be removed."

    a.    "The outer tube is unattached, unconnected, unbonded, and unsecured to the inner tube along the entire length of the inner tube, between the first end and the second end, so that the outer tube can move freely with respect to the inner tube along the entire length of the inner tube between the first end and the second end." ('870 [7, 10-16]).

    b.    As we have already shown that "to couple" means "to removably connect", the use of unconnected could also be read as "uncoupled."  Using "unsecured" in the same sentence provide additional support that the inventor recognizes that "secure" and "couple" mean something different.

    c.    Figures 7 and 8, which depict the connection between the tubes and the couplers, are described as follows:

        i.    "FIG. 7 is a perspective view of a male coupler secured to an end of the hose of the present invention when the hose is in its extended condition; and FIG. 8 is a perspective view of a female coupler secured to an end of the hose of the present invention when the hose is in its contracted condition."  ('870 [7, 62-67]).

        ii.    "FIGS. **7** and **8** illustrate how male and female couplers **16** and **18** respectively are secured to the hose of a preferred embodiment of the present invention."

('870 [10, 57-59]).

FIG. 7



d.  As can be seen in FIG. 7, the only component that supports removable connections

are the threads **20** on the male coupler.  We are taught that this is to "enable coupling

of one hose to another." ('870 Patent [8, 54]).  The element assigned the role of

securing the tubular extension of the male coupler to the end of the inner and outer

tubes is a securing device **34:**  "a securing device encompasses the outer sleeve **26**,

the outer tube **12**, and the inner tube **14** and secures these elements to the tubular

extension **34**." ('870 Patent [10, 65-67]).  There are no features visible on the

securing device **34** that would suggest how it secures the male coupler to the tubes.

FIG. 8



e.  Similarly, in FIG. 8, the female coupler has visible threads **28** "constructed to

couple to a faucet or water outlet on the exterior or interior of a house or residence."

('870 Patent [8, 55-57]). It goes on to teach that "Most water faucets on homes or residences are provided with a standard size male coupler or fitting.  Most conventional garden hoses or other hoses are provided with a standard size female coupler or fitting that will engage and couple the hose **10** to the faucet or water outlet." ('870 Patent [8, 55-57]).  The threads **28** confirm that this is a removable connection.

f.   Like the male coupler, the tubular extension of the female coupler is secured to the inner and outer tubes with a securing device **40** that "encompasses the outer sleeve **27**, the outer tube **12**, and the inner tube **14** and secures these elements to the tubular extension **36**." ('870 Patent [10, 65-67]).  There are no features visible on the securing device **40** that would suggest how it secures the female coupler to the hose.

g.   In both FIGS. 7 and 8, there is a securing device that secures the male coupler and female coupler, respectively to their respective ends of the hose.  To function as designed, the securing device must "affix or attach firmly" the couplers to the hose so they "cannot be removed" from the hose.

77.   Similarly, there are numerous dictionary definitions from 2011 or before that are consistent with construing "secured to" as "affixed or attached firmly so it cannot be removed from".  Returning to the Color Oxford Dictionary, 2011 (Exhibit 1), the verb form of "secure" is defined as "to firmly fix or fasten" and its adjective form extends to be defined as "fixed or fastened so as to not give way, become loose."  Concise Oxford English Dictionary, 2008 (Exhibit 2) uses the same adjective definition as "Fixed or fastened so as to not give way, become loose, or be lost."  The verb form is defined using the adjective form as "to fix or fasten securely."  In the Oxford English Dictionary, Second Edition Volume III,1989 (Exhibit 3), the adjective form "secured" is

34

defined as "tied, joined, linked, or associated together in pairs" and/or "In senses of the verb: assured; firmly fastened; rendered safe." The verb form, "secure" echoes the definition in other sources as "to make fast or firm."

78. Each of these definitions aligns with the usage of "secured" within the claims to "affixed or attached firmly so it cannot be removed." This is true when the first coupler, the first ends of the inner tube and outer tube are secured together. These components are attached firmly to each other so they cannot be removed from each other.

79. Unlike the ambiguity created by Dr. Glancey's approach, Winston's proposed definition is also consistent when the "securing device" is described as the means to ensure these components, once attached firmly to each other, they cannot be removed. Even the antonym use of "unsecured" within the claims describing the state that in the unpressurized state, the outer tube is not "secured" to the inner tube. It is not "affixed" to the inner tube, nor is it "attached firmly."

80. According, Dr. Glancey's assertion that "secured to" does not need to be construed is misplaced. The proper construction, consistent with the claims, the specification, the prosecution history, and the extrinsic evidence is "affixed or attached firmly so it cannot be removed from".

81. In summary, the proper construction of the Group A terms is as follows:

• "**secured to**" – "affixed or attached firmly so it cannot be removed from";

• "**to couple**" – "to removably connect"; and

• "**couple to**" – "removably connected to".

GROUP B:

**"said inner and outer tubes unsecured between said first and second ends so that said outer tube is not held in frictional contact with said inner tube so that said outer tube can move freely along said inner tube"**

35

**"said inner tube is unsecured to said outer tube between said first and second ends so that said outer tube can move freely over said inner tube"**

**"said flexible inner tube unsecured to said flexible outer tube between said first and second ends so that said flexible outer tube can move freely over said flexible inner tube"**

82.     Dr. Glancey erroneously suggests that these phrases do not require construction and that each phrase is defined by the language of the claim itself.  The language in Claim 1 in all three Patents-in-suit make explicit use of "couple" and "secure" in different context.  In the context of these phrases, the inventor uses the antonym of secure, "unsecured" to describe the relationship between the inner tube and outer tube between the first and second ends.  This aligns with the proposed construction of "secure" as "affixed or attached firmly so it cannot be removed."  This section of claims is teaching that prior to the "introduction of a flow of pressurized liquid through said first coupler into said inner tube" ('870 Patent [15, 22-23]) the outer tube, which is longer at this pre-pressurized state than the inner tube, is able to slide freely along the inner tube.  This is possible because:

> "the 50-foot non-elastic outer tube **12** has many folds that are compressed and gathered around the 10-foot contracted and relaxed inner tube **14**, the folded, compressed and gathered 50-foot outer tube **12** measures the same 10-foot length as the 10-foot contracted inner tube **12**." ('870 Patent [13, 22-27]).

83.     The gathering is possible because the diameter of the outer tube is 0.68 inches ('870 Patent [13, 52]) and the diameter of the inner tube in the unexpanded state is 0.375 inches ('870 Patent [14, 1]).  The 0.305 inch difference in diameters results in a maximum gap between inner and outer tubes in the unexpanded state of 0.1525 inches.  Even considering the smaller diameter of gather sections, there is still sufficient gaps between the inner and outer tubes to allow the outer tube to move freely along the inner tube in an unsecured manner.  The use of the term "unsecured" here aligns with the view that the outer tube is NOT "affixed" NOR "attached firmly" to the inner

tube "so it cannot be removed."

84.     The specification teaches that:

"the radial expansion of the inner tube **14** is constrained by the maximum diameter of the non-elastic outer tube **12**. ('870 Patent [8, 32-33])  This suggests that when the inner tube is fully expanded, then it is in contact with the outer tube, in fact, actually constrained in its expansion by the inner diameter of the outer tube.  For the constraint to function properly, the outer tube is required to be in frictional contact along the entire length of the tube.  We are also taught that "since the outer tube **12** is non-elastic, the length and width of the outer tube **12** determines the length and width of the hose **10** in its expanded condition." ('870 Patent [9, 47-50])

85.     Together, this suggests that in the expanded state, the outer tube is unable to move freely along the length of the inner tube because it is both laterally constrained by the maximum diameter of the outer tube being pressed upon by the expanded inner tube and longitudinally constrained by the maximum length of the outer tube prohibiting the inner tube from expanding further longitudinally.

86.     This is further supported in the specification in the description of the assembly process:

"when the stretched and extended elastic inner tube **14** contracts from its expanded length, the unattached, unbonded, unconnected and unsecured soft fabric non-elastic outer tube **12** is contracted by the couplers pulling together, as this happens, the outer fabric also catches on the rubbery elastic inner tube **14** material causing the outer tube **12** to become folded, compressed and gathered relatively evenly around the outside circumference along the entire length of the contracted inner tube **14**." ('870 Patent [13, 12-21]).

87.     When the hose is contracting during depressurization, the inner tube starts to shrink laterally and longitudinally, the surface friction of the elastic inner tube is in frictional contact with the outer tube, causing the outer tube to gather and reduce its apparent length to match the contracted inner tube in a uniform manner.  During the time of contraction, there can still be free movement of the outer tube over the inner tube as the inner diameter of the outer tube is larger than that of the shrinking inner tube.  Contact is only made at the gathers in the outer tube and the

37

contact friction can be easily overcome to allow for free movement.

88.     The claim language itself and the details provided by the specification teach that the use of "unsecured" to describe the ability of the outer tube to move freely along the inner tube in an unpressurized state is consist with the antonym of the proposed construction, "affixed or attached firmly so it cannot be removed."

89.     The use of "unsecured" in Group B is also consistent with the various Oxford definitions of "secure" being used as an adjective, such the Concise Oxford English Dictionary, 2008, (Exhibit 2), "Fixed or fastened so as to not give way, become loose, or be lost." The antonym definition would support the need for the outer tube to move freely, or loose, along the inner tube, to have the outer tube, between the first and second ends, to be unfixed or unfastened from the inner tube.

90.     Dr. Glancey's failure to provide a construction for Group B highlights the confusing and overlapping nature of how he extrinsically defines "couple to", "to couple" and "secured to", defining "secure" as "to fasten" or "tighten" (Glancey, para 48).  Using the antonym here out mean that the outer tube is "unfastened" or "untighten" to the inner tube.  To a POSITA, even with Dr. Glancey's broad and shallow description, "unfastening" would imply the use of a fastener component which is not described or taught in the patent.  Similarly, the use of "untighten" suggest the use of rotationally constricting fasteners such as nuts and bolts or screws, or the common stainless steel hose clamps mentioned earlier.  Not only as components that would support Dr. Glancey's definition of "secure" not present, but the inclusion of such components would impede the normal use of said hose, by requiring users to unfasten or untighten the elements keeping the outer tube from moving freely along the inner tube in the unexpanded state.

91.     Accordingly, the proper constructions of the Group B disputed terms are as follows:

38

• **"said inner and outer tubes unsecured between said first and second ends so that said outer tube is not held in frictional contact with said inner tube so that said outer tube can move freely along said inner tube"** – "the inner and outer tubes are not affixed or attached firmly except at their first and second ends so that the outer tube can move freely along the inner tube between the couplers";

• **"said inner tube is unsecured to said outer tube between said first and second ends so that said outer tube can move freely over said inner tube"** – "the inner tube is not affixed or attached firmly to the outer tube except at their first and second ends so that the outer tube can move freely along the inner tube between the couplers"; and

• **"said flexible inner tube unsecured to said flexible outer tube between said first and second ends so that said flexible outer tube can move freely over said flexible inner tube"** – "the flexible inner tube is not affixed or attached firmly to the flexible outer tube except at their first and second ends so that the flexible outer tube can move freely over the flexible inner tube"

GROUP C:

**"a first restrictor sleeve secured to said first end of said inner and said outer tubes" / "a first restrictor sleeve secured to said first end of said flexible inner tube and said flexible outer tube"**

**"a second restrictor sleeve secured to said second end of said inner and said outer tubes" / "a second restrictor sleeve secured to said second end of said flexible inner tube and said flexible outer tube"**

92.     Similar to Group B, Dr. Glancey refuses to propose a construction for the phrases in Group C.  Dr. Glancey focuses his analysis on how the specification defines the "restrictor sleeve" and even aligns with the proposed language when he says the "restrictor sleeves" are "component or sleeve that serves to restrict the expansion of the inner tube."  (Dr. Glancey, para 55). He goes on to say that this is the meaning that a POSITA about ascribe to it but recall that Dr. Glancey's definition of a POSITA is broad and shallow.  Given only two years of experience, would this hypothetical person assume this lack of specificity in the claim is the same as the "expansion restrictor sleeve" used throughout the specification (*see, e.g.,* '870 Patent [8, 47-49]) or ascribe other forms of restriction to this sleeve?  Could it be a flow restriction sleeve, designed to modify the pressure profile during use?  Could it be a tamper restriction sleeve designed to keep

the consumer from unduly modifying the hose and impacting its performance?  Dr. Glancey provides essentially no explanation on what the full scope of a "restrictor sleeve" is from the perspective of a POSITA.

93.     Additionally, by arguing that the Group C terms or phrases "do not require a construction," Dr. Glancey falls into the same dilemma addressed above regarding the so-called plain and ordinary meaning of the term "secured" as it appears in the Group C phrases (Dr. Glancey, para 55), because as discussed above (e.g., paragraphs 53, 55, and 82), the plain meaning of "secured" overlaps with "couple."  To overcome these problems, the Group C phrases clearly use the term "secured" in the same context as Winston's proposed construction of "secured," namely "affixed or attached firmly so it cannot be removed from" (which must be understood as distinct from the proper construction of the word "couple" as used in the claims, i.e., "to couple" means "to removably connect" and "couple to" means "removably connected to."

94.     As mentioned in paragraph 66 above, there is nothing in the specification or the claims that teaches how a "restrictor sleeve" can be "removably connected" to the ends of the inner and outer tubes.  The claims teaching the use of the "restrictor sleeves" are dependent claims, suggesting that there are embodiments of the hose where the restrictor sleeves are not included.  Elsewhere in the specification we are also taught that "the male coupler **16** includes a threaded portion **20**, a mid-portion **22**, and a portion **24** onto which are secured the inner tube **14**, the outer tube **12**, and an expansion restrictor sleeve **26**." ('870 Patent [8, 44-48]).  The equivalent teaching exists for the female coupler.  Nothing in the specification or claims suggest that the "restrictor sleeve" can be "removably connected" to the inner or outer tubes.  Instead, because the "restrictor sleeve' is "secured" to the tubes, the proper construction should reflect that the "restrictor sleeve" is "affixed or attached firmly so it cannot be removed" from the ends of the tubes.

40

95.     Dr. Glancey fails to resolve the ambiguity in the plain and ordinary meaning of "secured" as used in the Group C terms/phrases.  However, the specific use of "secured" in the claims teaches that "a first restrictor sleeve secured to said first end of said inner and said outer tubes" ('870 Patent and '278 Patent, Claim 5) means a "device that restricts the expansion of the inner tube and is affixed or attached firmly so it cannot be removed from the first end of the inner tube and the first end of the outer tube."  Similarly, in the '915 where Claim 4 teaches "a first restrictor sleeve secured to said first end of said flexible inner tube and said flexible outer tube", it means "a device that restricts the expansion of the inner tube and is affixed or attached firmly so it cannot be removed from the first end of the flexible inner tube and the first end of the flexible outer tube."

96.     The same logic applies to the similar teaching regarding the second "restrictor sleeve" is "secured" to the second end of the "inner tube and outer tube."  In the '870 Patent and '278 Patent, Claim 5 teaches "a second restrictor sleeve secured to said second end of said inner and said outer tubes", again describing on the second end "a device that restricts the expansion of the inner tube and is affixed or attached firmly so it cannot be removed from the second end of the inner tube and the second end of the outer tube."  The '915 Patent adds the word "flexible" to the inner and outer tubes, such that "a second restrictor sleeve secured to said second end of said flexible inner tube and said flexible outer tube" means "a device that restricts the expansion of the inner tube and is affixed or attached firmly so it cannot be removed from the second end of the flexible inner tube and the second end of the flexible outer tube."  The proposed constructions are consistent with the teaching throughout the patent, that in order for the hose to be of utility, "secure" is properly defined as "affixed or attached firmly so it cannot be removed."

97.     The use of "secured" in Group C is also consistent with the various Oxford

41

definitions of "secure" being used as a verb, such the Color Oxford English Dictionary, 2011, (Exhibit 3), "to firmly fix or fasten."  The "restrictor sleeve" needs to be firmly fixed or fastened to the first and second ends or else its stated function to restrict the expansion of the inner tube at the point where it is secured to the outer tube and the coupler would not be fulfilled.  If it was not firmly fastened to the first and/or second ends of the hose and slid into a position in between the first and second ends, then during pressurization, a stress concentration at the point where the inner hose, outer hose and coupler are secured together would like result in a catastrophic failure of the inner tube, defeating the utility of the hose as a fluid transport device.

98.    As such, the proper constructions for Group C are:

- **"a first restrictor sleeve secured to said first end of said inner and said outer tubes"** - "device that restricts the expansion of the inner tube and is affixed or attached firmly so it cannot be removed from the first end of the inner tube and the first end of the outer tube"

- **"a first restrictor sleeve secured to said first end of said flexible inner tube and said flexible outer tube"** – "a device that restricts the expansion of the inner tube and is affixed or attached firmly so it cannot be removed from the first end of the flexible inner tube and the first end of the flexible outer tube"

- **"a second restrictor sleeve secured to said second end of said inner and said outer tubes"** - "a device that restricts the expansion of the inner tube and is affixed or attached firmly so it cannot be removed from the second end of the inner tube and the second end of the outer tube"

- **"a second restrictor sleeve secured to said second end of said said flexible inner tube and said flexible outer tube"** - "a device that restricts the expansion of the inner tube

and is affixed or attached firmly so it cannot be removed from the second end of the flexible inner tube and the second end of the flexible outer tube"

GROUP D:

**"a first securing device securing said first restrictor sleeve, said outer tube, and said inner tube to said first coupler" / "a first securing device securing said first restrictor sleeve, said flexible outer tube, and said flexible inner tube to said first coupler"**

**"a second securing device securing said another expansion restrictor sleeve, said outer tube, and said inner tube to said second coupler" / "a second securing device securing said second expansion restrictor sleeve, said flexible outer tube, and said flexible inner tube to said second coupler"**

99.     Group D examines the construction of Dependent Claim 7 in the '870 Patent and the '278 Patent, and Dependent Claim 6 in the '915 Patent.  Dr. Glancey opines that "securing device" is not a nonce word as used in the Patents-in-suit.  In Dr. Glancey's attempt to describe what a "securing device" could be to a POSITA, he contradicts himself.   Dr. Glancey speculates that "the specification specifically contemplates this broad scope by explaining various *other* [emphasis his] types of devices may be used to secure" (Glancey, Para 60) the components at each end of the hose, suggesting that the other methods of securing components mentioned in the specification, "such as clamping and swaging can also be employed to secure the mail coupler to the inner tube **14** , the outer tube **12**, and the sleeve **26.".** ('870 Patent [11, 14-16]).   The specification suggests that the "securing device" is unique and distinct from these other types of connections.  Though Dr. Glancey goes on to assert that these "'securing devices' could be any known securing device," in contradiction to the explicit teaching of the patent away from common connections such as swaging and clamping.  (Glancey, Para 60). Furthermore, when Dr. Glancey expounds on the possible "securing devices" that would be clear to a POSITA, the list includes "a screw, a nut and bolt, a securing ring, a clamp, a crimp, a swage fitting" (Glancey, Para 65), he

ignores the fact that patent specifically teaches away from a "securing device" as including clamping and swaging.

100.    Additionally, of the examples provided, most would be impractical or conflict with what is taught in the patent.  For example, the use of screws would imply puncturing the wall of the inner and outer tube to secure it to the coupler, a securing method that would likely result in leaks and not consistently secure the components together uniformly but instead create localized secured zones at the screws but allow pressurized fluid to escape where there were not screws. Additionally, nothing in the specification nor the claims teach the uses of screws as the "securing" device.  In other aspects, where threads are used "to couple" components, the threads are detailed and specified, suggesting that if the securing device was a similar component, it would be detailed accordingly.  Using a nut and bolt, as Dr. Glancey's second example suggests falls into similar ambiguous territory as the screw, where it is a challenge for the novice engineer described by Dr. Glancey's description of a POSITA to even conceive, based on the specification, drawings and claims, how to use nuts and bolts as the securing device.

101.    Like screws, nuts and bolts are used typically for attached two or more components together using a preexisting hole, where both the nut and the head of the bolt are accessible for tightening operations.  Putting holes in the outer tube and inner tube would create stress concentrations and would increase the likelihood of the end hose failing under pressure. Additionally, the features required to fixture the nut during tightening and/or provide a means for the threads of the nut to mate are both not mentioned in the specification, drawings or claims, and the affordances for these features would likely impede the flow of liquid within the inner tube.

102.    Dr. Glancey even uses the term "securing ring" to describe a "securing device," (Glancey, Para 65), conflating it with a retaining ring, which is used in mechanical assemblies to

44

restrict translational motion, such as the mounting of bearings in a sleeve.  Retaining rings are effectively specially designed radial springs that are installed in a compressed state, shrinking their overall diameter, and then fitted into a retaining slot, where they can return to a relaxed or partially deformed state, creating a barrier to motion within the assembly.  Retaining rings apply spring force radially outward whereas the "securing device" necessary for this hose described in the Patents-in-suit requires force to be directed radially inward to effectively seal the outer tube and the inner tube to the coupler as taught. Frankly, it is not clear how Dr. Glancey concludes that a POSITA understand a "securing device" to include a "securing ring."

103.    According to the specification, a "securing device" is different from "other types of connections, such as clamping and swaging" that can be used to secure the coupler to the tube. ('870 [11, 13-18]).  As mentioned in the analysis above, swaging requires the plastic deformation of the tubes being swaged and then the addition of further sealant between the two tubes being swaged together in the joint.  As taught in the Patents-in-Suit, the inner tube cannot plastically deform.  Furthermore, the traditional sealant used in swaging is a solder render in a liquids state for swaging using a source of tremendous heat, such as a blow torch.  The specified materials of the inner and outer tubes in the Patents-in-Suit would not survive the soldering process.

104.    Dr. Glancey also mentions crimping, which is a type of irreversible process by which the components being connected are encompassed by an additional material that is mechanically deformed to provide clamping force even after the tool used to mechanically deform the crimp is removed.  This method of attaching components is routinely used in electrical connections, as well as for the construction of hoses, including garden hoses, air hoses and hydraulic hoses.  The Patents-in-Suit claim the securing device is novel in how it attaches the inner tube and the outer tube to the couplers at both the first end and the second end.  Yet we are never

taught how this "securing device" differs from what is common in the field.

105.    Dr. Glancey persists in his view that "securing device" is not a nonce term.  He goes on to contradict his own analysis of what constitutes a "securing device."  In his examples of the methods he claims are readily apparent to a POSITA, he either cites attachment methods specifically taught away from in the Patents-in-Suit (clamping and swaging), lists options that would be so impractical as to be useless in the assembly of the hose (screws, nuts and bolts), creates his own nonce term (securing ring) or cites a decisively not novel narrow type of clamping called crimping.  Not only has crimping been used for generations of hoses across multiple markets to attach couplers to tubes, but crimping also aligns with Winston's definition of "secured." Crimping is a non-reversible clamping technology requiring specially tools that allows the user to "affix or attach firmly so it cannot be removed."

106.    The use of "securing" in Group D is also consistent with the various Oxford definitions of "secure" being used as an adjective, such the Concise Oxford English Dictionary, 2008, (Exhibit 2), "Fixed or fastened so as to not give way, become loose, or be lost."  Within the context of these claims, the "securing device" is used to "fasten" the "restrictor sleeve", the "coupler," the "inner tube," and the "outer tube" together "so as to not give way, become loose." If the "securing device" did not perform the function as defined here, then the hose utility would be defeated.

107.    Accordingly, the proper constructions of the Group D disputed terms are as follows:

•    **"a first securing device securing said first restrictor sleeve, said outer tube, and said inner tube to said first coupler"** – "a device encompassing and affixing or attaching firmly the first restrictor sleeve, the first end of the outer tube, and the first end of the inner tube to the first coupler so they cannot be removed"

•    **"a first securing device securing said first restrictor sleeve, said flexible outer tube, and said flexible inner tube to said first coupler"** – "a device encompassing and affixing or attaching firmly the first restrictor sleeve, the first end of the outer tube, and

the first end of the inner tube to the first coupler so they cannot be removed"

• **"a second securing device securing said another expansion restrictor sleeve, said outer tube, and said inner tube to said second coupler"** – "a device encompassing and affixing or attaching firmly the second restrictor sleeve, the second end of the outer tube, and the second end of the inner tube to the second coupler so they cannot be removed"

• **"a second securing device securing said second expansion restrictor sleeve, said flexible outer tube, and said flexible inner tube to said second coupler"** – "a device encompassing and affixing or attaching firmly the second restrictor sleeve, the second end of the outer tube, and the second end of the inner tube to the second coupler so they cannot be removed"

108.    In the alternative, I understand that Winston contends that "securing device" is a nonce term that is governed by 35 U.S.C. § 112(f) (or pre-AIA 35 U.S.C. § 112 sixth paragraph). I agree that "securing device" is merely a generic placeholder that is followed by functional language in the claims.  *See, e.g.,* '870, Claim 7 ("a first securing device securing said first restrictor sleeve, said outer tube, and said inner tube to said first coupler, and a second securing device securing said another expansion restrictor sleeve, said outer tube, and said inner tube to said second coupler").  Accordingly, by identifying the corresponding structure described in the written description of the Patents-in-Suit, we can construe the proper scope of "securing device."

109.    In reviewing the claims, the claims reciting a "securing device" do not provide any structure besides a "device" that is used to "secure" the "inner tube," the "outer tube," and the "restrictor sleeve" to the "couplers." In other words, the claims use a generic placeholder to accomplish functional language but does not provide any structure or additional context as to how the generic placeholder accomplishes the recited functions. Therefore, I believe "securing device" should be interpreted under 35 U.S.C. § 112(f) (or pre-AIA § 112 sixth paragraph).

110.    Dr. Glancey renders two opinions: first, he opined that "securing device" is not a nonce term that should be construed under 35 U.S.C. § 112, sixth paragraph (Glancey, Para 62-

69); second, he states that even if "securing device" is construed as a mean-plus-function provision, Dr. Glancey states that "securing device" means the following structure: "at least securing rings 34 and 40" as well as "any number of appropriate and well-known securing devices." (Glancey, Para 70-74).

111.    Dr. Glancey repeats his argument that the claims and specification of the Patents-in-Suit sufficiently define the meaning of "securing device" and that a POSITA could infer numerous meanings for "securing device" including "a screw, a nut and bolt, a securing ring, a clamp, a crimp, a swage fitting, etc." (Glancey, Para 65). In my analysis of the proposed constructions in Group D, I detail how these potential interpretations of "securing device" using his improper definition of a POSITA, are not feasible for the task of securing the "restrictor sleeve," the "inner tube," and the "outer tube" to the "coupler," are specifically taught away from by the specification, or are interpreting a nonce term, "securing device" as another nonce term, "securing ring."  Even "crimping," which is a type of irreversible "clamping," has been used in hose manufacturing for generations, suggesting both that the specification teaches away from the "securing device" being a crimping device as it is a type of clamping and that crimping itself is not novel within the context of this hose.

112.    Dr. Glancey fails to demonstrate how a POSITA would glean sufficient structure for performing the function of the "securing device."  Dr. Glancey's analysis raises more questions than it answers as to how a POSITA would accomplish the function of the "securing device."  His extensive list of examples of a "securing device" would simply not work and highlights the failure of the claims and specifications to sufficiently describe the structure to perform the function of securing the "restrictor sleeve," the "inner tube," and the "outer tube" to the "coupler."

113.    Dr. Glancey neglects to accept the narrow structure taught in the patent with regard

to the "securing device." The only structure for the "securing device" taught in the Patents-in-suit appears in FIGS. 7 & 8:



FIG. 7

114. FIG. 7 illustrates the "male coupler" **16** secured to the "second restrictor sleeve" **26**, and then "second end" of the "outer tube" **12**, the "inner tube" **14** by the "securing device" **34** that encompasses the "second restrictor sleeve" **26**, and then "second end" of the "outer tube" **12**, the "inner tube" **14**. As can be seen from the drawing, the "securing device" seems to be a ring of unspecified material, roughly half the width of the hexagonal portion of the "male coupler" **16**, that encompasses the "second restrictor sleeve" **26**, and then "second end" of the "outer tube" **12**, the "inner tube" **14**. The "male coupler" **16** extends into the interior of the "second restrictor sleeve" **26**, and then "second end" of the "outer tube" **12**, the "inner tube" **14**. Though not explicitly taught how this structure, "securing device" **34**, accomplishes the function, evidently this apparent ring of unspecified material somehow attaches the "second restrictor sleeve" **26**, and then "second end" of the "outer tube" **12**, the "inner tube" **14** to the "tubular extension" **34** as the means of securing these components to the "male coupler" **16**.

115. The specification mentions the "securing device" used on the female coupler only twice in the specification. First, detailing that "A securing device **34** encompasses the outer sleeve **26**, the outer tube **12**, and the inner tube **14** and secures these elements to the tubular extension

49

**34**." ('870 Patent [10, 65-67]).  Secondly, to use the "securing device" to describe the location of the function of another element, "the expansion restrictor sleeve 26 is restricting the expansion of the inner and outer tubes at the junction of the securing device 34." ('870 Patent [11, 7-9]). Nowhere else is the "securing device" used to attach the "restrictor sleeve", the "inner tube" and the "outer tube" to the "male coupler" until the broad use of "securing devices" in the claims of the Patents-in-Suit.



FIG. 8

116.    FIG. 8 illustrates the "female coupler" **18** secured to the "first restrictor sleeve" **27**, and then "first end" of the "outer tube" **12**, the "inner tube" **14** by the "securing device" **40** that encompasses the "first restrictor sleeve" **27**, and then "first end" of the "outer tube" **12**, the "inner tube" **14**.   As can be seeing from the drawing, the "securing device" seems to be a ring of unspecified material, roughly one-fifth the width of the exterior width of the "threaded portion" **28** of the "female coupler" **18**, that encompasses the "first restrictor sleeve" **27**, and then "first end" of the "outer tube" **12**, the "inner tube" **14**.  The "female coupler" **18** extends into the interior of the "first restrictor sleeve" **26**, and then "first end" of the "outer tube" **12**, the "inner tube" **14**. Though not explicitly taught how this structure, "securing device" **40**, accomplishes the function, evidently this apparent ring of material somehow attaches the "first restrictor sleeve" **27**, and then "first end" of the "outer tube" **12**, the "inner tube" **14** to the "tubular extension" **36** as the means

of securing these components to the "female coupler" **18**.

117.    The specification goes on to describe that the "securing device **40** encompasses the outer sleeve **27**, the outer tube **12**, and the inner tube 14 and secures these elements to the tubular extension **36**." ('870 Patent [11, 31-33]).  The only other time the "securing device" on the "female coupler" is mentioned that in the unexpanded state, "the sleeve **27** is not restricting expansion of the inner and outer tubes at the junction of the securing device **40**." ('870 Patent [11, 37-39]).  Here, the "securing device" is used only to mark the location where expansion is not being restricted.  There is no other mention of the "securing device" on the female coupler anywhere else in the Patents-in-Suit other than when the broad nonce term "securing device" is used in the claims.



118.    FIGS. 1 & 3, which show the "male coupler" and "female coupler" in both the expanded and contracted state of the hose, give no indication of how the "inner tube" and the "outer tube" are secured to the "couplers" nor how the "restrictor sleeve," the "inner tube" and the "outer tube" all three are secured to the couplers.  There is no "securing device" identified in these preferred embodiments illustrated.  Nothing matches the ring shown as "securing device" **34 & 40** in FIGS 7 & 8.  Item **24** in FIGS. 1 & 3 is labeled as a "portion" of unknown structure or function

as part of the "male coupler **16** includes a threaded portion **20**, a mid-portion **22**, and a portion **24** onto which are secured the inner tube **14**, the outer tube **12**, and an expansion restrictor sleeve **26**." ('870 Patent [8, 44-48]). The other potential element labeled in FIGS. 1 & 3 is **30**, which is defined nowhere in the specification.

119.    I agree with Winston Products' assertion that "securing device" is a nonce term, one that is ill defined in the Patents-in-Suit.  Using what I understand of the requirements of 35 U.S.C. § 112 sixth paragraph, "securing device" must be construed to be only the ring labeled "34" in FIG 7 and labeled "40" in FIG 8, and not the broad range of possible attachment methods briefly cited but not explained by Dr. Glancey (Glancey, para 65), but not supported by the written description of the Patents-in-Suit.  In other words, the "securing device" mentioned in the claims in the Patents-in-Suit must be construed as a "ring, of a width roughly one fifth of the width of the threaded portion of the female coupler, encompassing and affixing or attaching firmly the restrictor sleeves, the ends of the outer tube, and the ends of the inner tube to the couplers so they cannot be removed."

## VI.    RESERVATION OF RIGHTS

120.    I understand that discovery in this case is ongoing. I reserve the right to amend or supplement my opinions expressed above upon the discovery of new facts and information. This includes, but is not limited to, deposition testimony or additional documents and statements that I may become aware of.

121.    I reserve the right to submit additional materials related to my opinion about the material phrase and its construction upon any critique or analysis of my opinions, including but not limited to a response to any testimony set forth by Plaintiff's expert Dr. James L. Glancey, or any testimony of other experts relied upon by the Plaintiff. In addition, I reserve the right to submit

additional expert reports in this matter should they be needed or requested by the parties and/or Court. Finally, I reserve the right to rely on any visual aid or demonstrative in support of my opinions should the Court request my testimony.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: 16 Jan 2024

John M. Feland, III, Ph.D.

53

Exhibit 1

*Color*

# Oxford
# English
## Dictionary



wherever you are

The world's most
trusted dictionaries

**second-degree** (of burns) causing blistering but not permanent scars.
**second-guess** predict someone's actions or thoughts by guesswork.
**second-hand 1** having had a previous owner. **2** heard from another person. **second nature** a habit that has become instinctive. **second-rate** of bad quality. **second sight** the supposed ability to know what will happen in the future. **second thoughts** a change of opinion after reconsidering something. **second wind** fresh energy gained during exercise after having been out of breath. ■ **secondly** adverb.

**second²** noun **1** a unit of time equal to one sixtieth of a minute. **2** (**a second**) informal a very short time. **3** a measurement of an angle equal to one sixtieth of a minute.

**second³** /si-**kond**/ verb Brit. temporarily move a worker to another position or role. ■ **secondment** noun.

**secondary** adjective **1** coming after, or less important than, something else. **2** (of education) for children from the age of eleven to sixteen or eighteen. ■ **secondarily** adverb.

**secret** adjective **1** hidden from, or not known by, other people. **2** secretive. ● noun **1** something that other people do not know about. **2** a method of achieving something that is not generally known. □ **secret agent** a spy. **secret police** a police force working in secret against a government's political opponents. **secret service** a government department concerned with spying. ■ **secrecy** noun **secretly** adverb.

**secretariat** /sek-ri-**tair**-i-uht/ noun a government office or department.

**secretary** noun (plural **secretaries**) **1** a person employed to type letters, keep records, etc. **2** an official of a society or other organization. □ **Secretary of State 1** (in the UK) the head of a major government department. **2** (in the US) the government official responsible for

foreign affairs. ■ **secretarial** adjective.

✔ -ary, not -ery: secretary.

**secrete** verb (**secretes**, **secreting**, **secreted**) **1** (of a cell, gland, or organ) produce a liquid substance. **2** hide an object. ■ **secretion** noun.

**secretive** adjective inclined to hide your feelings or not to give out information. ■ **secretively** adverb.

**sect** noun a small religious or political group with different beliefs from those of the larger group that they belong to.

**sectarian** adjective having to do with a sect or group. ■ **sectarianism** noun.

**section** noun **1** any of the parts into which something is divided. **2** a distinct group within a larger body of people or things. **3** the shape that results from cutting through something. ● verb divide into sections.

**sector** noun **1** a distinct area or part. **2** a part of a circle between two lines drawn from its centre to its circumference.

**secular** adjective not religious or spiritual. ■ **secularism** noun.

**secure** adjective **1** certain to remain safe. **2** fixed or fastened so as not to give way or become loose. **3** free from fear or anxiety. ● verb (**secures**, **securing**, **secured**) **1** protect against danger or threat. **2** firmly fix or fasten. **3** succeed in obtaining. ■ **securely** adverb.

**security** noun (plural **securities**) **1** the state of being or feeling secure. **2** the safety of a state or organization. **3** a valuable item offered as a guarantee that you will repay a loan.

**sedan** noun **1** an enclosed chair carried between two horizontal poles. **2** N. Amer. a car for four or more people.

**sedate** adjective **1** calm and unhurried. **2** respectable and rather dull. ● verb (**sedates**, **sedating**, **sedated**) give someone a sedative drug. ■ **sedately** adverb.

**sedation** noun the action of

sedating someone.

**sedative** adjective having the effect of making someone calm or sleepy. ● noun a sedative drug.

**sedentary** /sed-uhn-tri/ adjective **1** involving a lot of sitting and not much exercise. **2** sitting down a lot; taking little exercise.

**sedge** noun a grass-like plant that grows in wet ground.

**sediment** noun **1** matter that settles to the bottom of a liquid. **2** material carried by water or wind and deposited on land. ■ **sedimentary** adjective.

**sedition** noun things done or said to stir up rebellion against a ruler or government. ■ **seditious** adjective.

**seduce** verb (**seduces**, **seducing**, **seduced**) **1** persuade someone to do something unwise. **2** persuade someone to have sex with you. ■ **seduction** noun.

**seductive** adjective tempting and attractive. ■ **seductively** adverb.

**sedulous** adjective showing great care or effort; diligent.

**see¹** verb (**sees**, **seeing**, **saw**; past participle **seen**) **1** become aware of with the eyes. **2** experience or witness. **3** realize something after thinking or getting information. **4** think of in a particular way. **5** meet someone socially or by chance. **6** meet someone regularly as a boyfriend or girlfriend. **7** consult a specialist or professional. **8** guide or lead someone somewhere. □ **see someone off** go with a person who is leaving to their point of departure. **see something through** carry on with a project until it is completed. **see-through** transparent or semi-transparent. **see to** deal with.

**see²** noun the district or position of a bishop or archbishop.

**seed** noun **1** a small, hard object produced by a plant, from which a new plant may grow. **2** the beginning of a feeling, process, etc. **3** any of the stronger competitors in a sports tournament who are kept from playing each other in the early rounds. **4** old use a man's

semen. ● verb **1** sow land with seeds. **2** remove the seeds from. **3** (**be seeded**) be made a seed in a sports tournament.

**seedling** noun a young plant raised from seed.

**seedy** adjective (**seedier**, **seediest**) unpleasant because dirty or immoral. ■ **seediness** noun.

**seeing** conjunction because; since.

**seek** verb (**seeks**, **seeking**, **sought**) **1** try to find or get. **2** ask for. **3** (**seek to do**) try or want to do. **4** (**seek someone/thing out**) search for and find someone or something. ■ **seeker** noun.

**seem** verb **1** give the impression of being. **2** (**cannot seem to do**) be unable to do, despite having tried.

**seeming** adjective appearing to be real or true. ■ **seemingly** adverb.

**seemly** adjective respectable or in good taste.

**seen** past participle of **see¹**.

**seep** verb (of a liquid) flow or leak slowly through a substance. ■ **seepage** noun.

**seer** noun a person supposedly able to see visions of the future.

**seersucker** noun a fabric with a crinkled surface.

**see-saw** noun a long plank supported in the middle, on each end of which children sit and move up and down by pushing the ground with their feet. ● verb repeatedly change between two states or positions.

**seethe** verb (**seethes**, **seething**, **seethed**) **1** be very angry but try not to show it. **2** be filled with a crowd that is moving about. **3** (of a liquid) boil or churn.

**segment** noun /seg-muhnt/ each of the parts into which something is divided. ● verb /seg-**ment**/ divide into segments.

**segregate** verb (**segregates**, **segregating**, **segregated**) **1** keep separate from the rest or from each other. **2** keep people of different races, sexes, or religions separate. ■ **segregation** noun.

**segue** /seg-way/ verb (**segues**,

Case: 1:23-cv-00631-BMB  Doc #: 40-9  Filed: 04/23/24  58 of 93.  PageID #: 1320

**countermand** verb cancel an order.

**countermeasure** noun something done to deal with a danger or threat.

**counterpane** noun dated a bedspread.

**counterpart** noun a person or thing that corresponds to another.

**counterpoint** noun 1 the playing of two or more tunes at the same time. 2 a tune played at the same time as another.

**counterproductive** adjective having the opposite effect to the one intended.

**countersign** verb sign a document that has already been signed by another person.

**countersink** verb (**countersinks, countersinking, countersunk**) insert a screw or bolt so that the head lies flat with the surface.

**countertenor** noun the highest male adult singing voice.

**counterterrorism** noun political or military activities designed to prevent terrorism.

**countervailing** adjective having an equal but opposite effect.

**countess** noun 1 the wife or widow of a count or earl. 2 a woman holding the rank of count or earl.

**counting** preposition taking account of; including.

**countless** adjective too many to be counted; very many.

**countrified** adjective characteristic of the country or country life.

**country** noun (plural **countries**) 1 a nation with its own government. 2 areas outside large towns and cities. 3 an area of land with particular physical features: *hilly country*. □ **country music** (or **country and western**) a kind of popular music from country areas of the southern US.

**countryside** noun land and scenery outside towns and cities.

**county** noun (plural **counties**) each of the main areas into which some countries are divided for the purposes of local government.

□ **county town** the main town of a county, where its council is based.

**coup** /koo/ noun (plural **coups** /kooz/) 1 (also **coup d'état** /koo day-**tah**/) a sudden violent seizing of power from a government. 2 a successful move or action.

**coupe** /koo-pay, koop/ noun a sports car with a fixed roof and a sloping rear.

**couple** noun 1 two individuals of the same sort considered together. 2 two people who are married or in a romantic or sexual relationship. 3 informal an unspecified small number. •verb (**couples, coupling, coupled**) 1 connect or combine. 2 have sex.

**couplet** noun a pair of rhyming lines of poetry one after another.

**coupling** noun a device for connecting railway vehicles or parts of machinery together.

**coupon** noun 1 a voucher that gives you the right to claim a discount or buy something. 2 a form that can be sent off to ask for information or to enter a competition.

**courage** noun 1 the ability to do something frightening; bravery. 2 strength when faced with pain or grief.

**courageous** adjective having courage; brave. ■ **courageously** adverb.

**courgette** /koor-**zhet**/ noun Brit. a long, thin vegetable with green skin.

**courier** noun 1 a person employed to deliver goods or documents quickly. 2 a person employed to guide and help a group of tourists.

**course** noun 1 a direction that is taken or intended. 2 the way in which something progresses or develops. 3 (also **course of action**) a way of dealing with a situation. 4 a dish forming one of the stages of a meal. 5 a series of lectures or lessons in a particular subject. 6 a series of repeated treatments or doses of a drug. 7 an area prepared for racing, golf, or another sport. •verb (**courses, coursing, coursed**) 1 (of liquid) flow. 2 (**coursing**) the

activity of hunting animals, especially hares, with greyhounds. □ **of course** 1 as expected. 2 certainly; yes.

! don't confuse **course** with **coarse**, which means 'havng a rough texture'.

**court** noun 1 the judge, jury, and lawyers who sit and hear legal cases. 2 the place where a law court meets. 3 an area marked out for ball games such as tennis. 4 a courtyard. 5 the home, advisers, and staff of a king or queen. •verb 1 try to win someone's support. 2 behave in a way that might lead to something bad happening. 3 dated try to win the love of someone you want to marry. □ **court shoe** a woman's plain shoe with a low-cut upper and no fastening. **hold court** be the centre of attention.

**courteous** /**ker**-ti-uhss/ adjective polite and considerate. ■ **courteously** adverb.

**courtesan** /kor-ti-**zan**/ noun a prostitute with wealthy clients.

**courtesy** /**ker**-tuh-si/ noun (plural **courtesies**) 1 polite and considerate behaviour. 2 a polite speech or action. □ **courtesy of** given or allowed by.

**courtier** /**kor**-ti-er/ noun a companion or adviser of a king or queen.

**courtly** adjective (**courtlier, courtliest**) very dignified and polite.

**court martial** noun (plural **courts martial**) a court for trying people accused of breaking military law. •verb (**court-martial**) (**court-martials, court-martialling, court-martialled**) try someone in a court martial.

**courtship** noun 1 a period during which a couple develop a romantic relationship. 2 the process of trying to win someone's love or support.

**courtyard** noun an open area enclosed by walls or buildings.

**couscous** /**kuuss**-kuuss/ noun a North African dish of steamed or soaked semolina.

**cousin** noun (also **first cousin**) a

child of your uncle or aunt. □ **second cousin** a child of your mother's or father's first cousin.

**couture** /koo-**tyoor**/ noun the design and making of fashionable clothes, especially for a particular customer.

**couturier** /koo-**tyoo**-ri-ay/ noun a person who designs couture clothes.

**cove** noun a small sheltered bay.

**coven** /**kuv**-uhn/ noun a group of witches who meet regularly.

**covenant** /**kuv**-uh-nuhnt/ noun 1 a formal agreement. 2 an agreement to make regular payments to a charity.

**cover** verb (**covers, covering, covered**) 1 put something over or in front of a person or thing so as to protect or hide them. 2 spread or extend over an area. 3 deal with a subject. 4 travel a particular distance. 5 (of money) be enough to pay for something. 6 (of insurance) protect against a loss or accident. 7 (**cover something up**) try to hide or deny a mistake or crime. 8 (**cover for**) temporarily take over someone's job. 9 perform a cover version of a song. •noun 1 something that covers or protects. 2 a thick protective outer part or page of a book or magazine. 3 shelter. 4 a means of hiding an illegal or secret activity. 5 protection by insurance. 6 (also **cover version**) a performance of a song previously recorded by a different artist. □ **break cover** suddenly leave shelter when being chased. **cover charge** a charge per person added to the bill in a restaurant. **covering letter** a letter sent with a document or parcel to explain what it is. **cover-up** an attempt to hide a mistake or crime.

**coverage** noun the extent to which something is covered.

**coverlet** noun a bedspread.

**covert** adjective /kuv-ert, koh-vert/ not done openly; secret. •noun /kuv-ert/ an area of bushes and undergrowth where game birds and animals can hide. ■ **covertly** adverb.

# OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford  New York

Auckland  Cape Town  Dar es Salaam  Hong Kong  Karachi
Kuala Lumpur  Madrid  Melbourne  Mexico City  Nairobi
New Delhi  Shanghai  Taipei  Toronto

With offices in

Argentina  Austria  Brazil  Chile  Czech Republic  France  Greece
Guatemala  Hungary  Italy  Japan  Poland  Portugal  Singapore
South Korea  Switzerland  Thailand  Turkey  Ukraine  Vietnam

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

© Oxford University Press 1994, 1995, 1998, 2001, 2002, 2006

Database right Oxford University Press (makers)
First edition 1995, first published as the *Little Oxford Dictionary*,
    seventh edition, in 1994
Revised edition 1998
Second edition 2001
Reissued with title change and new cover design 2002
Third edition 2006
Reissued 2011

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose this same condition on any acquirer

British Library Cataloguing in Publication Data

Data available

Library of Congress Cataloging in Publication Data

Data available

ISBN 978-0-19-960791-4
ISBN 978-0-19-861440-1   (US edn)

10 9 8 7

Typeset in Frutiger and Parable
by Interactive Sciences Ltd, Gloucester
Printed in China by Sheck Wah Tong Printing Press Ltd.

Exhibit 2

# Concise
# Oxford
# English
# Dictionary

Powered by
Oxford Corpus

The world's most trusted dictionaries

**country house** ■ n. Brit. a large house in the country, typically the seat of a wealthy or aristocratic family.

**countryman** (or **countrywoman**) ■ n. (pl. **countrymen** or **countrywomen**) **1** a person living or born in the country. **2** a person from the same country as someone else: *my fellow countryman.*

**country mile** ■ n. informal a very long way.

**country music** ■ n. a form of popular music that originates in the rural southern US, characteristically featuring guitar and pedal steel guitar.

**country rock¹** ■ n. Geology the rock which encloses a mineral deposit, igneous intrusion, or other feature.

**country rock²** ■ n. a type of popular music that is a blend of rock and country music.

**countryside** ■ n. the land and scenery of a rural area.

**countrywide** ■ adj. & adv. extending throughout a nation.

**county** ■ n. (pl. **counties**) **1** a territorial division of some countries, forming the chief unit of local administration. ➤ US a political and administrative division of a state. **2** [as modifier] Brit. of or denoting aristocratic people with an ancestral home in a particular county.
– ORIGIN ME: from OFr. *conte*, from L. *comitatus*, from *comes, comit-* (see **COUNT²**).

**county borough** ■ n. (in England, Wales, and Northern Ireland) a large town formerly having the administrative status of a county.

**county commissioner** ■ n. Brit. a Justice of the Peace on the commission of the peace of a county.

**county corporate** ■ n. Brit. historical a city or town that ranks as an administrative county.

**county council** ■ n. (in the UK) the elected governing body of an administrative county.
– DERIVATIVES **county councillor** n.

**county court** ■ n. (in England and Wales) a judicial court for civil cases. ➤ US a court for civil and criminal cases.

**County Palatine** ■ n. historical (in England and Ireland) a county in which royal privileges and exclusive rights of jurisdiction were held by its earl or lord.

**county town** (N. Amer. **county seat**) ■ n. the town that is the administrative capital of a county.

**coup** /ku:/ ■ n. (pl. **coups** /ku:z/) **1** (also **coup d'état**) a sudden violent seizure of power from a government. **2** an unexpected and notably successful act. **3** Billiards a direct pocketing of the cue ball, which is a foul stroke. **4** historical (among North American Indians) an act of touching an enemy, as a deed of bravery.
– ORIGIN C18: from Fr., from med. L. *colpus* (see **COPE¹**).

**coup de foudre** /ˌkuː də ˈfuːdr(ə)/ ■ n. (pl. **coups de foudre** pronunc. same) a sudden unforeseen event, especially love at first sight.
– ORIGIN Fr., lit. 'stroke of lightning'.

**coup de grâce** /ˌkuː də ˈɡrɑːs/ ■ n. (pl. **coups de grâce** pronunc. same) a final blow or shot given to kill a wounded person or animal.
– ORIGIN Fr., lit. 'stroke of grace'.

**coup de main** /ˌkuː də ˈmã/ ■ n. (pl. **coups de main** pronunc. same) a sudden surprise attack.
– ORIGIN Fr., lit. 'stroke of hand'.

**coup d'état** /ˌkuː derˈtɑː/ ■ n. (pl. **coups d'état** pronunc. same) see **COUP** (sense 1).
– ORIGIN Fr., lit. 'blow of state'.

**coup de théâtre** /ˌkuː də terɑːˈtr(ə)/ ■ n. (pl. **coups de théâtre** pronunc. same) **1** a dramatically sudden action or turn of events, especially in a play. **2** a successful theatrical production.
– ORIGIN Fr., lit. 'blow of theatre'.

four-wheeled enclosed carriage for two passengers and a driver.
– ORIGIN C19: from Fr. *carrosse coupé*, lit. 'cut carriage'.

**couped** /ku:pt/ ■ adj. Heraldry cut off or truncated in a straight line.
– ORIGIN C16: from Fr. *couper* 'to cut' + **-ED²**.

**couple** ■ n. **1** two individuals of the same sort considered together. **2** [treated as sing. or pl.] two people who are married or otherwise closely associated romantically or sexually. **3** informal an indefinite small number: *a couple of days ago.* **4** Mechanics a pair of equal and parallel forces acting in opposite directions, and tending to cause rotation about an axis perpendicular to the plane containing them. ■ v. **1** join to form a pair. ➤ (often **be coupled to/with**) combine. ➤ connect (a railway vehicle or a piece of equipment) to another. **2** have sexual intercourse.
– DERIVATIVES **coupledom** n.
– ORIGIN ME: from OFr. *cople* (n.), *copler* (v.), from L. *copula* (n.), *copulare* (v.), from *co-* 'together' + *apere* 'fasten'; cf. **COPULA** and **COPULATE**.

**coupler** ■ n. **1** something that connects or couples two things. **2** Photography a compound in a developer or an emulsion which combines with the products of development to form an insoluble dye, part of the image. **3** (also **acoustic coupler**) a modem which converts digital signals into audible signals and vice versa so that they can be transmitted and received over telephone lines.

**couplet** ■ n. a pair of successive lines of verse, typically rhyming and of the same length.
– ORIGIN C16: from Fr., dimin. of *couple*, from OFr. *cople* (see **COUPLE**).

**coupling** ■ n. a device for coupling railway vehicles or parts of machinery together.

**coupling constant** ■ n. Physics a constant representing the strength of the interaction between a particle and a field.

**coupling rod** ■ n. a rod which couples the driving wheels of a locomotive, enabling them to act as a unit.

**couply** /ˈkʌpli/ (also **coupley**) ■ adj. informal, often derogatory relating to or characteristic of a couple in a romantic or sexual relationship.

**coupon** ■ n. **1** a voucher entitling the holder to a discount on a product or a quantity of something rationed. **2** a detachable form used to send for a purchase or information or to enter a competition. **3** a detachable portion of a bond which is given up in return for a payment of interest. ➤ the nominal rate of interest on a fixed-interest security. **4** Scottish & Irish a person's face.
– ORIGIN C19: from Fr., lit. 'piece cut off', from *couper* 'cut'.

**courage** ■ n. the ability to do something that frightens one. ➤ strength in the face of pain or grief.
– PHRASES **have the courage of one's convictions** act on one's beliefs despite danger or disapproval. **take courage** make an effort to do something that frightens one. **take one's courage in both hands** nerve oneself to do something that frightens one.
– ORIGIN ME: from OFr. *corage*, from L. *cor* 'heart'.

**courageous** ■ adj. having courage; brave.
– DERIVATIVES **courageously** adv. **courageousness** n.

**courant** /kʊˈrant/ ■ adj. Heraldry represented as running.
– ORIGIN C17: Fr., 'running', pres. part. of *courir*.

**courante** /kʊˈrɒnt, -ˈrɑːnt/ ■ n. a rapid gliding dance in quick triple time.
– ORIGIN C16: Fr., lit. 'running', fem. pres. part. of *courir*.

**courbette** /kʊəˈbɛt/ ■ n. (in classical riding) a

Case: 1:23-cv-00631-BMB  Doc #: 40-9  Filed: 04/23/24  63 of 93.  PageID #: 1325

denoting a carnassial tooth, or a similar cutting tooth in mammals other than carnivores.

**secular** /ˈsɛkjʊlə/ ■ adj. **1** not religious, sacred, or spiritual. **2** Christian Church not subject to or bound by religious rule. Contrasted with REGULAR. **3** Astronomy of or denoting slow changes in the motion of the sun or planets. **4** Economics (of a fluctuation or trend) occurring or persisting over an indefinitely long period. **5** occurring once every century or similarly long period (used especially in reference to celebratory games in ancient Rome). ■ n. a secular priest.
– DERIVATIVES **secularism** n. **secularist** n. **secularity** n. **secularization** or **secularisation** n. **secularize** or **secularise** v. **secularly** adv.
– ORIGIN ME: senses 1 and 2 from OFr. *seculer*, from L. *saecularis*, from *saeculum* 'generation', used in Christian L. to mean 'the world'; senses 3, 4, and 5 (C19) from L. *saecularis* 'relating to an age or period'.
**secular arm** ■ n. the legal authority of the civil power as invoked by the Church to punish offenders.
**secund** /sɪˈkʌnd/ ■ adj. Botany arranged on one side only (such as the flowers of lily of the valley).
– DERIVATIVES **secundly** adv.
– ORIGIN C18: from L. *secundus* (see SECOND¹).
**secure** ■ adj. **1** fixed or fastened so as not to give way, become loose, or be lost. **2** certain to remain safe and unthreatened. ➤ protected against attack or other criminal activity. **3** feeling free from fear or anxiety. ➤ (**secure of**) dated feeling no doubts about attaining. **4** (of a place of detention) having provisions against the escape of inmates. ■ v. **1** fix or fasten securely. **2** protect against threats. **3** succeed in obtaining. ➤ seek to guarantee repayment of (a loan) by having a right to take possession of an asset in the event of non-payment. **4** Surgery compress (a blood vessel) to prevent bleeding.
– PHRASES **secure arms** Military hold a rifle with the muzzle downward and the lock in the armpit to guard it from rain.
– DERIVATIVES **securable** adj. **securely** adv. **securement** n. **secureness** n.
– ORIGIN C16 (earlier (ME) as *security*): from L. *securus*, from *se-* 'without' + *cura* 'care'.
**securitize** or **securitise** ■ v. [often as adj. **securitized**] convert (an asset, especially a loan) into marketable securities, typically for the purpose of raising cash.
– DERIVATIVES **securitization** n.
**security** ■ n. (pl. **securities**) **1** the state of being or feeling secure. **2** the safety of a state or organization against criminal activity such as terrorism. ➤ measures taken to ensure such safety. **3** a thing deposited or pledged as a guarantee of the fulfilment of an undertaking or the repayment of a loan, to be forfeited in case of default. **4** a certificate attesting credit, the ownership of stocks or bonds, or the right to ownership connected with tradable derivatives.
**security blanket** ■ n. **1** a blanket or other familiar object which is a comfort to a child. **2** Brit. an official sanction imposed on information in order to maintain complete secrecy.
**sedan** /sɪˈdan/ ■ n. **1** (also **sedan chair**) an enclosed chair for conveying one person, carried between horizontal poles by two porters, common in the 17th and 18th centuries. **2** chiefly N. Amer. a car for four or more people.
– ORIGIN perh. an alt. of an Ital. dial. word, based on L. *sella* 'saddle'.
**sedate¹** ■ adj. **1** calm and unhurried. **2** staid and rather dull.
– DERIVATIVES **sedately** adv. **sedateness** n.
– ORIGIN ME (also as a medical term in the sense 'not

sedative drug.
– ORIGIN ME: from OFr. *sedatif* or med. L. *sedativus*, from L. *sedat-*, *sedare* (see SEDATE¹).
**sedentary** /ˈsɛd(ə)nt(ə)ri/ ■ adj. **1** tending to spend much time seated. ➤ (of work or a way of life) characterized by much sitting and little physical exercise. ➤ sitting. **2** Zoology & Anthropology inhabiting the same locality throughout life. **3** Zoology sessile.
– DERIVATIVES **sedentarily** adv. **sedentariness** n.
– ORIGIN C16 (in the sense 'not migratory'): from Fr. *sédentaire* or L. *sedentarius*, from *sedere* 'sit'.
**Seder** /ˈseɪdə/ ■ n. a Jewish ritual service and ceremonial dinner for the first night or first two nights of Passover.
– ORIGIN from Heb. *sēḏer* 'order, procedure'.
**sederunt** /sɪˈdɪərənt, -ˈdɛː-/ ■ n. (in Scotland) a sitting of an ecclesiastical assembly or other body.
– ORIGIN C17: from L., lit. '(the following persons) sat'.
**sedge** ■ n. a grass-like plant with triangular stems and inconspicuous flowers, growing typically in wet ground. [*Carex* and other genera.]
– DERIVATIVES **sedgy** adj.
– ORIGIN OE *secg*, of Gmc origin.
**sedge warbler** ■ n. a common migratory songbird with streaky brown plumage, frequenting marshes and reed beds. [*Acrocephalus schoenobaenus*]
**sedilia** /sɪˈdɪlɪə/ ■ pl. n. (sing. **sedile** /sɪˈdʌɪli/) a group of three stone seats for clergy in the south chancel wall of a church.
– ORIGIN C18: from L., 'seat'.
**sediment** ■ n. **1** matter that settles to the bottom of a liquid. **2** Geology particulate matter carried by water or wind and deposited on the land surface or seabed. ■ v. settle or deposit as sediment.
– DERIVATIVES **sedimentation** n.
– ORIGIN C16: from Fr. *sédiment* or L. *sedimentum* 'settling'.
**sedimentary** ■ adj. relating to sediment. ➤ Geology (of rock) that has formed from sediment deposited by water or wind.
**sedition** ■ n. conduct or speech inciting rebellion against the authority of a state or monarch.
– DERIVATIVES **seditious** adj. **seditiously** adv.
– ORIGIN ME (in the sense 'violent strife'): from OFr., or from L. *seditio(n-)*, from *sed-* 'apart' + *itio(n-)* 'going'.
**seduce** ■ v. **1** entice into sexual activity. **2** persuade to do something inadvisable.
– DERIVATIVES **seducer** n. **seducible** adj. **seductress** n.
– ORIGIN C15 (earlier (ME) as *seduction*): from L. *seducere*, from *se-* 'away' + *ducere* 'to lead'.
**seduction** ■ n. the action of seducing someone. ➤ a tempting or attractive thing.
**seductive** ■ adj. tempting and attractive.
– DERIVATIVES **seductively** adv. **seductiveness** n.
**sedulous** /ˈsɛdjʊləs/ ■ adj. showing dedication and diligence.
– DERIVATIVES **sedulity** /sɪˈdjuːlɪti/ n. **sedulously** adv. **sedulousness** n.
– ORIGIN C16: from L. *sedulus* 'zealous' + **-ous**.
**sedum** /ˈsiːdəm/ ■ n. a fleshy-leaved plant of a large genus including the stonecrops, with small star-shaped flowers. [Genus *Sedum*.]
– ORIGIN from mod. L., denoting a houseleek.
**see¹** ■ v. (**sees**, **seeing**, **saw**; past part. **seen**) **1** perceive with the eyes. ➤ watch (a game, film, or other entertainment). ➤ experience or witness (an event or situation). **2** deduce after reflection or from information. ➤ ascertain or establish after inquiry or consideration. **3** regard in a specified way. ➤ envisage as a possibility. **4** meet (someone one knows) socially or by chance. ➤ meet regularly as a boyfriend or

**S**

# Exhibit 3

# THE OXFORD ENGLISH DICTIONARY

## SECOND EDITION

*Prepared by*

J. A. SIMPSON *and* E. S. C. WEINER

## VOLUME III

Cham–Creeky

CLARENDON PRESS · OXFORD

Case: 1:23-cv-00631-BMB  Doc #: 40-9  Filed: 04/23/24  66 of 93.  PageID #: 1328

*Oxford University Press, Walton Street, Oxford* OX2 6DP
*Oxford New York Toronto*
*Delhi Bombay Calcutta Madras Karachi*
*Petaling Jaya Singapore Hong Kong Tokyo*
*Nairobi Dar es Salaam Cape Town*
*Melbourne Auckland*
*and associated companies in*
*Berlin Ibadan*

*Oxford is a trade mark of Oxford University Press*

© *Oxford University Press 1989*
*First published 1989*
*Reprinted (with corrections) 1991*

*All rights reserved. No part of this publication may be reproduced,*
*stored in a retrieval system, or transmitted, in any form or by any means,*
*electronic, mechanical, photocopying, recording, or otherwise, without*
*the prior permission of Oxford University Press*

*British Library Cataloguing in Publication Data*
*Oxford English dictionary.—2nd ed.*
*1. English language–Dictionaries*
*I. Simpson, J. A. (John Andrew), 1953–*
*II. Weiner, Edmund S. C., 1950–*
*423*
*ISBN 0-19-861217-6 (vol. V)*
*ISBN 0-19-861186-2 (set)*

*Library of Congress Cataloging-in-Publication Data*
*The Oxford English dictionary.—2nd ed.*
*prepared by J. A. Simpson and E. S. C. Weiner*
*Bibliography: p.*
*ISBN 0-19-861217-6 (vol. V)*
*ISBN 0-19-861186-2 (set)*
*1. English language—Dictionaries.  I. Simpson, J. A.*
*II. Weiner, E. S. C.  III. Oxford University Press.*
*PE1625.087 1989*
*423—dc19    88–5330*

*Data capture by ICC, Fort Washington, Pa.*
*Text-processing by Oxford University Press*
*Typesetting by Pindar Graphics Origination, Scarborough, N. Yorks.*
*Manufactured in the United States of America by*
*Rand McNally & Company, Taunton, Mass.*

Bards of Tyne 356 'There's Billy the Barber for coupin' see
cliver. *Mod. Sc.* I'll coup knives with you.

**coup, coupe** (ku:p), *v.*² Also 5 cope. [a. F.
*couper* to cut: cf. COPE *v.*¹, a doublet of this.]

**¶1.** *trans.* To cut, slash. *Obs.* (Only in pa.
pple.)

*a*1300 *Syr Degarre* 790 His sschon i-couped as a knijt.
1377 LANGL. *P. Pl.* B. xvii. 14 To geten him kijte spores or
galoches ycouped [C. y-coped, ykeped]. *c*1435 *Torr.
Portugal* 1193 Withoute couped shone.

**2.** *Her.* To cut off clean: see COUPE.
1610 GUILLIM *Heraldry* iii. xiii. (1666) 160 Couping is
when a part is cut off smooth. 1639 FULLER *Holy War* v.
xxix. (1840) 285 Piercing, voiding, fimbriating, ingrailing,
couping [the cross].

**coup** (kaup), *v.*³ *Sc.* Also 5 caupe, 8 cowp.
[prob. originally the same word as COPE *v.*²
(which had variant forms *coupe, caupe*). From
sense 1, was passes easily to that of 'upset or
overturn with a shock or impact', and so to
'upset, overturn, tilt' generally; cf. the sense
history of TILT *v.*]

**¶1.** *intr.* To strike; to come to blows, meet in
the shock of combat, tilt. *Obs.* See COPE *v.*²
*c*1400 *Morte Arth.* 2059 Thane the comlyche kynge ...
With a crewelle lance cowpez hulle reene .. emange the
schorte rybbys. *c*1400 *Rowland & O.* 453 In schelдes pay
cowped full euen.

**2** *trans.* To overturn, upset, tilt; to empty out,
as from a cart or wheelbarrow by suddenly
tilting or the like; to toss off (a pot of liquor).
*to coup the crans, or creels:* Sc. Fishery phrases; also *fig.*
to cease or sustain an upset, be upset, come to grief; in
various applications. (See CRAN, CREEL.)
*a*1572 KNOX *Hist. Ref.* 203 (Jam.) The pure woman ..
coupt up his builkes so that his heid went doun. *c*1610 SIR
J. MELVIL *Mem.* (1735) 399 He is in hazard of being couped
and wrecked. 1785 BURNS *To J. Laprak* 13 Sept. ix, But
Mauks are couped wi' the blast. 1816 SCOTT *Old Mort.*
xxxviii, 'The bairns would be left to .. coup ane anither into
the fire.' 1818 ――― *Hrt. Midl.* xlviii, 'the only grace
fortunes, and does not .. coup cadgers' carts, or ony sort of
mischief.' 1832-53 *Whistle-binkie* (Sc. Songs) Ser. III. 9 Let
us coup aff our bicker, And toast meikle joy to the vea. 1874
*Daddy* Mag. 823 He just brings a cartload of texts and
cowps them in. *Mod. Sc.* The horse ran away and coupit the
cart.

**3.** *intr.* To be overturned or upset; to fall or
tumble over; to capsize.
1785 BURNS *Dr. Hornbook* xviii, I drew my scythe in sic a
fury, I near-hand couped wi' my hurry. 1824 SCOTT
*Redgauntlet* Let. xi, 'Ower he cowped as if he had been
dead.' 1853 READE *Chr. Johnstone* 228 'She'll hae coupit a
mile wast Inch Keith, an' the tide rinning aff the island.'

**coup,** obs. form of COOP, COPE, COUP.

**coupabil, -ble,** obs. forms of CULPABLE.

**†coupage.** *Obs. rare.* [f. A. F. *coupage*, f. *couper* to
cut: see -AGE.] The cutting up or carving of meat
etc.
*c*1483 *Liber Niger in Household. Ord.* 59 That ye .. be at the
coupage of fleyhsse and at the departing of fyshe.

**coupar,** obs. form of COOPER.

**coup-cart** (ˈkaup,kɑːt). [f. COUP *sb.*², ¹ or *v.*³]

**1.** A coup *sb.*², a box-cart.
1794 *Statist. Acc. Scotl.* XII. 185 (Jam.) In the year 1750,
there were but two box-carts, or what is here called coup
carts, in the parish [of St. Vigeans, Forfar], but at present
there is no other kind made use of here. 1805 R. W. DICKSON
*Pract. Agric.* (1807) I. 61 A close single-horse cart ..
sometimes termed a coup-cart. 1868 ATKINSON *Cleveland
Gloss.* 1869 *Lonsdale Gloss., Coup, Coup-cart,* a dung-cart, a
small cart.

**2.** A cart with a body which can be tilted, so
that the load may be 'couped' out. (Chiefly *Sc.*)
1794 *Agric. Surv. Berwicksh.* 167 (Jam.) The body of the
coup cart is attached to the shafts by a peculiar kind of
hinges, which allow of elevating it before, either partially or
entirely, to facilitate the discharge of its load backwards.
1799 J. ROBERTSON *Agric. Perth* 100 Used in what are called
coup-carts, i.e. when the box is moveable on a frame; and the
contents can be discharged, without lifting the shafts. 1855
ROBINSON *Whitby Gloss., Coup,* to tilt out the material from
a 'coup cart', or cart that turns up to be emptied.

**†coupe¹** (kuːp). [Fr., goblet.] **a.** A shallow cup,
bowl, or glass. **b.** A mixture of ice-cream and
fruit, etc., served in a glass goblet or the like;
also *coupe Jacques* (see quot. 1951.)
1895 Montgomery *Ward Catal.* 528/3 Soup Coupe Saucer
shape. 1905 E. WHARTON *House of Mirth* II. iv. 355 What
kraut shall we have to-day, dear―*Coupe Jacques* or *Pêches à
la Méba?* 1951 *Good Housek. Home Encycl.* 421/2 *Coupe
Jacques.* Half-fill the glass goblets with fruit salad, flavoured
with kirsch, cover this with a layer of vanilla ice cream, and
then add a layer of strawberry ice. Decorate with a place
with kirsch. 1967 *Spectator* 29 Sept. 378/1 The tulip-shaped
glass is much more suitable than the *coupe*―among other
reasons because it holds the champagne bubbles longer
successfully. 1969 R. & D. DE SOLA DICK. *Cooking* 74/2
*Coupe glacée,* ice cream or sherbet combined with fruit or
other ingredients; *coupe* is always served in a rimless bowl or
cup. 1909 *Southerly* XXX. 17 Proudly he carried the
brimming bucket into the kitchen where Medora was filling
coupes with porridge.

---

**coupe²** (kuːp). [a. F. *coupe* felling, f. *couper* to
cut.] A periodic felling of trees; also, the area so
cleared.
1922 W. SCHLICH *Man. Forestry* (ed. 4) I. 27 The annual
or periodic coupes were further reduced to strips or to
groups, known as the 'Strip and the Group Systems'. 1928
R. S. TROUP *Silvicultural Systems* ii. 4 In its ideal form the
clear-cutting system involves felling and regenerating each
year equal areas (coupes). 1928 *Forestry* II. 83 A block of
one thousand acres of chestnut coppice worked on a twelve
year rotation (providing annual coupes of fifty acres). 1953
*Brit. Commonw. Forest Terminol.* 33 Coupes are preferably
numbered with Roman numerals to distinguish them from
compartments.

**coupe,** obs. f. COOP, COPE, COUP, CULP, CUP.

**‖coupe** (kupe), *a. Her.* Also 6 coupye, 7 -ée. [F.
*coupé,* pa. pple. of *couper* to cut.] = COUPED 2.
1572 BOSSEWELL *Armorie* iii. 16 An Arme Coupe, Partie
per Pale, Or and Ermine. 1634 PEACHAM *Genil. Exerc.* 158
The heads .. of beasts Coupee or erazed, that is cut or pluckt
off. 1761 *Brit. Mag.* II. 152 The bust of a king .. coupé at the
breast proper. 1830 ROBSON *Brit. Herald* III. Gloss.,
*Couped or Coupey.*

**‖coupé** (kupe), *sb.* [F.; specific application of
*coupé* (pa. pple.) cut: in sense 1 Littré has also
*carosse coupé* cut carriage.]

**1.** A short four-wheeled close carriage with an
inside seat for two, and outside seat for the
driver.
1834 MEDWIN *Angler in Wales* II. 182 There we met with
his 'Coupé' and the fair Ravennese *en route.* 1880 MRS.
FORRESTER *Roy & V.* I. 13, I will send the coupé for you at
a quarter to one. 1892 *Times* 16 Feb., The Coupé company
wish to return .. a rug .. left in one of their carriages.
**b.** A closed two-door motor car, usually with
two seats (see also quot. 1967). Also *attrib.* In
*U.S.* freq. spelt *coupe* and pronounced (kuːp).
1908 A. BENNETT *Buried Alive* ix. 207 This agreeable Jew
in the hall, and the *coupé* at the kerb. 1912 *Motor* 23 July
1104/2 The ordinary coupé or doctor's car. 1915 *Scotsman*
3 Apr. 12/1 'Wanted, 2-Seat Car, with Coupé Body
preferred. 1924 *Morris Owner* Sept. 653 The coupé is the
ideal car for .. the business man who has to motor in all
weathers. 1927 in *Amer. Speech* (1967) XLII. 307 The
coupe roadster for two passengers with rumble seat. 1934
[see CROSSBUS d.]. 1936 H. L. MENCKEN *Amer. Lang.* (ed. 4)
vii. 347, I have .. heard .. coupé for coupe. 1967 *Consumer's
Car Glossary* (ed. 2) 26 *Coupé,* car in which the roof slopes
down sharply behind the front seat, leaving little or no head
room in the back, or car with no back seat. In a two-door
coupé the roof can be folded back behind the seats.
**c.** *coupé de ville:* a type of motor car in which
the passenger seats are covered but with the
driver's compartment open or adapted to fold
down.
1939 E. AMBLER *Mask of Dimitrios* viii. 149 The chauffeur
.. ushered Latimer ceremoniously into a huge chocolate-
coloured coupé de ville, and drove off. 1969 J. LEASON *They
don't make them like that any More* vi. 169 A special type of
body, very popular on Rolls chassis in the late twenties and
early thirties. The passengers sat under cover in the rear ..
while the .. chauffeur and footman, sat .. up front. .. English
coach-builders called this style coupé de ville.

**2. a.** The front or after compartment of a
continental diligence.
1834 J. BARROW *Excurs. N. Europe* ii. 82 The *coupé* in front
accommodates one who sits next to the *conducteur* .. In the
rear in another *coupé. Ibid.* 83 A seat in the after *coupé* of a
Russian diligence.
**b.** An end compartment in a railway carriage,
seated on one side only.
1853 *Ann. Reg.* 132 Two ladies, who were seated in a
coupé. 1859 *All Y. Round* No. 30. 78, I have written a
column of close 'copy' in a coupé.
**c.** *coupé-lit,* a coupé (sense 2 b) in which the
seats can be extended to form a couch or bed.
(Not in current use.)
1882 DE WINTON *Equator* 10 A sound sleep in a
comfortable *coupé lit.* 1896 *Daily News* 28 Oct. 3/7 A
coupé-lits-toilette and first-class carriage will run through
to Vintimille by the 2.13 p.m. train from Boulogne. 1898
*Ibid.* 18 Oct. 2/2 A coupé-lit compartment at the Nord
Station.

**3.** *Fencing.* A movement of the sword
equivalent to a disengage, but effected by
drawing the sword along and over the point of
the adversary's.
1889 W. H. POLLOCK, etc. *Fencing* (Badm. Libr.) 49 The
coupé is the opposite of the disengage, the blade being
passed over the adversary's blade instead of under. *Ibid.* 62
Simulate disengagement into tierce and make a coupé.
**4.** *Dancing.* = COUPEE, q.v.

**†coupe-band.** ? *Obs.* A portion cut off the end
of a stack to supply material to complete it
above.
1641 BEST *Farm. Bks.* (Surtees) 59 That which is cutte off
of the stacke end is called (for the most part) a coupe-band.

**couped** (kuːpt), *ppl. a.* Also 7 cooped.
**†1.** Cut, slashed: see COUP *v.*¹ 1. *Obs.*
**2.** *Her.* Said of the head or any member of an
animal, or a part of a plant, represented as cut off
'clean' or smoothly (opp. to *erased, slipped*); also
of an ordinary (*e.g.* a cross) having the
extremities cut off so as not to extend to the
boundaries of the shield.
1679 PLOT *Staffordsh.* (1686) 297 Three childrens heads
couped at the shoulders. 1705 HEARNE *Collect.* 24 Nov., An

---

Asses Head couped. 1864 BOUTELL *Heraldry Hist. & Pop.*
xvii. (ed. 3) 274 A dexter hand couped at the wrist. 1882
CUSSANS *Her.* iv. 61 The Cross haunteed, or couped, as its
name implies, has its extremities cut off.
*transf.* 1678 BUTLER *Hud.* III. iii. 214 Th' Ears, Eras'd, or
Coup'd for Perjurers.

**coupee** (kuˈpiː, ˈkuːpiː), *sb.* Also 8 coopee,
coupie, coupé. [ad. F. *coupé* in same sense: see
-EE.] A dancer step formerly much used; the
dancer rests on one foot and passes the other
forward or backward, making a sort of
salutation; hence, sometimes used for a bow
made while advancing.
1673 WYCHERLEY *Gentl. Dancing-Master* III. i, One, two,
and a coupee. 1690 D'URFEY *Collin's Walk* iii. (D.) Coupees
low from pauper drudges. 1708 MOTTEUX *Rabelais* v. xxiv.
(1737) 105 Jerts .. *Coupés,* Hops, Leadings, Risings. 1757
MRS. GRIFFITH *Lett. Henry & Frances* (1767) II. 105 Why
shall a man practise coupees, who only means to walk? 1827
LAMB *Let. to Barton in Final. Mem.* viii. (1865) 261
Advancing .. with a coupee and a sidelong bow.
*transf.* to make this movement; to make this movement;
to make a sort of bow or salutation in dancing.
1690 D'URFEY *Collin's Walk* iii. (D.) [He] Would lose his
freedom like a puppy, Rather than she his daughter] not
learn to coupee. 1707 J. STEVENS tr. *Quevedo's Com. Wks.*
(1709) 386 It being dubious whether I limp or coupee. 1748
*Earthquake of Peru* iii. 255 That it may not hinder them in
rising or coupeeing.

**‖coupe-gorge** (kupgɔrʒ). [F.; = cut-throat.]
**†1.** A cut-throat. *Obs.*
*c*1400 *Rom. Rose* 7422 A rasour sharpe and wel bitinge
That was forged in a forge Which that men callid Coupe-
Gorge. [Hence in MINSHEU 1617, PHILLIPS, COLES.]
**2.** 'Used in a military sense to signify any spot
or position which affords an enemy so many
advantages that the troops who occupy it must
either surrender or be cut to pieces'
(Stocqueler).
*fig.*
1612 SIR R. WINWOOD *Let. to Jas. I* in Motley *Barneveld*
II. 456 On thys, he long insisted, as th' only couppe-gorge,
of all resultats, whatsoever, between france and spayne.

**coupel,** obs. form of CUPEL.

**couper,** cowper (ˈkaupə(r)). *Sc.* and *north. dial.*
[f. COUP *v.*¹ + -ER.] One who barters, deals, or
buys and sells. Cf. COPER. Now chiefly in *Comb.,*
as *herring-, horse-couper,* etc.
1581 *Sc. Acts Jas. VI* c(1597) §122 The halding of horses
at hard meat all the Sommer season, used commoule be ..
Cowpers. *a*1662 R. BAILLIE *Lett.* I. 85 (Jam.) The horse
which our coupers had bought at Morton fair. 1792 *Statist.
Acc. Scotl.* VI. 44 note (Jam.) Nor are they .. a match for
horse-cowpers, cow-cowpers,―the people that farmers
have to deal with. 1844 W. H. MAXWELL *Sports & Adv.
Scot.* xiii. (1855) 121 His visitants [were] Dutch herring-
coupers.

**couper,** obs. form of COOPER, COPPER.

**coupholite** (ˈkaufəʊlaɪt). *Min.* Also koupholite.
[Named 1797 from Gr. κοῦφος tender + -LITE.]
A variety of PREHNITE occurring in thin fragile
laminæ.
1805 R. JAMESON *Min.* II. 561 Foliated Prehnite..
Koupholite. 1868 DANA *Min.* 411 §.v. *Prehnite,* Coupholite
is in cavernous masses, made of small, thin, fragile laminæ or
scales.

**coupis,** pl. of coupe, obs. form of CUP.

**coupisse,** obs. form of COPPICE.

**coupla** (ˈkʌplə). orig. *U.S.* Colloquial form of
*couple of.*
1908 H. GREEN *Actors' Boarding House* 254 A coupla
parties is come for rooms! 1934 D. L. SAYERS *Nine Tailors*
II. ii. 276 He'd had nothing to eat .. for a coupla days. 1965
H. C. RAE *Skinner* II. xiii. 179 I'll manage to paint the thing
off on some mug for a coupla quick quid profit.

**couple** (ˈkʌp(ə)l), *sb.* Forms: 4 coppell, 4-5
cuple, copul(l, coupel, 4-6 coupil(l, -yl(l, cople,
copple, 4-7 cuppel, 5 couple, coupyl, cowpyle,
cuppil, -ylle, 5-6 copel, -il(l, -yl(l, cowple, 6
cooele, 4- couple. [a. OF. *cuple, couple,* later
*couple―L. cōpula* band, tie, connexion: see
COPULA.]

**I.** That which unites two.
**1. a.** A brace or leash for holding two hounds
together. Usually in *pl.*; also a *pair of couples.*
*c*1340 *Gaw. & Gr. Knt.* 1147 Couples huntes of kest [=
hunters cast off couples]. 1483 *Cath. Angl.* 86 A Cwpylle of
hundys, *copula.* 1486 *Bk. St. Albans* E v b, When he has of
cast his cowples at will. 1602 *Return fr. Parnass.* ii. v. (Arb.)
32 Another company of houndes .. had their couples cast off.
1678 *Lond. Gaz.* No. 1345/4 Strayed .. a red pied Fox Beagle
Bitch .. with a pair of Couples on her. 1781 P. BECKFORD
*Hunting* (1802) 81 Care should be taken that the couples be
not too loose, lest they should slip their necks out of the
collar. 1821 SCOTT *Kenilw.* xxxiv, Hounds yelled in their
couples.
*fig.* 1825 THACKERAY *Newcomes* II. 66 In pursuit of a
husband who will run away from the couple.
**b.** *transf.* and *fig.* to go, hunt, run in couples.
Here the original meaning is often forgotten,
and *couples* used with the sense of *pairs, twos.*

1048

**1610** B. Jonson *Alch.* i. i, 'Sdeath, you perpetual curs, Fall to your couples again, and cozen kindly. **1611** Shaks. *Wint. T.* ii. i. 135 'He keepe my Stables where I lodge my Wife, Ile goe in couples with her. **1633** P. Fletcher *Purple Isl.* ii. 19 note, None of them [the nerves] single, but runne in couples. **1647–7** Cl1eveland *Char. Lond. Diurn.* 4 They hunt in their Couples, what one doth at the head, the other scores up at the heele. **1705** Hickeringill. *Priest-cr.* ii. iv. 39 (Like Blood-hounds) they usually hunt (in Couples) together, (Avarice and Ambition) that's their Name. **1836–9** Dickens *Sk. Boz, Dancing Acad.* ix, And when he had been sufficiently broken in in the parlour he began to run in couples in the public room.

**2.** *transf.* †**a.** A connexion between two parts of the body; **?** a ligament. *Obs.*

**1535** Coverdale *Col.* ii. 19 The heade wherof the whole body by ioyntes and couples receaueth norishment and is knyt together.

†**b.** *Gram.* A connecting word or particle; a copula. *Obs.*

**1628** T. Spencer *Logick* 161 The Verbe (in the common language of the Schooles) is called the band, or couple. **1711** J. Greenwood *Eng. Gram.* 152 It is called the Subjunctive Mood because it is subjoin'd or added to the first Sentence by some Copule or Tye.

†**3.** Union or coupling in matrimony; the bond of wedlock; sexual union. *Obs.*

**c 1320** *Orpheo* 422 in Ritson *Metr. Rom.* II. 265 A foule couple it were forthy To tete hir com in thy company. **1362** Langl. *P. Pl.* A. x. 180 Hit is an vn-comely couple . To ieuen a yong wenche to an old feble Mon. **1375** Wycl. *Serm.* 194 Wyth-outen couuple or fleschly dede. **2 1583** Ld. Berners *Huon* clxii. 631 It were a mete copyull of vs twayne to be ioyned together in maryage. **1611** Cotgr. *Couples* Al To be begotten in the honest and chast couple of marriage.

**II.** A union of two; a pair.

The plural after a numeral is often *couple*, esp. when followed by *of* with the names of animals or things.

**4.** A brace of dogs used for hunting, *esp.* harriers or spaniels; also, a brace of conies or rabbits.

**c 1430–50** *Two Cookery-bks.*, CC. coupil Conyngges. **1470–85** Malory *Arthur* x. xlii. 434 A royce as hit hadde bene a noble couple of houndes. **1527** W. Capon in Fiddes *Wolsey* ii. (1726) 104 He gave to vs 6 cowple of conyes. **1610** Guillim *Heraldry* iii. xiv. (1660) 167 Skilfull Forresters . Do use to say, a Couple of Rabbets or Conies. **1636** W. Denny in *Ann. Dubrensia* (1877) 14 Then throw they in their Couples, and one cry of many Parkes do ring about the Skie. **1725** Bradley *Fam. Dict., Couple,* in respect to Conies and Rabbets, the proper Term for two of them; so it is for two Hounds. **1801** Strutt *Sports & Past.* i. i. 19 Two spaniels or harriers were called a couple.

**5. a.** A man and woman united by love or marriage; a wedded or engaged pair.

**c 1300** Cursor M. 10168 (Cott.) To wijf he has dame anna tan,—Was suilk a cuple [v.r. coupil, couple] neuer nan. **1393** Langl. *P. Pl.* C. xix. 182 The feble bereþ witnesse . þat a-corsed alle couples þat no kynde forþ bredeþ. **1481** Caxton *E. Wills* (1882) 107 Euery couple of man & wyf dwellyng at Ochecote. **1545** Brinklow *Compl.* 44 b, 2ii. pownd of euery hundreth, to be bestowyd vpon poore copils at their maryages. **1610** Shaks. *Temp.* iv. i. 40, I must Bestow vpon the eyes of this yong couple Some vanity of mine Art. **1667** Milton *P. L.* iv. 339 Fair couple, linkt in happie nuptial League. **1711** Steele *Spect.* No. 254 ⁋3 A very loving Couple. **1753** *Scots Mag.* Aug. 422/2 The happy couple who got the Dunstable bacon in 1751. **1833** H. Martineau *Man. Use of Gt. Men* Wks. (Bohn) I. 284 It is observed in old couples . who have been housemates for a course of years, that they grow alike. **1875** Mrs. Randolph *Wild Hyacinth* I. 43 Sir Loudoun would give up Glen Ettrick at once to the young couple.

**b.** A man and woman associated as partners in a dance or the like.

**1759** Compl. *Lett.-writer* (ed. 6) 226, I stood two couple above her. **1857** Hughes *Tom Brown* ii. viii, A merry country-dance was going on, and new couples joined in every minute. **1875** *Routledge's Ball-room Guide* 31 The Lancers must be danced by four couples only in each set.

**6.** Of animals: **a.** A pair of opposite sexes.

**c 1338** E. E. *Allit. P.* B. 333 Of viche best pat berez byf busk pe a cupple. **1362** Langl. *P. Pl.* A. x. 169 Alle telarðs dyce for his dedes . Out-taken Eihte soules, and of vche beest a couple.

**b.** *Farming.* A ewe and her lamb; *double couple,* a ewe with two lambs.

**a 1722** Lisle *Husb.* Gloss. (E.D.S.), *Couples,* ewes and lambs. **1825** Prof. N. *Agric. Soc.* XVI. ii. 295, 200 ewes with their lambs, generally here [Bucks.] called 'couples'. **1882** *Somerset Gaz.* 18 Mar., 9 single couples and 1 double ditto of ewes and lambs.

**7. a.** *gen.* Two individuals (persons, animals, or things) of the same sort taken together; properly used of such as are paired or associated by some common function or relation; but often loosely, as a mere synonym for *two.* Cf. *pair.*

†*couple of corn:* app. two quarters.

All shades of gradation connect the strict sense (as in 1541) with the loosest (as in 1711).

**1365** Durh. *Halmote Rolls* (Surtees) 42 Ad emendum ij coppell' de siles cum les pannes. *c 1400* Beryn 2002 þer & per a couppill gon to oule the house. **1481** Caxton *Reynard* (Arb.) 58 Tho gaf I hym a copel of maynchettis with swete butter. **1486** Bk. St. Albans F v j a, A Cowple or a payere of bottillis. **1526** Act. 18 Hen. VIII in Stat. Irl. (1621) 77 After the rate of fifteene shillings the couple of corne. **1535** Coverdale *Judith* xix. 3 A seruaunt and a couple of asses. **1541** R. Copland *Guydon's Quest. Chirurg.,* Howe many couples of sensityfe synewes come fro the brayne. **1570** Ascham *Scholem.* Pref. to Rdr. (Arb.) 20 Though they three doe cost me a couple of hundred poundes by yeare. **1599** Shaks. *Much Ado* III. v. 34 A couple of as

arrant knaues as any in Messina. **1611** Bible 2 *Sam.* xiii. 6 Make me a couple of cakes. **1638** Brome *Antip.* iv. viii, These persons passe ouer the Stage in Couples. **1711** Steele *Spect.* No. 8 ⁋1, I shall here communicate to the World a couple of letters. **1867** Lady Herbert *Cradle L.* vii. 194 We spent a couple of hours resting and exploring the ruins. **1885** *Law Times* LXXX. 111/1 The rule . has existed for at least a couple of centuries.

**b.** (With *of* omitted) = *couple of* (cf. COUPLA; U.S. *colloq.*).

**1925** S. Lewis *Martin Arrowsmith* xvi. 188 A couple months in Italy. **1934** D. Hammett *Thin Man* xxii. 173 She touched me for a couple hundred to buy a new car.

**c.** Quasi-*adj.* a *couple more* ( . ), two more (*colloq.*).

**1834** A. Taylor *Sandbar Sinister* vi. 52 'Just you hang on for a couple minutes more,' Asey promised her.] **1961** 'If Stone' *Man who looked Death in Eye* iii. 57 The crowd of curious onlookers gathered in the street and a couple more cops to hold them at a decent distance. **1969** A. Lurie *Nowhere City* xii. 123 I wonder if I could dictate a couple more letters then, while we wait? **1985** *Washington Post* 4 Jan. A13/4 It's going to be a couple more months . . before we decide what to do.

**d.** With ellipsis *of* drinks, of glasses, etc. *colloq.*

**1934** in coll. *a couple.* **1934** H. M. Harwood *Old Folks at Home* i. i, Liza (coldly). I said you had had a couple.

**8.** One of a pair of inclined rafters or beams, that meet at the top and are fixed at the bottom by a tie, and form the principal support of a roof; a principal rafter, a chevron.

[Cf. *c 600* Isidore *Orig.* xix. xix. 6 Cuple [*v.r.* copile, complie] vocate, quod copulentur in luctantes.]

**1364** *Durh. Halm. Rolls* (Surtees) 11, 2 domum sufficientem de iij copuls. *c 1380* Sir *Ferumb.* 1328 Al pe coples cipres were & pe raftres were al-so. *c 1425* Wyntoun *Cron.* ix. vi. 163 Twenty cuppil he gave or ma, to pe body or pe kerk alsua. **1572** Bossewell *Armorie* II. 75 An house is neuer made perfecte, till from euerye couple . . by the maner of an heade. **1659** Willsford *Scales Comm.,* Archit. 12 At every joynt a collar-beam, fastned at their heads with a pin onely; these last by some are called the Arch-couples. **1796** *Statist. Acc. Scotl.* XVII. 140 (Jam.) The couples were of a circular form, lined with wood. **1868** G. Macdonald *R. Falconer* I. 97 The other [room] . . showing the naked couples from roof-tree to floor. **1888** Elworthy *W. Somerset Word-bk.* s.v., A 'half-couple' is a single main timber, such as would be used in a 'lean-to' roof.

†**9.** = COUPLET I. *Obs. rare.*

*c 1330* R. Brunne *Chron. Wace* (Rolls) 102 Sir Tristrem; ouer gestes it has pe steem . . if men itsayd as made Thomas; But I here it no man so say, but of som cupple som is away. **1423** Jas. I. *Kingis Q.* xxxvii, All the gardyng and the wallis rong Ryght of thaire song, and on the copill next Off thaire answere . **1589** Puttenham *Eng. Poesie* ii. x. (Arb.) 99 By distick or couples of verses agreeing in one cadence.

**10.** *Dynamics.* A pair of equal and parallel forces acting in opposite directions, tending to produce a motion of rotation.

**1855** Price *Anal. Mechanics* 40 A couple of forces is a system of two parallel and equal forces which act in different lines. **1881** Maxwell *Electr. & Magn.* II. 103 The moment of the couple with which terrestrial magnetism tends to turn the . .magnet.

*fig.* **1883** *Blackw. Mag.* Sept. 293/1 The central 'couple', as the Mathematicians would call it, of the European balance.

**11.** *Geom.* (See quot.)

**1881** C. Taylor *Geom. Conics* 257 If three or more pairs of points A, A'; B, B'; C, C'; etc. be taken on a straight line at such distances from a point O thereon that OA . OA' = OB . OB' = OC . OC' = etc., they are said to constitute a system in Involution . . the points (A, A') (B, B') (C, C') etc., are called Conjugate Points or Couples of the involution.

**12.** *Electr.* A pair of connected plates of different metals, used for creating either a galvanic or a thermo-electric current.

**1823** Tyndall *Heat* i. App. (1890) 17 The figure represents what is called a thermo-electric pair or couple. **1863–72** Watts *Dict. Chem.* II. 415 The system of two dissimilar metals immersed in a liquid which acts on one of them is called a *Galvanic* or *Voltaic Couple.* **1885** Watson & Burbury *Math. Th. Electr. & Magn.* I. 240.

**13.** *Astron.* A double star.

**14.** *attrib.* and *comb.*, as **couple-balk** (*Sc.*), cf. sense 8 and BALK *sb.*[1]; **couple-keg** (see quot.).

**1843** Bethune *Sc. Fireside Stor.* 113 The wooden framework of an old bed . . was brought down from the couple-bauks of the barn. **1888** Elworthy *W. Somerset Word-bk., Couple-keg* is often to be found in advertisements. It means a good crop of early grass fit for ewes and lambs, which must be well fed.

**couple** ('kʌp(ə)l), *v.* Forms: 3 kuple, 3–5 cuple, 4 copil, cupel, –ul, 4–5 coupel, -il, -yl, cowpyll, cuppil(le, 4–6 copple, cowple, couppull, 4–7 cople, cuple, 6 couple, 4– couple. [a. OF. *copler, cupler,* later *coupler,* f. *couple: cople:* see prec. and cf. L. *copulāre.*]

**I.** *trans.* To tie or fasten (dogs) together in pairs.

*c 1340* Gaw. & Gr. Knt. 1139 Penne rise pacheres pat couple cowpled hor houndez, Vnclosed pe kenel dore, & calde hem þer-oute. *c 1400* Maundev. (1839) 71 *v.l.* **1486** Bk. St. Albans B iij b, Cowple vp youre houndis two. **1530** Palsgr. *Couple* with the deepe-mouth'd brach. *1662 2nd Pt. Return fr. Parnass.* ii. v. (Arb.) 34 The Huntsmen hallowed, so ho, Venue a coupler, and so coupled the dogges. **1700** Steele *Tatler* No. 37 ⁋2 Tom. Belffrey and Ringwood were coupled together . . to be in at the Death

of the Fox, Hare, or Stag. **1859** Jephson *Brittany* ix. 147 They [the dogs] were all coupled.

**2. a.** *gen.* To fasten or link together (properly in pairs); to join or connect in any way.

*c 1330* R. Brunne *Chron. Wace* (Rolls) 88 If it were made in ryme couwce . . par rede lynes, þune . . þat couthe not half coppled a kowe. **1382** Wyclif *Isa.* v. 8 Wo that sowmen hous to hous, and feld to feld couplith . **1530** Palsgr. (Rolls) I. 135 'The superior Scythia . is a grete region . . coplede of the este parte to Ynde, of the northe to the Ocean.' **1747** Rauf *Collyear* 43 With ane Capill and twa Corbit cupit alsulk . . **1535** Coverdale *Isa.* xxvi. 27 These shalbe coupled together as prisoners þe. **1600** Hakluyt *Voy.* vs two and two together. **1664** Sir T. Herbert *Trav.* (1677) 64 These [places] þefar coupled to the rest of his Empire. **a 1734** Pope (J.), That man . . who is measuring syllables and coupling rhimes, when he should be mending his own soul. **1819** Shelley *Cyclops* 202, I see my young lambs coupled two by two With willow bands.

**b.** To yoke (a horse or cart). *Obs.*

**a 1300** *Cursor M.* 6220 (Cott.) His folk all armed did he call, And cuppel did his cartes all. **1393** Langl. *P. Pl.* C. iii. 190 Let coplele comissarie, oure cart shal he drawe.

**c.** *Organ-playing.* To connect (two keys or keyboards) by means of a coupler. Also *intr.* (of a key or keyboard) To admit of this connexion.

**1829** *Organ Specif.* in Grove *Dict. Mus.* II. 596/1 Pedal to couple Swell to Great. **1880** *ibid.* 601/2 When the Swell was coupled to the Great Manual.

**d.** *Mech.* To connect (railway carriages) by a coupling; to connect (the driving-wheels of a locomotive steam-engine) by a coupling-rod.

**1842** Penny *Cycl.* XIX. 249/1 The two pair of wheels of a locomotive engine] were coupled together by connecting rods. **1864** *Law Times Rep.* X. 719/1 Trucks . . filled with ballast . were coupled together and carried away by engine. **1874** Knight *Dict. Mech.* s.v. *Car-coupling,* in Europe the connection is more intimate, the cars being coupled together so firmly as to prevent the jar as the cars collide or jerk apart in starting or stopping.

**e.** *Photogr.* To connect a device (as a rangefinder, etc.) to the mechanism of a camera. Also *intr.*, to be capable of being so connected.

**1934** R. M. Fanstone *Mod. Miniature Cameras* ii. 7 This camera has automatic focussing by means of a range finder coupled to the focussing adjustment of the lens. **1933** W. D. Emanuel *Miniature Camera Guide* p. 1 (Advt.) Leica Model III. Automatically coupled range-finder focusing. **1939** *Amer. Ann. Photogr.* 1940 77,2 These new, small cameras were characterized by their versatility and built-in features, such as range finders coupled to the lens and shutter assembly. **1958** *Amateur Photographer* 31 Dec. 854 (Advt.), Rangefinder couples with all lenses. **1961** A. L. M. Sowerby *Dict. Photogr.* (ed. 19) *Coupled exposure-meter,* an exposure-metre the mechanism of which is linked to the controls adjusting stop and shutter-speed.

†**3. a.** To join in wedlock or sexual union. *Obs.*

*a 1340* Hampole *Psalter* xviii. 5 Sol þat sett his spouse til spouse in cuppile. **1375** Barbour *Bruce* iv. 41 Dame marioryc was couplyt in-to godlynes band with hir knycht, Schir Walter Stewart off Scotland. **1450–1530** Myrr. our *Ladye* 12 Barton of woman that was caruall coupled vnto hym. **1485** Caxton St. Wenefr. 2, I am couplid in matrimonye to the sone of the euerlastyng kyng. **1535** Coverdale *Mark* x. 9 Let not man therfore put asunder that which God hath coupled together. **1549** Bk. Com. Prayer, Solemn. Matrim., If any man do allege any impediment why they may not be coupled together in matrimony. **1600** Shaks. *A Y. L.* iii. iii. 45 The Vicar of the next village . . hath promis'd to . couple me. **1746** Swift *Let. to Pope* 17 Nov. 369 To assist in degrading a parson who couples all our beggars. **1740** Fielding *Tom Jones* xviii. xii, As eager for her marriage with Jones as he had before been to couple her to Blifil.

**b.** To espouse, marry. *Obs.*

**c 1400** *Destr. Troy* 2754 Clunestra at kirke couplit onone This Engast, with Jolite to hit sustane.

**c.** To pair (animals).

**1721** R. Bradley *Wks. Nat.* 91 If a Sow of that Breed is Coupled with a Boar of the Cloven-footed kind. **a 1754** Fielding *Fathers* v. v, We [Wedding] directly what to do? I think you are coupling some of your animals in the country?

**4.** *intr.* To unite with one of the opposite sex, come together sexually; to pair.

**1362** Langl. *P. Pl.* A. x. 153 To kepe him cum from Coueytyse, And coupe not his catel er his Caughte or þou couple til Æneid iv. 35 He that with the first coupled tooke away M'ly love with him. **1590** Shaks. *Mids. N.* v. i. 143 Begin man. **1664** Evelyn *Kal. Hort.* (1729) 194 Furnish . . your Aviaries with Birds that couple. **1871** Milton *P. R.* ii. 181. **1774** Goldsm. *Nat. Hist.* spring. **1869** Tennyson *Pelleas & E.* 546 Why then let men couple at once with wolves.

**5. a.** *trans.* To associate or bring together (persons) in pairs, or as companions or partners; †formerly also, to match or engage as opponents in a contest.

**1362** Langl. *P. Pl.* A. iv. 132 Clerkes pat wen confessours coupled hem to-gedere Furre construe þe brym. *c 1400* Ywaine & *Gaw.* 3596 Thai saw never undire the hevyn Twa Knightes that war copled so even. *c 1489* Caxton *Sonnes of Aymon* xviii. 392 Or ever they left other, other goon, whan they were cowpled ones togyder [wrestling]. **1526** Tindale *Acts* ix. 26 He aszyde to couple hym self with the apostles. **1583** Stocker *Hist. Cin. Wares* ii. 58 a, Ihon Montiew, as he was coupled to the Admirall ii. When the rest of the Company is coupled. **1841** Worsew. *Eccles. Sonn.* II. xxxiv. *Latimer & Ridley,* Seest thou . . the high-souled man . . Latimer and Ridley in the might Of Faith stand coupled for a common flight?

**b.** To attach or unite by ties of affection, or the like.

**1362** Langl. *P. Pl.* A. xi. 116 Ryd forþ bi Richesse . . For 3if þou couple þe to hym, to Clergie comestou neuere. *c 1430*

Case: 1:23-cv-00631-BMB   Doc #: 40-9   Filed: 04/23/24   69 of 93.   PageID #: 1331

*Hymns Virg.* (1867) 22 For Fuere loue couplip god to man. **1526** TINDALE *N.T.* Prol., The spyrite of god, whych .. copleth us to god. **1548** HALL *Chron.* 172 b, The bodyes of these noble personages .. were .. a sonder seperated .. yet their hartes were knitte and coupled in one. † **c. to couple friendship:** a Latinism. *In couple a skirmish* (cf. *to join battle*). *Obs.*

**1382** WYCLIF *Eccles.* xxxvii. 1, I frenshipe couplide [**1388** Y haue couplid frenschip]. **1583** STOCKER *Hist. Civ. Warres Low C.* II. 66 a, A skirmishe beganne to be coupled betwene the Roiters of the Wood and the Roiters of the Reister.

**6.** *intr.* To join or unite with another as a companion, to come together or associate in pairs; †to engage (*with* another) in a contest.

c **1477** CAXTON *Jason* 39 b, Ther were none so hardy that durste .. cople with him. **1548** HALL *Chron.* 182 b, The quene heyng therof assertined, determined to couple [*i.e.* join battle] with hym while hys power was small and his ayde not come. **1871** B. TAYLOR *Faust* (1875) II. i. iii. 21 They crowding come, I see, already, Close coupling, or withdrawn unsteady.

**7. a. trans.** Of things immaterial: To connect, conjoin, link (one *with* or to another, or *together*). Properly of two things only.

a **1225** *Leg. Kath.* 1059 burh þet he wes soð godd, in his riunde cuplet wið ure. a **1300** *Cursor M.* 18804 (Cott.) He .. pat cupplud pus vr kind til his. **1362** LANGL. *P. Pl.* A. iii. 158 Clergye an Couetise beo [Meed] couple togedere. **1375** BARBOUR *Bruce* i. 236 The wrechyt dome, That is cowplyt to foule thyrldome. **1526** TINDALE 1 *Pet.* iii. 2 Whyll they beholde youre pure conversacion coupled with feare. **1597** HOOKER *Eccl. Pol.* v. lxvii. §10 He hath coupled the substance of his bread and the substance of bread together. **1727–38** GAY *Fables* I. xii. 48 A v'rice .. Must still be coupled with its cares. **1847** EMERSON *Repr. Men, Montaigne* Wks. (Bohn) I. 342 A biblical plainness, coupled with a most uncanonical levity. **1874** DIXON *Two Queens* III. xiii. x. 57 A man who coupled acts with words.

**b.** To conjoin in thought or speech.

a **1225** *Ancr. R.* 78 Isaie ueieð hope & silence, & kupleð boðe togedere. **1581** J. BELL *Haddon's Answ. Osor.* 489 Neither did he so couple you to the Colledge of Philosophers, and Oratours. **1751** JORTIN *Serm.* (1771) IV. i. 5 Theft and swearing are coupled together in the Prophet Zechariah. **1826** SOUTHEY *Vind. Eccl. Angl.* 233 To this let me couple the just complaint of .. Melchior Canus. **1866** MRS. RIDDELL *Race for Wealth* xxii, I wish you would not couple her name and mine together.

**8.** *Physics.* To bring about a coupling (sense 6 f) between. So **coupled** *ppl. a.* **a.** Said of (i.).

**1893** *Proc. R. Soc.* LIV. 76 Its coils (coupled inductively) were connected in series with the non-inductive coils of the inactive ring. **1908** [see COUPLING *vbl. sb.* 6 f (i)]. **1915** A. F. COLLINS *Bk. of Wireless* III. iv. 143 When the open and closed circuits are coupled together they can be tuned to each other so that the electric oscillations in both circuits .. have the same frequency. **1927** E. G. RICHARDSON *Sound* ii. 54 Owing to the assumption of the vibration by the air in the box the tone of the combined 'coupled system' is much more intense than that of the fork alone. **1927** I. B. CRANDALL *Theory Vibr. Syst.* ii. 63 A very complicated change in natural frequencies .. have brought about by coupling to the heavy diaphragm a relatively light resonator system. **1944** A. WOOD *Physics of Music* ii. 24 Two pendulums of unequal length suspended from a horizontal string .. form a coupled system. **1962** SIMPSON & RICHARDS *Junction Transistors* xiv. 341 The primary and secondary circuits are tuned separately to resonance at the same frequency and connected in series with the .. coupled circuit. **1965** H. J. J. BRADDICK *Vibrations, Waves, & Diffraction* i. 26 Two oscillators may be coupled in such a way that when one is vibrating, motion is transferred to the other. **1968** C. G. KUPER *Introd. Theory Superconductivity* ix. 147 (*caption*) Coupled-harmonic-oscillator model for a three-mode alternative dimensions.

**b.** Said of particles (electrons, atoms, etc.) and fields, and of mathematical quantities representing them. So **to be coupled with** = to interact with, to be influenced in (its) behaviour by. (Cf. COUPLING *vbl. sb.* 6 f (ii).)

**1922** *Chem. Abstr.* XVI. 3033 The magnetic energy of the valence electron and of the atom body, coupled in the manner postulated. **1923** H. L. BROSE tr. *Sommerfeld's Atomic Struct.* vi. 420 An outer valence electron .. and .. the rest of the atom .. are coupled together by the central magnetic field. **1935** J. DOUGALL tr. *Born's Atomic Physics* vii. 154 For every electron the orbital and spin moments are firmly coupled; but the various electrons influence each other comparatively little. **1959** B. I. & B. BLEANEY *Electr. & Magn.* xx. 548 We need to know more about the mutual interactions between the various electrons. .. These can be expressed in the form of a set of rules for coupling together the angular momenta in forming the vector coupled. **1964** J. C. SLATER *Quantum Theory of Atomic Struct.* I. x. 239 It was useful to postulate two vectors L and S, which could be coupled to give a vector J. **1966** [see COUPLING *vbl. sb.* 6 f (ii)].

† **coupleable,** *a. Obs.* [f. COUPLE *v.* + -ABLE.] That may be coupled.

**1611** COTGR., *Accouplable,* yoakeable, coupleable, fit to be coupled with.

† **couple-beggar,** *sb. Obs.* [f. COUPLE *v.* 3 + BEGGAR.] A disreputable priest who made it his business to 'couple' beggars or perform irregular marriages.

**1701** *Wilmslow Parish Reg.* in Earwaker *E. Cheshire* I. 99 Were lately married by a couple begger. **1725** SWIFT *Poems, Riddle,* No Couple-Beggar in the Land E'er join'd such Numbers Hand in Hand. **1744** *Faulkner's Jrnl.* 6–9 Oct. in Lecky *Eng. in 18th C.* (1878) II. 369 This last term is notorious couple beggar .. was excommunicated , by the Vicar-General of this diocese, on account of his persisting in this scandalous trade, which he had taken up, to the undoing of many good families.

**couple-clause.** Coupling of clauses; a name given by Puttenham to the rhetorical figure *Polysyndeton.*

**1589** PUTTENHAM *Eng. Poesie* III. xvi. (Arb.) 186 Another maner of construction which they called (*Polisindeton*) we may call him the (*couple clause*) for euery clause is knit and coupled together with a continuatiue.

**couple-close.** Also **-clos.** [app. f. F. *couple* + *clos* closed, shut.]

**1.** *Her.* A diminutive of the chevron, having one fourth of its breadth, borne in couples, and usually coising a chevron.

**1572** BOSSEWELL *Armorie* 12 A Copleclose muste conteine the fourth part of the Cheuron, and is not borne but by payres, except there be a Cheuron betwene two of them. **1864** BOUTELL *Heraldry Hist. & Pop.* xxi. (ed. 3) 303 A chevron between two couple-closes **12**. **1868** CUSSANS *Her.* iv. 57 The term Cotising is applied indifferently to Costs, Barrulets, and Couple-close.

**2.** A pair of rafters or couples in a roof. (See COUPLE *sb.* 8.)

**1849** J. Wiggs *Archit. Terms, Couple-close,* a pair of spars of a roof. **1869** in WEBSTER.

**coupled** ('kʌp(ə)ld), *ppl. a.* [f. COUPLE *v.* + -ED.]

**1.** Tied, joined, linked, or associated together in pairs. In *Her.* = CONJOINED *c.*

c **1440** *Promp. Parv.* 99 Cowplyd, *copulatus.* **1598** SYLVESTER *Du Bartas* II. i. iv. 614 Thou .. that things to come dost know Not by .. coupled points, nor flight of fatall Birds. **1621** LADY M. WROTH *Urania* 361 The rest .. came coupled, Polarchos and his soone womne Lady, etc. **1709** WATTS *Lyric Poems, Adventurous Muse* v, His verse sublime A monument too high for coupled worlds to climb. **1860** *Eng. Mech.* 19 Mar. 579/2 The coupled wheels [of a locomotive] were .. equally loaded. Six-wheeled coupled engines had from 5 tons to 6 tons on a wheel.

**b.** *Arch.* **coupled columns:** columns disposed in pairs close together, with wider intervals between the pairs. **coupled windows:** windows placed side by side, forming a pair: cf. COUPLET 3.

**1731** BAILEY (vol. II) s.v. *Column, Coupled Columns,* are such as are disposed by two and two, so as almost to touch each other at their bases and capitals. **1842–76** GWILT *Archit.* §267 The use of coupled columns and niches exhibits other varieties in which the Romans delighted. **1879** SIR G. G. SCOTT *Lect. Archit.* I. 95 Coupled columns of nearly three feet diameter each. **1881** FREEMAN *Subj. Venice* 108 A grand range of Romanesque coupled windows, bearing date 1250.

**c.** Joined in marriage.

**1672** *Essex Papers* (Camden) I. 38 After they have marryed persons, the coupled, on discontents, part, and pretend they were not legally married.

**d.** See COUPLE *v.* 8.

**† 2.** Built with couples or rafters, roofed. *Obs.* (See COUPLE *sb.* 8.)

**1382** WYCLIF *Haggai* i. 4 That 3e dwelle in housis couplid with rymbre [Vulg. *in domibus laqueatis*].

**3.** In combination, as **well-coupled, short-coupled:** said of the joining of the back to the hind-quarters in horses, etc. Also in reference to roof-couples.

**1641** BEST *Farm. Bks.* (Surtees) 100 Horses that are short coupled and well-backed. **1649** G. DANIEL *Trinarch. Hen. V,* clxxxv, The well-rais'd Arch of Honour! where noe Act of Fame misplac't, Firms him, well-coupled, from the sure-lay'd Base. **1720** W. GIBSON *Diet Horses* vi. (ed. 3) 120 Many of our best ambling nags are well coupled, and for the most part durable on a journey. **1828** SCOTT *F. M. Perth* viii, A strong black horse .. high-shouldered, strong-limbed, well-coupled, and round-barrelled.

¶ Erroneously for CUPOLAED, having a cupola.

**1615** G. SANDYS *Trav.* 33 The Ottaman Mausoleus .. built all of white marble, round in forme, coupled on the top. **1665** SIR T. HERBERT *Trav.* (1677) 120 'Tis covered at top, arched and coupled after the mode of those oriental Countreys.

† **couplement** ('kʌp(ə)lmənt). *Obs.* Also 7 **coplement.** [a. OF. *couplement:* see COUPLE *v.* and -MENT; cf. *accouplement.*]

**1.** The act of coupling or fact of being coupled together; union of pairs.

**1548** HALL *Chron., Hen. VII,* an. 16. 52 b, By this conjunccion and couplement of matrimony. **1596** SPENSER *Prothal.* vi, Ioy may you haue and gentle hartes content Of your Ioues couplement. **1600** SHAKS. *Sonn.* xxi, Making a couplement of proud compare With Sunne and Moone, with earth and seas rich gems. a **1670** HACKET *Abp. Williams* II. (1692) 140 He met with all sort of factions such factions combined in one couplement.

**2.** The result of coupling. **a.** A couple, pair.

**1588** SHAKS. *L.L.L.* v. ii. 535, I wish you the peace of minde, most royall couplement. **1596** SPENSER *F.Q.* VI. v. 24 And forth together rode, a comely couplement. **1816** SOUTHEY *Lay of Laureate, Dream* 70 Anon two female forms .. Came side by side, a beauteous couplement.

**b.** Of verses: A couplet or stanza.

**1594** CARRW *Huarte's Exam. Wits* (1616) 42 He made couplements of verses very well composed.

**3.** Anything that couples together; a coupling.

**1622** F. MARKHAM *Bk. War* III. x. 55 Ordnance ready mounted with all their Couplements, Ornaments, Traces.

**coupler** ('kʌplə(r)). [f. COUPLE *v.* + -ER[1].]

**1.** One that couples; *spec.* one whose business it is to couple railway carriages or trucks.

**1552** HULOET, *Coupler, copulator.* **1748** SMOLLETT *Rod. Rand.* xi. (1804) 58 No such creature as you neither—no ten pound sneaker—no quality coupler. **1772** PENNANT *Tour Scot. in 1772* (1790) II. 95 Those infamous couplers despise the fulminations of the Kirk. **1885** *Manch. Exam.* 15 May 5/7 Couplers [of railway carriages or trucks] .. expose themselves to danger in shunting operations.

**2.** A thing that couples or links together. *spec.* **a.** In an organ: A contrivance for connecting two manuals, or a manual with the pedals, or two keys an octave apart on the same keyboard, so that both can be played by a single motion.

**1668** CULPEPPER & COLE *Barthol. Anat.* IV. 144 The Orbicular Muscle only moves the upper Eye-lid, and doth but embrace the lower, and knit it as a coupler. **1840** *Penny Cycl.* XVI. 492/1 These several parts, or organs, when brought together by stops, called *couplers,* give to the great organ the command of every pipe in the instrument. **1871** *Pall Mall G.* 29 Mar. 8 The organ .. is fitted with 123 stops and 32 couplers.

**b.** (See quot.) Also = COUPLING.

**1874** KNIGHT *Dict. Mech., Coupler* .. 2. The ring which slips upon the handles of a crucible tongs, or a nipping-tool of any kind. Also called *reins.*

**c.** *Zool.* A plate joining two opposite swimming appendages of a crustacean.

**1897** PARKER & HASWELL *Zool.* I. 530 The first four thoracic appendages bear biramous swimming feet .., those of the right and left sides being connected by transverse plates or couplers.

**d.** *Photogr.* (See quots.)

**1938** *Brit. Jrnl. Photogr.* LXXXV. 628/1 The dyestuffs forming the images are in all cases produced by the effect of an oxidising agent on a mixture of a suitable agent and coupler... In some instances the developer and the coupler may be identical. **1944** J. S. FRIEDMAN *Hist. Color Photogr.* xi. 127 The true problem .. is not the inability to obtain uniform dispersions of the couplers throughout the emulsion, but to prevent the couplers in one emulsion layer from wandering over into a neighboring layer. **1957** R. W. G. HUNT *Reprod. Colour* v. 45 Instead of letting the oxidized developer react with the gelatine of the emulsion, a coupler is present in the developer (or in the emulsion layer) and this reacts with the oxidized developing agent to form an insoluble dye. **1960** D. M. AVEDON *Gloss. Terms Microphotogr.* (ed. 4) 13 In a diazo material the coupler is a compound which combines with the unexposed diazonium salt to form the visible dye image.

**e.** In full *acoustic coupler.* A modem for converting digital signals from a computer into an audible sound signal and vice versa so that they can be transmitted and received over telephone lines; *spec.* a sound-absorbent cradle, incorporating a microphone and loudspeaker, into which a telephone handset is placed.

**1968** *N.Y. Times* 26 June 70 Each client will get a portable teletype and a thing called an 'acoustic data coupler' that allows the teletype to send messages to a computer over any old telephone. **1969** *Mechanised Accounting Oct.* 9/1 The Post Office has agreed to the introduction of suitably approved acoustic couplers, devices capable of turning almost any modern telephone into a data transmission terminal. **1978** *Pract. Computing July–Aug.* 56/2 The coupler converts pulses of sound. **1984** *Daily Tel.* 24 Apr. 16/4 Connex Data Systems is selling the machine and acoustic coupler (on which you rest the telephone handset for communications) as a package in a business briefcase for £397.

**coupleress** ('kʌplərəs). *rare.* [f. prec. + -ESS.] A female coupler; a woman who brings couples together.

**1864** W. BELL in *N. & Q.* V. 442 These old witches were frequently bawds and couplefesses at Rome. **1885** R. F. BURTON *1001 Nights* I. 338 *note,* So the Germ. 'Kuppelerinn', a Couplefess. It is one of the many synonyms for a pimp.

**couplet** ('kʌplɪt). Also 7 **cop-, cup-, (? caplet).** [a. F. *couplet* (1364 in Godefroy) two pieces of iron riveted or hinged together, succession of verses riming together, stanza, etc., dim. of *couple.*]

**1.** A pair of successive lines of verse, *esp.* when riming together and of the same length.

**1580** SIDNEY *Arcadia* (J.), In singing some short couplets, whereto the one half beginning, the other half should answer. **1646** DRUMM. of HAWTH. *Conv. to Jonson* Wks. (1711) 225/1 It is all in couplets, for he detested all other rhimes. **1780** JOHNSON *L.P., Congreve* Wks. III. 271 Except what relates to the stage, I know not that he has ever written a stanza that is sung, or a couplet that is quoted. **1866** ROGERS *Agric. & Prices* I. xviii. 613 A popular notion, embodied in a rhyming couplet. **1889** SKEAT *Chaucer's L.G.W.* Introd. 33 He introduces a new metre .. now famous as 'the heroic couplet'.

**2.** *gen.* A pair or combination; in *pl.* = twins (quot. 1824, *nonce-use:* cf. *triplets*).

**1601** SHAKS. *Twel. N.* III. iv. 432 Weel whisper ore a couplet or two of most sage saws. **1602** —— *Ham.* v. i. 310 As patient as the female Doue, When that her golden Couplet [*Qy.* couplets] are disclos'd. **1824** MISS MITFORD *Village Ser.* I. (1863) 161 Their very nurse, as she used to boast, could hardly tell her pretty 'couplets' apart.

**3.** *Arch.* A window of two lights.

**1844** *Ecclesiologist* III. 149 The church is lighted with four couplets and a half on each side. **1879** SIR G. G. SCOTT *Lect. Archit.* I. 251 The couplets, triplets, and more numerous groups of the Early English windows.

**4.** *Music.* Two equal notes inserted in a passage of triple rhythm and made to occupy the time of three.

**1876** in STAINER & BARRETT *Dict. Mus. Terms.*

**† 5.** A coupling, link, or chain. *Obs. rare*[−1].

# THE OXFORD ENGLISH DICTIONARY

## SECOND EDITION

*Prepared by*

J. A. SIMPSON *and* E. S. C. WEINER

## VOLUME XIV

Rob–Sequyle

CLARENDON PRESS · OXFORD

*Oxford University Press, Walton Street, Oxford OX2 6DP*
*Oxford New York Toronto*
*Delhi Bombay Calcutta Madras Karachi*
*Petaling Jaya Singapore Hong Kong Tokyo*
*Nairobi Dar es Salaam Cape Town*
*Melbourne Auckland*
*and associated companies in*
*Berlin Ibadan*

*Oxford is a trade mark of Oxford University Press*

*© Oxford University Press 1989*
*First published 1989*
*Reprinted (with corrections) 1991*

*All rights reserved. No part of this publication may be reproduced,*
*stored in a retrieval system, or transmitted, in any form or by any means,*
*electronic, mechanical, photocopying, recording, or otherwise, without*
*the prior permission of Oxford University Press*

*British Library Cataloguing in Publication Data*
*Oxford English dictionary.—2nd ed.*
*1. English language–Dictionaries*
*I. Simpson, J. A. (John Andrew), 1953-*
*II. Weiner, Edmund S. C., 1950-*
*423*
*ISBN 0-19-861226-5 (vol. XIV)*
*ISBN 0-19-861186-2 (set)*

*Library of Congress Cataloging-in-Publication Data*
*The Oxford English dictionary.—2nd ed.*
*prepared by J. A. Simpson and E. S. C. Weiner.*
*Bibliography: p.*
*ISBN 0-19-861226-5 (vol. XIV)*
*ISBN 0-19-861186-2 (set)*
*1. English language—Dictionaries.  I. Simpson, J. A.*
*II. Weiner, E. S. C.  III. Oxford University Press.*
*PE1625.087 1989*
*423—dc19    88-5330*

*Data capture by ICC, Fort Washington, Pa.*
*Text-processing by Oxford University Press*
*Typesetting by Pindar Graphics Origination, Scarborough, N. Yorks.*
*Manufactured in the United States of America by*
*Rand McNally & Company, Taunton, Mass.*

**SECUNDUM**

851

Poland, even if it were to be placed under Austrian secundogeniture, will..on no account be connected to by Germany. **1910** *Nation* 32 Jan. 672/2 If the same hypnotism could be transferred to the second or the third son, secundogeniture or tertigeniture would rest on a firmer basis than does primogeniture to-day.

**secundum** (sĭˈkandəm), [L., according to; orig. neut. accus. of *secundus* SECUND *a*.] Used in various med. Latin phrases, sometimes occurring in Eng. contexts. **secundum artem** (= Gr. κατὰ τὸ τέχνην): 'according to art', in accordance with the rules of the art (chiefly of medicine; often jocularly *transf.*). **secundum curam**, 'according to the same argument, calculation etc.', in the same manner or respect. **secundum magis et minus** (= Gr. κατὰ τὸ μᾶλλον καὶ ἥττον): 'according to more and less'; in a quantitative manner or respect; in various degrees. **secundum naturam** [Cicero; = Gr. κατὰ φύσιν]: according to nature, naturally. **secundum quid** [= Gr. κατά τι]: 'according to something', in some particular respect only (opposed to *simpliciter*, Gr. ἀπλῶς).

**1632** B. JONSON *Magn. Lady* III. vi. *Rut.* That is my course with all my Patients. *Pal.* Very methodicall, *secundum* Codz-head,..drest *secundum artem*. **1815** SCOTT *Guy M.* iv, *artem*. **1856** 'STONEHENGE' *Brit. Rural Sports* iii. iv. 176/2 The kennel-man of the dog will see to everything being done, *secundum artem*. **1696** J. SERGEANT *Method to Sci.* 390 To Affirm that the Atome is Chang'd according to One of those Different Regards or Notions, *viâ* the Form, and Not-chang'd according to the Other, *viâ* the Matter, has not the least show of Affirming and Denying *secundum idem*, but consequently, the least show of a Contradiction. **1865** S. HODGSON *Time & Space* ii. 140 The two objects are then not limited and unlimited secundum idem. **1880** W. JAMES in *Mind* Apr. 187 The union and the division are not *secundum idem*: it divides them by keeping them out of relation between, it unites them by keeping them out of the space beyond. **1621** BURTON *Anat. Mel.* Democr. to Rdr. 14 Alexander, Gordonius..[and others] confound them, as differing *secundum magis & minus*. [Note, More or lesse, some number than some.] **1837** MACAULAY *Ess., Bacon* (1897) 409 He might have gone on to instances *secundum magis et minus*. **1563** T. GALE *Inst. Chirurg.* 16 Thesi. 13, thinges which the composition of mans body. **1754** *Gray's Inn Jrnl.* No. 76 Passions..and in that Sense may be said to live *secundum naturam*.

**secundus** (sĭˈkandəs), *a*. [L. *secundus* SECOND *a*.] Appended to a personal name: The second of name. In some schools used to designate the second in age or seniority of two boys having the same name.

**1826** DISRAELI *Viv. Grey* I. viii, 'What a knowing set out', squeaked Johnson secundus. **1827** FLEMING *Brit. Zool.* Pref. 11 The University of anatomist..anxious to inquire [etc.]. **1867** BAKER *Nile Tributaries* xviii. Mahomet..Mahomet secundus (a groom), and Barrake. **1887** *Athenæum* 12 Mar. 350/2 Two excellent volumes..The former contains some sensible advice.. by Robert Chambers secundus.

**secur**, obs. form of SICKER *a*.

**securable** (sĭˈkjuərəb(ə)l), *a. rare.* [f. SECURE *v.* + -ABLE.] Capable of being secured. **1855** in OGILVIE *Suppl.* **1876** by the 'No Popery' cry.

**securance** (sĭˈkjuərəns). *rare.* [f. SECURE *v.* + -ANCE.] The action or means of securing; assurance, security.

**secure** (sĭˈkjuə(r)), *sb*. [f. SECURE *v*.] The position in which a rifle or musket is held when secured; 'see SECURE *v*. 2. *b.* h.

---

**secure** (sĭˈkjuə(r)), *a. and adv.* [ad. L. *sēcūrus*, f. *sē-* without (see SE-) + *cūra* care (whence CURE *sb.*).]

In the late L. sense 'safe, free from danger', the word passed into the Rom. langs.: F. *sûr* (OF. *seür*, whence *sure a.*), Pr. *segur*, Sp., Pg. *seguro*, It. *sicuro*; it was also early adopted in WGer., and hence appears in Eng. as SICKER *a*.]

**A. *adj*.**

**I. Feeling no care or apprehension.**

**1. Without care, careless; free from care, apprehension or anxiety, or alarm; over-confident. Now *arch*. a.** in predicative use.

**2. From freedom from distrust; feeling sure or certain. Const. *of*; also with *clause*. ? *Obs*.**

**b.** Confident in expectation; feeling certain of something in the future. Also with *infinitive*.

**II. Having or affording ground for confidence; safe; (objectively) certain.**

**3. a.** Rightly free from apprehension; protected from or not exposed to danger; safe.

**b.** Const. *against, from, *of*.

**c.** Of actions or conditions; Involving no danger; safe.

**d.** Of an argument, means, agent, etc.: Not liable to fail, trustworthy; safe.

**e.** Of a material thing, a support or fastening: Not liable to be displaced or to yield under strain; firmly fixed, safe.

**f.** Of a telephone (line): free from the risk of being tapped.

**4.** Of a place, of means of protection or guardianship: Affording safety.

**5.** Predicatively. In safe custody; safely in one's possession or power.

**6.** Free from risk as to the continued or future possession of something; having a safe prospect of some acquisition or desirable event.

SECURE                                          852                                          SECURE

with infinitive: Ensured against failure *to do* something. Cf. 2 b.

**1664** TILLOTSON *Serm.* i. Wks. (1714) 22 Consider man without the protection and conduct of a superior Being, and he is secure of nothing that he enjoys in this world, and uncertain of every thing that he hopes for. **1700** DRYDEN *Sigism. & Guisc.* 626 For this, she had distill'd, with early Care, The Juice of Simples, friendly to Despair, A Magazine of Death; and this prepar'd, Secure to die, the fatal Message heard. **1705** tr. *Bosman's Guinea* 10 No Body is here secure of Life. **1748** FRANCIS tr. *Horace, Epist.* ii. i. 69 Ennius .. Forgets his Promise, now secure of Fame, And heeds no more his Pythagoric Dream. **1758** S. HAYWARD *Serm.* Introd. 17 Oh happy case, when the soul .. bodily ventures into eternity, secure of eternal life. **1770** GOLDSM. *Des. Vill.* 288 As some fair female unadorned and plain, Secure to please while youth confirms her reign. **1788** GIBBON *Decl. & F.* xlii. IV. 548 The zeal of Cyril exposed him to the penalties of the Julian law; but in a feeble government, and a superstitious age, he was secure of impunity, and even of praise. **1825** SCOTT *Talism.* vi, When they seemed most secure of victory. **1865** H. BROUGHTON *Let.* in Trevelyan *Compet. Wallah* (1866) 355 For, if they succeed in obtaining her attention, they are secure of her humanity and her justice.

**7.** Of a possession, acquisition, desirable event, etc.: That may be counted on with certainty; sure to continue or to be attained.

**1713** SWIFT *Last Vrs. Q. Anne* Wks. 1902 X. 31 Representing their opinion that no peace could be secure for Britain, while [etc.]. **1819** SHELLEY *Cyclops* 438 Listen then what a punishment I have For this fell monster, how secure a flight From your hard servitude. **1848** THACKERAY *Van. Fair* xxxi, 'If the worse comes to the worst', Becky thought, 'my retreat is secure; and I have a right-hand seat in the barouche'. **1860** TYNDALL *Glac.* i. xviii. 132 We knew that our progress afterwards was secure. **1874** GREEN *Short Hist.* viii. §2 (1882) 461 At the Queen's accession, the peace of the Reformation seemed almost everywhere secure.

**B.** *quasi-adv.* and *adv.* (Chiefly *poet.*)

†**c1592** MARLOWE *Edw. II,* iv. vi. 1893 Your grace may sit secure, if none but we four do set your abode. **1593** SHAKS. *3 Hen. VI,* IV. v. 50 All which secure, and sweetly he enioyes. **1596** — *1 Hen. IV,* i. ii. 145 We may doe it [the robbery] as secure as sleepe. **1611** BIBLE *Judg.* xviii. 7 They dwelt carelesse, after the manner of the Zidonians, quiet and secure. **1633** MASSINGER *Guardian* II. ii, Sleep you Secure on either ear. **1654** FULLER *Two Serm.* 11 The Structure may still stand .. by vertue of .. such Foundations which still stand secure. **1738** GRAY *Tasso* 15 Against the stream the waves secure he trod. **1784** COWPER *Task* vi. 970 Beneath the shadow of whose vine He sits secure. **1818** SHELLEY *Hymn Venus* 34 Nor mortal men, nor gods Who live secure in their unseen abodes.

**secure** (si'kjᴜǝ(r)), *v.* [f. SECURE *a.* Cf. med.L. *sēcūrāre, sēcūriāre,* Sp., Pg. *segurar,* It. *sicurare.*]

†**1. a.** *trans.* To make free from care or apprehension; also, to make careless or over-confident. *Obs. rare.*

**1604** SHAKS. *Oth.* i. iii. 10, I do not so secure me in the Error, But the maine Articke I do approue In fearefull sense. **1605** — *Lear* IV. i. 22 Full oft 'tis seene, Our meanes secure vs, and our meere defects Proue our Commodities. **1655** FULLER *Ch. Hist.* IX. 82 [tr. Let. Mary Queen of Scots] To obtain of her, that she will let me go out of her country, whither I came, secured by her promises.

†**b.** To free from doubt, to satisfy, convince. Also, to make (one) feel secure of or *against* some contingency. *Obs.*

**1602** CECIL *Let.* to *Mountjoy* 7 Aug. in *Moryson's Itin.* (1617) II. 235, I cannot be secured but that he wil stil feede that fier with fewel. **1646** H. LAWRENCE *Commun. & War with Angels* 118 Which should incourage us to fight and secure us of the issue. **1666–7** PEPYS *Diary* 28 Feb., Mr Holliard [a surgeon] dined with us .. I love his company, and he secures me against ever having the stone again. **1668** OWEN *Nat. Indwelling–Sin* viii. 115 Until the soul .. be secured of it self of pardon in course.

**2.** To make secure or safe.

**a.** To make (a person, his life, etc.; rarely a thing) secure from danger or harm; to guard, protect.

*Obs. exc.* with reference to a specific danger mentioned or implied: see c.

**1602** WARNER *Alb. Eng.* x. xviii. (1612) 248 And whilst the Writ in reading was [Mary Q. of Scots] no more regarded it, Then if it had secured or concerned her no mind. **1602** SHAKS. *Ham.* I. v. 116 *Mar.* Lord Hamlet. *Hor.* Heauen secure him. *Mar.* So be it. **1624** CAPT. SMITH *Virginia* Ep. Ded. Wks. (Arb.) I. 276 The beauteous Lady Tragabigzanda, when I was a slaue to the Turkes, did alse could to secure me. **1639** FULLER *Holy War* II. iv. (1640) 48 Their profession was to fight against Infidels, and to secure Pilgrimes comming to the Sepulchre. **1645** T. TULLY *Siege Carlisle* (1840) 34 Wilson .. shot Cholmley in the brest, but his arms secured him. **1697** DRYDEN *Virg. Georg.* IV. 210 His lofty Pines, With friendly Shade, secur'd his tender Vines. a**1700** EVELYN *Diary* 22 Sept. 1641, A pass .. securing me through Brabant and Flanders. **1706** E. WARD *Wooden World Diss.* (1708) Advt., The Bill .. for securing Property in Printed Books. **1707** SIR W. HOPE *New Meth. Fencing* I. 11 For 'tis a general Rule in Fencing .. never to present one's Sword, without perfectly Covering, or Securing, as we call it, one side of the Body. **1722** DE FOE *Col. Jack* xix, Any English men-of-war that might be on the coast to secure us to the capes. **1729** TINDAL tr. *Rapin's Hist.* XVII. 438 They .. only helped to secure Elizabeth's Affairs, who thereby was sheltered from the Quarter whence she had most to fear. **1775** JOHNSON *Let.* to *Mrs. Thrale* 12 May, I really question if at this time my life would not be in danger, if distance did not secure it. **1776** GIBBON *Decl. & F.* xi. I. 410 Maximian .. gave him [Severus] the most solemn assurances that he had secured his life by the resignation of the throne.

**1593** SHAKS. *2 Hen. VI,* v. ii. 76 Now is it manhood .. To secure vs By what we can, which can no more but flye. **1697** POTTER *Antiq. Greece* I. iv. (1715) 15 Compelled to .. secure himself by a dishonourable Flight. **1705** tr. *Bosman's Guinea* 320 Each endeavouring to secure himself by getting away. **1735** JOHNSON *Lobo's Abyssinia, Descr.* 31. 51 We had no way of securing ourselves but by flight. **1760** T. HUTCHINSON *Hist. Mass.* i. (1765) 186 His men had secured themselves in a swamp. **1793** SMEATON *Edystone L.* §313 High water .. did not engage them to secure themselves with a sufficient stock of provisions. **1800** *Asiat. Ann. Reg., Misc. Tracts* 30/2 He accordingly began to secure himself by his intrenchment. **1842** W. C. TAYLOR *Anc. Hist.* xvii. §3 (1851) 515 Though Didius .. was able to secure himself in Rome, he could not [etc.].

**c.** To render safe, protect or shelter *from,* guard *against* some particular danger. Also *refl.*

**1634** MILTON *Comus* 618 Care and utmost shifts How to secure the Lady from surprisal, Brought to my mind a certain Shepherd Lad. **1646** J. MAXWELL *Burd. Issachar* 34, I never accounted them as Apostles, men secur'd from error. **1679** MOXON *Mech. Exerc.* ix. 164 The Battlement being .. Man-high, to secure Men from the shot of their enemies. **1685** STILLINGFL. *Orig. Brit.* ii. 77 For when he came against the Bagaudae, Carausius was employ'd to secure the Seas against the Franks and the Saxons. **1692** LOCKE *Consid. Lower. Interest* 130 That way of Coinage less secures you from having a great part of your Money melted down. **1699** WANLEY in *Lett. Lit. Men* (Camden) 293 Whereby Mr. Benson may secure many old words from being buried in the grave of everlasting oblivion. **1741** WATTS *Improv. Mind* I. vii. §19 [We should] consult the dictionary .. they are certain information, and thus secure us from mistake. **1748** *Anson's Voy.* III. ix. 386 A very safe road, secured from all winds. **1754** J. BROWN *Barbarossa* V. (1755) 66 Is the Watch doubled? Are the Gates secur'd? Against Surprize? **1766** BROOKE *Fool of Qual.* II. 11. Wks. I. 224 The hedge-hog, so well secured against all assaults by his prickly hide. **1784** COWPER *Task* 119 Neatly secur'd from being soil'd or torn. **1821** SCOTT *Kenilw.* xxxiv, Amy hastily endeavoured to recall what she were best to say, which might secure herself from the imminent dangers that surrounded her, without endangering her husband. **1855** JOWETT *Plato* (ed. 2) V. 20 No possessions seemed to him to have any value which were not secured against enemies.

**d.** *absol.* To obtain security, take effective precautions *against.*

**1658** *Whole Duty of Man* vii. §19. 65 It being much more easie to abstain from all, than to secure against the one, when the other is allowed. **1718** SCOTT *Rob Roy* xxxvi, The extreme strength of the country .. made the establishment of this little fort seem rather an acknowledgment of the danger, than an effectual means of securing against it. **1828** F.M. *Perth* xx, This guard the burghers will willingly maintain, to secure against the escape of the murderer of their townsman.

†**e.** To take effectual precautions against, to prevent (a danger). Also, to prevent or preclude (a person) *from* doing something dangerous. *Obs.*

**1633** P. FLETCHER *Purple Isl.* iv. xv. Which stretching round about his circling arms, Warrants these parts from all exteriour harms; Repelling angry force, securing all sha'rms. **1692** R. L'ESTRANGE *Fables* cxiii. 174 Man only is the Creature, that to his Shame, no Benefits can Oblige, no nor Severe, even from seeking the Ruine of his Benefactor. **1697** in *Perry Hist. Coll. Amer. Col. Ch.* I. 33 Such fort can be no security for his Majesty's Customs, nor for finding and securing false and illegal trade. **1710** CELIA FIENNES *Diary* (1888) 83 They'l round the Wells to y'mines to Secure their Mold'ring in upon them. *Ibid.* 140 They Carry much of their Carriages on sledges to secure their pitching in the streetes. **1831** SCOTT *Cast. Dang.* viii, I deprecate no hardship .. so I may secure you from acting with a degree of rashness, of which you will all your life repent. **1833** T. HOOK *Parson's Dau.* II. ix, I have secured him from visiting Binford.

†**f.** To render (an action) safe; to free from attendant dangers. Also, to render (a place) safe for transit. *Obs.*

**1617** SIR O. ST. JOHN in *Buccleuch MSS.* (Hist. MSS. Comm.) I. 194 The King's ship and pinnace that are appointed for the securing of those seas. **1659** FULLER *Holy War* v. (1640) 236 Two hundred and fourteen years .. they [sc. the Hospitallers] maintained this Island, and secured the seas for the passage of Pilgrims to Jerusalem. **1667** MILTON *P. L.* v. 222 And to him call'd Raphael .. that deign'd To travel with Tobias, and secur'd His marriage with the seaventimes-wedded Maid.

**g.** *Mil.* To render secure from attack or molestation by the enemy; to take defensive means for the safe execution of (a movement, e.g. a retreat, the crossing of a river); to guard efficiently (a pass, a defile).

**1617** *Moryson Itin.* II. 66 His Lordship .. sent Captaine Edward Blany with 500 foot and 40 horse, to secure their passage through the pace of the Moyrie. **1645** SYMONDS *Diary* (Camden) 242 The out workes, which secured the suburbs. **1667** LD. FAIRFAX *Mem.* (1699) 21 It made us think of securing our retreat, with the prisoners we had got. **1698** FRYER *Acc. E. Ind. & P.* 337 The Passes are easily secured (an Handful of men being able to withstand an Host). **1701** STEELE *Funeral* v. i, Then .. you, and your Party, fall in to secure my Rear; while I march off with the Body. **1760** GOLDSM. *Adv. to Officers of Army* 108 It may be the Means of saving an Army, or securing some Out-post of the utmost Importance. **1831** SCOTT *Ct. Robt.* iv, To take post in the defile .. and thus secure it for the passage of the rest of the army. **1849** MACAULAY *Hist. Eng.* xi. 261 Making dispositions which, on the worst event, would have secured his retreat. **1869** FREEMAN *Norm. Conq.* (1876) III. xii. 210 The main point in the fortification was to secure the

**h.** *Mil. to secure arms:* 'to hold a rifle or musket with the muzzle down, and lock well up under the arm, the object being to guard the weapon from the wet' (Ogilvie 1882).

**1802** C. JAMES *Milit. Dict.* s.v., *Secure arms!* a word of command which is given to troops who are under arms in wet weather. **1892** *Rifle Exerc.* (L.–M.) 14 *Secure Arms.*

†**i.** To fence off. *Obs. rare.*

**1729** CELIA FIENNES *Diary* (1888) 86 Its vaine to trye y° securing it [*sc.* a hole] round from any falling in. *Ibid.* 99 Water .. does often flow y° grounds after Raines, so the Road is secur'd w'h a banck and a breast wall of a good Length.

**j.** To put in safety, 'get in' (a crop).

**1885** *Times* (weekly ed.) 11 Sept. 9/1 Shocks of oats, cut, though not yet secured.

**3.** To make secure or certain.

†**a.** To make (a person) secure of a present or future possession, of an advantage or benefit, etc. Also *const. to* with infinitive. *Obs.*

**1610** HEALEY *St. Aug. Citie of God* xxi. 898 Assigning .. a false blisse, vnto the Saints in heauen, where they could neuer be secured to remaine. **1620** BRENT tr. *Sarpi's Counc. Trent* VIII. (1676) 728 And indeed he was secure of France and Germany. For besides his treaty with Luiran which did abundantly secure him of France, he resolved at the same time a resolution from the Emperour. **1656** EARL MONM. tr. *Boccalini's Advts. fr. Parnas.* 11. vi. 218 Since no man can secure himself of the next years perishful harvest. **1670** DRYDEN *1st Pt. Conq. Granada* v. i, Secur'd of what we hold most dear, (Each other's Love) we'll go – I know not where. **1745** tr. *Col. Rec. Pennsylv.* V. 1 Had I .. been secured of Fund for supplying those Nations with Arms.

†**b.** *refl.* To get possession of, make sure of. *Obs.*

**1675** *Machiavelli's Prince* x. Wks. 72 By .. securing himself nimbly of such an appear .. turbulent. **1795** LONG *Gaz.* No. 4158/1, 3 or 4000 of the Inhabitants had taken up Arms, .. and had secured themselves of Denia, a good Seaport Town. *Ibid.* No. 4162/1 Those who have declared for his .. Majesty having secured themselves of Denia. **1728** BROOME *Notes to Pope's Odyss.* viii. 239 Ulysses .. had way .. to secure himself of a powerful advocate, by [etc.].

†**c.** To certify, assure (a person) of some fact. Also in asseverative phrase, *I'll secure you. Obs.*

**1659** HAMMOND *Ps.* lxxiii. 4 This doth secure us of the importance of the word in this place. **1672** WYCHERLEY *Love in Wood* II. iv, The spark secures the Innocents from all Aproms (ile secure you) he has made great mistake concerning Christina. **1674** BOYLE *Excell. Theol.* i. 32 For ought reason can secure us of, one of the conditions of that association may be, that the body and soul shall not survive each other. **1680** HICKERINGILL *Ceremony–Monger* vi. 34 But Mum–not a Penny, I'll secure you, rule me Sound, and one Mouth. **1737** WHISTON *Josephus, Antiq.* Diss. ii. §3 The events and consequences of things afterwards always corresponded, and secured them of the truth of such divine revelations.

**d.** To establish (a person) securely in *some* position, privilege, etc.

**1712** SWIFT *Jrnl. to Stella* 27 Dec., Steele I have kept in his place. Congreve I have got to be used kindly, and secured. Now I have recommended, and got a promise of a place. **1713** ADDISON *Cato* v. i, The Soul, secur'd in her Existence, smile's At the drawn Dagger, and defies it's Point. **1874** GREEN *Short Hist.* iii. §3 (1882) 125 The towns were secured in the enjoyment of their municipal privileges.

**e.** To make (something) secure, certain, or reliable.  Now only with reference to a prospective possession or result of action: 'To place beyond hazard' (J.), to ensure.

**1653** HOLCROFT *Procopius, Goth. Wars* IV. 126 In the Roman army was one Arthabanes a Persarmenian, revolted from the Roman army, having secured his faith by the killing of a hundred and twenty Persian Soldiers. **1697** DRYDEN *Virg. Past.* vi. 18 For he who sings thy Praise secures his own. **1746** FRANCIS tr. *Horace, Epist.* i. xvi. 52 Whose Bail secures, whose Oath decides a Cause. **1856** GILBERT *Chr. Atonem.* ii. (1852) 39 Yet merely to know that life immortal may be obtained, is not to secure our personal enjoyment of it. **1883** P. H. HUNTER *Story of Daniel* 191 Their manner of building secured a certain air of solidity and grandeur.

**f.** To make the tenure of (a property, office, privilege, etc.) secure to a person.

**1726** BUTLER *Anal.* I. v. Wks. 1874 I. 82 Our whole present interest is secured to our hands, without any solicitude of ours. **1825** SCOTT *Betrothed* Introd. The shareholder might contrive to secure to his heirs a handsome slice of his own death-bed and funeral expences. **1828** FROUDE *Hist. Eng.* (1858) I. ii. 150 Her right to succession .. would have been readily secured to her by act of parliament.

**g.** To make (a creditor) certain of receiving payment by means of a mortgage, bond, pledge, or the like.

**1677** YARRANTON *Eng. Improv.* 15 The Party lending the Moneys is safe, well and surely secured. **1861** M. PATTISON *Ess.* (1889) I. 41 Some of the large German houses in London .. advanced large sums, taking care .. to secure themselves by mortgages of parts of the public revenue.

**h.** To make the payment of (a debt, pension, etc.) certain by a mortgage or charge upon certain property.

**1818** CRUISE *Digest* (ed. 2) II. 208. 2,000*l.* part of the money secured upon Gidea Hall. *Ibid.* IV. 392 Then such daughter should have 3,000*l.,* to be secured upon part of the estate. **1861** M. PATTISON *Ess.* (1889) I. 36 He assigns 1000 marks yearly as pin-money to his wife, secured upon the Swiss possessions of his house.

**i.** With double obj.: To ensure (a person's) obtaining (something). *rare.* (In quot. *passive.*)

**1831** SCOTT *Cast. Dang.* xii, You shall be secured an opportunity of being fully heard.

**4.** To seize and confine; to keep or hold in custody; to imprison.  Now somewhat *rare.*

**1645** CHAS. I in *Ellis Orig. Lett.* Ser. I. III. 314 You should begyme with securinge the person of William Legge. **1677** YARRANTON *Eng. Improv.* 3 Some of which Persons .. that intend to get me secur'd for setting out the strength of the Dutch. **1683** WOOD *Life* 6 Sept. (O.H.S.) III. 72 The proctor

**SECURED**

853

**SECURITY**

vice-chancellor would then have secured him [Mr. Parkinson]... ill security for his appearance at the assizes should be produced. *a* **1700** EVELYN *Diary* 20 June 1689, Newes of a Plot discover'd, on which divers were sent to the Tower and secured. **1705** [T. WALKER] *Wit of a Woman* iii. 32 Secure that Rogue in the Stocks till we have search'd further. **1706** PHILLIPS (ed. Kersey), To *Secure*,.. to apprehend or lay hold of one, to chip him into Prison. *a* **1715** BURNET *Own Time* (1724) I. 211 He proposed that about twenty of the chief gentlemen of those Counties might be secured. And he undertook for the security of the country if they were clap'd up. **1799** HT. LEE *Canterb. T., Old Wom.* T. (ed. 2) I. 192 'Let him be secured', said St. Aubert. **1818** SCOTT *Hrt. Midl.* ii, Wilson and Robertson,.. each secured betwixt two soldiers of the city guard. **1828–32** WEBSTER, *Secure*,.. to inclose or confine effectually; to guard effectually from escape; sometimes, to seize and confine; as, to secure a prisoner. The sheriff pursued the thief with a warrant, and secured him.

**5. a.** To make fast or firm.

**1663** GERBIER *Counsel* 97 And so much may suffice for the securing of doores and windowes. **1687** M. SCRIVENER *Will in Willis & Clark Cambridge* (1886) III. 437 Chains for the securing the books. **1719** DE FOE *Crusoe* I. 305, I sent Friday with the Captain's Mate to the Boat, with Orders to secure her, and bring away the Oars and Sail. **1753** BARTLEY *Gentl. Farriery* xxv. 231 A proper compress of cloth, and a linnen rowler is absolutely necessary both for this purpose, and to secure on the dressings, wherever they can conveniently be applied. **1823** *Mechanic's Mag.* I. 105 On the securing of carriage wheels. **1825** SCOTT *Betrothed* viii, A girdle.. secured by a large buckle of gold. **1867** AUGUSTA WILSON *Vashti* xix, She caught up her hair, twisted it hastily into a knot, and secured it with her comb. **1879** *Cassell's Techn. Educ.* IV. 80/2 These work in nuts secured to the doors. **1894** WEYMAN *Man in Black* 189 A wide-leafed hat, in which a costly diamond secured a plume of white feathers.

**b.** *Surg.* To close (a vein or artery) by ligature or otherwise, in order to prevent loss of blood.

**1662** WISEMAN *Treat. Wounds* i. 35 Having thus secured the Vessels for the present. **1753** BARTLEY *Gentl. Farriery* xxvi. 234 Should the wound bleed much from an artery divided, the first step should be to secure that by passing a crooked needle underneath, and tying it up with a waxed thread. **1880** C. HEATH *Man. Minor Surg.* (ed. 6) 34 In the case of an amputation, the main arteries will be secured before the cord is loosened.

**6. a.** To get hold or possession of (something desirable) as the result of effort or contrivance.

**1743** BULKELEY & CUMMINS *Voy. S. Seas* 19 We took Care to secure some Powder, Ball, and a little Bread. **1748** SMOLLETT *Rod. Rand.* xxii, Having thus secured my good opinion, he began [etc.]. **1814** SCOTT *Antiq.* i, The first comer hastens to secure the best birth in the coach for himself. **1824** J. H. NEWMAN *Hist. Sk.* (1873) II. i. 141 secured the sympathy of all with whom he came in contact. **1873** TRISTRAM *Moab* Pref. 5 The splendid series of 180 photographs which they secured.

**b.** *Rugby Football.* To get or obtain (a try). **1885** *Field* 31 Jan. 135/2 The last-mentioned secured a try between the posts.

**7. Hort.** (See quot. 1928.)

**1928** *Daily Express* 11 Aug. 4/2 The Japanese varieties of the chrysanthemum are now beginning to show their flower buds, and these should be 'secured', as it is called, at the earliest possible moment. This is done by pinching out with the thumb and finger the incipient side shoots or laterals that will be found in process of formation immediately beneath the buds and in the axils of the leaves. **1951** *Dict. Gardening* (R. Hort. Soc.) I. 476/1 It should be possible to secure the first crown bud of many varieties during the last week in July.

**secured** (sɪˈkjʊəd), *ppl. a.* [f. SECURE *v.* + -ED¹.] In senses of the verb: Assured; firmly fastened; rendered safe. Now chiefly of a debt: For which the creditor holds security. Also of a creditor.

**1605** BACON *Adv. Learn.* II. xx. §5 'They haue also excellentlye handled it... in the distinction betwen vertue with reluctation, and vertue secured. **1875** *Act* 38 & 39 *Vict.* c. 77 §10 The respective rights of secured and unsecured creditors. **1899** *Westm. Gaz.* 28 Aug. 6/3 The companies have no scale by which they regulate their charges, but advance to one man at 4 per cent. and to another at 5 per cent. for a secured loan.

**†seˈcureful**, *a.* *Obs. rare⁻¹.* [f. SECURE *a.* + -FUL.] Protecting.

**c1611** CHAPMAN *Iliad* VII. 209, I know... euery sway, of my secureful targe.

**securely** (sɪˈkjʊəlɪ), *adv.* [f. SECURE *a.* + -LY².] In a secure manner (in various senses).

**† 1.** In a manner free from care or apprehension; carelessly; confidently; without care or misgiving.

**1588** SHAKS. *Tit. A.* III. i. 3 Whose youth was spent In dangerous warres, whilst you securely slept. **1593** — *Rich. II*, II. i. 266 We see the winde sit sore vpon our sailes, And yet we strike not, but securely perish. **1631** GOUGE *God's Arrows* i. §60 A Priest by vertue of his calling readily and securely admitted lepers to come to him. **1678** BUNYAN *Pilgr.* I. (1900) 67 When I dwelt securely at home. **1707** ATTERBURY *Vind. Doctr. Funeral Serm.* 42 Whether any of the Reasonings.. are inconsistent with each other, I securely leave to the Judgment of the Reader. **1768–74** TUCKER *Lt. Nat.* (1834) II. 297 We have nothing but thoughtlessness and insensibility of danger to make us enjoy pleasures securely. **1802** MAR. EDGEWORTH *Moral T.* (1816) I. iv. 25 Trusting securely to the power of his own eloquence.

**2.** Without danger; in security; safely.

**1615** BRATHWAIT *Strappado* (1878) 118 Being vnder shade secured without, Which place he had elected for the noost. **1662** J. DAVIES tr. *Olearius' Voy. Ambass.* 67 This anime [the Reindeer] goes as securely as if it were upon the

Ground. **1697** DRYDEN *Virg. Georg.* II. 396 How deep they must be planted wou'd they know? In shallow Furrows Vines securely grow. *a* **1700** EVELYN *Diary* 11 May 1652, Two cut-throats started out, and.. haled me into a shepe thickett some quarter of a mile from the highway, where they might securely rob me. *a* **1700** MAUNDRELL *Journ.* (1732) 43 Princes can never sleep securely but by day. **1784** COWPER *Tiroc.* 868 Tenants of life's middle state, Securely plac'd between the small and great. **1871** GEO. ELIOT *Middlem.* xxi, It was in that way Dorothea came to be sobbing as soon as she was securely alone.

**3. Without risk of error; certainly.**

**1597** HOOKER *Eccl. Pol.* v. lxxviii. §12, I may securely thence take there are [etc.]. **1877** RUSKIN *Fors Clav.* lxxxii. 297 As I am securely informed. *Ibid.* lxxxiv. 409 The metaphor.. I do not yet securely understand.

**4. Firmly.**

**1856** KANE *Arct. Expl.* I. xxiii. 293 They had tied the dogs securely, as they thought: but Toodla and four others had broken loose. **1908** [MISS FOWLER] *Betw. Trent & Ancholme* 14 Those wrought stones.. are now securely clamped to the south wall.

**securement** (sɪˈkjʊəmənt). *rare.* [f. SECURE *v.* + -MENT.] The action or an act of securing. †a. Making safe from or against. *Obs.* b. Ensuring or making sure.

**1647** *Forster Eng. Factories Ind.* (1908) II. 168 [Willoughby has also been furnished with money, and left to take his choice of means] for his best securement. **1646** SIR T. BROWNE *Pseud. Ep.* I. ii. 7 Cain.. grew afraid thereof, and obtained a securement from it [death]. **1658** — *Gard. Cyrus* ii. Dugdale 10 Nov., The laborious Aggers, Banks, and Works of Securement against Floods and Inundations. **1883** *Century Mag.* July 475/2 Liberty, however, is so highly prized that society condemns the securement in all cases of perpetual protection by means of perpetual imprisonment.

**secureness** (sɪˈkjʊənɪs). *rare.* [f. SECURE *a.* + -NESS.] = SECURITY 1, 3.

**1591** HARINGTON *Orl. Fur.* VII. xxxvi. 52 To restraine turne your doing wrongs, Your fond secureness, turne to godly feares. **1618** BOLTON *Florus* IV. xii. (1636) 326 Therefore (O strange secureness!) as hee sate vpon the Tribunall,.. they at vn-awares assailed him on all hands. **1633** T. ADAMS *Exp. 2 Peter* i. 5 No man perfectly knows his own heart: you think all well; this may be not accurate, but secureness. **1668** TEMPLE *On Approach of Shore of Harwich* 32 Thy sweet Inclosures.. Shew thy secureness from thy Neighbours Harms. **1838** MRS. BROWNING *Seraphim* I. (near end), Down-lay Your sweet secureness for congenial fears.

**securer** (sɪˈkjʊərə(r)). *rare.* [f. SECURE *v.* + -ER¹.] One who or that which secures, in various senses of the verb.

**1636** STRAFFORD *Lett.* (1739) II. 18 The Army.. was rather to be reinforced.. as the chief Securer.. of the... Plantations. *a* **1704** T. BROWN *Satire upon Fr. King* Wks. 1730 I. 59 Of kings distressed thou art a fine securer. **1820** *Examiner* No. 616. 66/1 He rose early, which is a great securer of health.

**securi-** (sɪˈkjʊərɪ, ˌsɛkjʊˈrɪ), combining form of L. *securis* axe, f. *secāre* to cut. Used in various scientific terms. seˌcuriˈcornate [L. *corn-ū* horn + -ATE] *Ent.*, 'having the antennæ in form of a hatchet' (Mayne *Expos. Lex.* 1858). ||seˈcurifer [L. *securifer* adj.,-*fera* to bear] *Ent.*, one of the *Securifera* or phyllophagous hymenoptera. secuˈriferous *a.* [-FEROUS], axe-bearing; *spec.* of or pertaining to the *Securifera*. secuˈrigerous *a.* [-GEROUS] *Bot.* (see quot.). seˈcuripalpi [L. *palp-us* PALP] *Ent.*, a beetle of the division *Securipalpi.* secuˈripalpous *a.* [-OUS] *Ent.*, of or pertaining to the division *Securipalpi.* See also SECURIFORM *a.*

**1656** BLOUNT *Glossogr.*, *Securiferous*, that beareth an Axe or Hatchet. **1842** BRANDE *Dict. Sci.* etc., *Securifers*, Securiferi, the name of a tribe of *Terebrantia*, or boring Hymenopterous insects. **1858** MAYNE *Expos. Lex.*, *Securiferous. Ibid., Securigerous*,.. applied to the *Monthretea securigera*, from the form of the appendages that garnish the corol: securigerous. **1842** BRANDE *Dict. Sci.* etc., *Securipalpi*, Securipalpi, the name of a family of Coleopterous insects, comprehending those in which the maxillary palps terminate in a hatchet-like shape, whence the trivial and hatchet-shaped. **1858** MAYNE *Expos. Lex.*, Securipalpous.

**Securicor** (sɪˈkjʊərɪkɔ(r)). [Invented name f. SECURI(TY + COR(PS.] The proprietary name of a private security organization employed in the guarding and safe transport of money, goods, and property. Freq. *attrib.*, esp. as *Securicor man*, *van.* Also *fig.* (with small initial).

**1953** *Change of Name Certificate* 3 Jan. in Dept. of Trade (354883) Night Guards Limited... Securicor Ltd. **1961** *Security Gaz.* Feb. 64/3 *(caption)* Securicor guards are responsible for the safety of Ireland's greatest art treasure,.. 1,000 year old 'Book of Kells'. **1962** *Daily Tel.* 6 Sept. 13/1 An executive of Securicor, the security organization, said.. 'They were stupid to try to change vehicles.' *Ibid.*, Mr. Norman Negus, 54, a Securicor guard, walked out of the bank.. carrying the cash box chained to him. As he approached the armoured Securicor van the ambush was sprung. *Ibid.*, Another Securicor man, locked inside the armoured van, sounded the alarm siren. **1968** *Listener* 12 Dec. 804/3 Unless future student audiences can be screened in advance by the BBC's own securicor, one sees small hope for this series. **1970** *Guardian Weekly* 14 Mar. 9/1 Securicor, Security Express, and Factoryguards—the three main companies which account for about 90 per cent of the manned protection in Britain. **1977** D. BAGLEY *Enemy* xxx. 239 The auctioneer has Securicor men all over the place.

**securiform** (sɪˈkjʊərɪfɔːm), *a.* [f. SECURI- + -FORM.] Axe-shaped, having the form of an axe or hatchet. *a. Bot.* applied to leaves, etc. b. *Ent.* applied to a palpus or joint, etc.

**1760** J. LEE *Introd. Bot.* iii. xviii. (1765) 212 *Securiform*, Hatchet-shaped. **1815** KIRBY & SP. *Entomol.* ix. (1818) I. 299 *note*, Mordellæ will open the anthers with the securiform joints of their palpi. **1819** SAMOUELLE *Entomol. Compend.* 162 Labial palpi securiform. **1835–6** *Todd's Cycl. Anat.* I. 703/2 *Conchifera*... The foot... is securiform when its free edge is arched like the cutting face of an axe, as in *Petunculus*. **1852** DANA CRust. II. 869 A small hand, slightly oblong, somewhat securiform.

**seˈcuring**, *ppl. a. rare.* [f. SECURE *v.* + -ING².] That secures, in various senses of the verb.

**1643** J. ST. *Son. Salve* 35 The only sure and securing way to follow. **1798** *Times* 28 June 1/1 Drawing papers, pallets, gold and silver paper, copal and securing varnish.

**†seˈcuritan**. *Obs. rare.* [f. SECURIT-Y + -AN, ?after *Puritan.*] One who is characterized by 'security' or culpable freedom from apprehension.

**1623** BP. HALL *Serm. Re-edif. Chapell of Earle of Exeter* Wks. (1625) 529 The sensual Securitan pleases himselfe in the conceit of his owne peace. **1627** R. BERNARD *Isle of Man* 21 One Mʳ. Out-side, in the inside a carnall Securitan, [is] a fellow that will come to his Church [etc.].

**securite** (sɛkjʊˈrʌɪt). Also -it. [f. SECURE *a.* + -ITE *a.*, after the Ger. name *sicherit* (*sicher* sure, safe).] A high explosive consisting of a mixture of meta-di-nitro-benzole with nitrate of ammonium (Cundill *Dict. Explosives*, 1889, p. 82); used chiefly in blasting operations.

**1888** *Timber* 3 Mar. 1/6 Securite consists of nitrated hydro-carbons in admixture with certain oxidizing agents. It is the invention of Herr Schoeneweg, who has now rendered it flameless when exploded, by the addition of an organic salt in certain proportions. **1897** *Allbutt's Syst. Med.* II. 958 The symptoms following the use of sicareit (securite or sicherite) resemble those which are caused by roburite.

**security** (sɪˈkjʊərɪtɪ). Forms: 5 securyte, securitie, 6–7 securyte, securitie, 6– security. [ad. L. *sēcūritās*, f. *sēcūr-us* see SECURE *a.* and -ITY. Cf. F. *sécurité* (16th c. in Hatz.-Darm.), Sp. *seguridad*, Pg. *seguridade*.]

**I.** The condition of being secure.

**1. a.** The condition of being protected from or not exposed to danger; safety.

**1432–50** tr. *Higden* (Rolls) I. 77 Also hit [Paradise] hathe securite, to the whiche scveuge the altitude of the place berrethe testimonye [Lat. *Habet et securitatem an attestatur loci altitudo*]. **1492** RYMAN *Poems* lxxx. 3 in *Arch. Stud. neu. Spr.* LXXXIX. 349 Thye eye of grace vpon vs cast, Of helth and of securitee. **1582** STANYHURST *Æneis* i. (Arb.) 25 Therefor No worldly corner can thyme securitye warrant. **1617** MORYSON *Itin.* II. 13 This Earle providing for his securitie, about this time imprisoned the aboue mentioned sonnes of Shane O'Neale. **1745** in *Col. Rec. Pennsylv.* V. 26 Some Provision should be made for the Security of our Frontier Settlements at least. **1781** GIBBON *Decl. & F.* xxxi. III. 229 The emperor and his court... enjoyed the security of the marshes and fortifications of Ravenna. **1861** M. PATTISON *Ess.* (1889) I. 46 The Esterlings.. lay in security behind their walls, while the Flemish and other foreign residents fell helpless victims to the plundering foe. **1903** A. SMELLIE *Men of Covenant* xxxii. (ed. 2) 352 His security, of course, in his lord's dealings.

**b.** The safety or safeguarding of (the interests of) a state, organization, person, etc., against danger, esp. from espionage or theft; (the exercise of measures to this end); (the maintenance of) secrecy about military movements or diplomatic negotiations; in espionage, the maintenance of cover. Hence (with capital initial), a department (in government service, etc.) charged with ensuring this. (This sense tends towards 'the condition of making secure'.)

**1941** *Times* 16 July 3/1 In order to ensure public security, the occupation of the principal localities in Syria and the Lebanon will be undertaken in accordance with the programme which will allow immediate replacement of French by the occupying forces. **1941** E. JOHNS *Lofwen Let.* 34 Major Talbot.. prides himself... on the 'security' of this expedition... [*note*] That is the Army term for what normal people call 'secrecy'. **1945** *Bull. Atomic Sci.* Apr. 164/3 'Security', as it relates to the continuing struggle between the free world and the Soviet bloc, is an abundantly common yet widely misunderstood word. **1959** *Listener* 8 Oct. 558/1 You can call at offices, clubs, studios, and institutions—anywhere that does not verge on security—and usually they will tell you, foreigner though you are, the telephone numbers of their staff. **1961** R. SETH *Anat. Spying* v. 83 In the spy's vocabulary, Security means doing nothing that is likely to reveal his clandestine rôle... Each separate aspect of Security may be small.. but any one aspect neglected is sufficient to cause the spy's downfall. **1966** M. ALLINGHAM *Mind Readers* vi. 59, I thought that might have been what Security told you when they sent for you. **1976** M. DELVING *China Expert* iv. 44 Security persuaded him to leave the army, and a place was found for him in.. MI5. **1976** *Daily Tel.* 20 July 2/3 Security at places like the airport is always under review. **1982** *Observer* 6 June 1/7 While Israeli reaction has been to praise the British police... there is some evidence that security outside the hotel was lax.

**2.** Freedom from doubt; confidence, assurance. Now chiefly, well-founded confidence, certainty.

Exhibit 4

U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/794,662 | 10/26/2017 | Michael J. Berardi | 4082U.028 | 1700 |

21917       7590       02/09/2018
MCHALE & SLAVIN, P.A.
2855 PGA BLVD
PALM BEACH GARDENS, FL 33410

| EXAMINER |
|---|
| BRINSON, PATRICK F |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3753 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/09/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

uspatents@mchaleslavin.com

PTOL-90A (Rev. 04/07)

<table>
<tr><td rowspan="2"><strong>Office Action Summary</strong></td><td><strong>Application No.</strong><br>15/794,662</td><td colspan="2"><strong>Applicant(s)</strong><br>BERARDI, MICHAEL J.</td></tr>
<tr><td><strong>Examiner</strong><br>Patrick F. Brinson</td><td><strong>Art Unit</strong><br>3753</td><td><strong>AIA (First Inventor to File) Status</strong><br>No</td></tr>
</table>

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1)☐ Responsive to communication(s) filed on _____.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.  2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5)☒ Claim(s) _1-20_ is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) _1-20_ is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on _10/26/2017_ is/are: a)☒ accepted or b)☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
  **Certified copies:**
    a)☐ All  b)☐ Some**  c)☐ None of the:
    1.☐ Certified copies of the priority documents have been received.
    2.☐ Certified copies of the priority documents have been received in Application No. _____.
    3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _1/12/18_.

3) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

Application/Control Number: 15/794,662                                   Page 2
Art Unit: 3753

1.      The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

### *Double Patenting*

2.      The nonstatutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent

the unjustified or improper timewise extension of the "right to exclude" granted by a

patent and to prevent possible harassment by multiple assignees. A nonstatutory

double patenting rejection is appropriate where the conflicting claims are not

identical, but at least one examined application claim is not patentably distinct from

the reference claim(s) because the examined application claim is either anticipated by,

or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d

1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d

2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re

Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164

USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

        A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or

1.321(d) may be used to overcome an actual or provisional rejection based on

nonstatutory double patenting provided the reference application or patent either is

shown to be commonly owned with the examined application, or claims an invention

Application/Control Number: 15/794,662                                    Page 3
Art Unit: 3753

made as a result of activities undertaken within the scope of a joint research

agreement. See MPEP § 717.02 for applications subject to examination under the first

inventor to file provisions of the AIA as explained in MPEP § 2159.  See MPEP §§

706.02(l)(1) - 706.02(l)(3) for applications not subject to examination under the first

inventor to file provisions of the AIA. A terminal disclaimer must be signed in

compliance with 37 CFR 1.321(b).

        The USPTO Internet website contains terminal disclaimer forms which may be

used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the

application in which the form is filed determines what form (e.g., PTO/SB/25,

PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based

eTerminal Disclaimer may be filled out completely online using web-screens. An

eTerminal Disclaimer that meets all requirements is auto-processed and approved

immediately upon submission. For more information about eTerminal Disclaimers,

refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

3.      Claims 1-20 rejected on the ground of nonstatutory double patenting as being

unpatentable over claims 1-14 and 17-22 of U.S. Patent No. 8,291,941 in view of

6,523,539 to **McDonald et al**.  The '941 reference discloses the recited structure with

the exception of reciting that the flexible outer tube has a maximal length and a

maximal diameter wherein the inner flexible tube has a relaxed length being

substantially less than the outer tube maximal length.  The **McDonald et al**. reference

Application/Control Number: 15/794,662                                        Page 4
Art Unit: 3753

discloses a self-elongating hose including a flexible outer tube (36) constructed from

fabric having a first end and second end, the tube having a maximal length and a

maximal diameter, and a flexible elongated inner tube (30), formed of an elastic

material, and having a first and second end, with the elastic tube having a relaxed

length when not stretched that is substantially less than the outer tube maximal length.

It would have been obvious to one having ordinary skill in the art at the time the

invention was made to modify the elastic inner hose of the **'941** reference, such that it

is substantially less than the maximal length of the outer tube, as suggested by

**McDonald et al.**, in order to allow the tube to extend to its maximum length.


### *Claim Rejections - 35 USC § 103*

4.      The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth
> in section 102, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a
> person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be
> negatived by the manner in which the invention was made.

5.      Claims 1-7, 10-18 and 20 are rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over U.S. 6,948,527 to **Ragner et al**. in view of U.S. 6,523,539 to

**McDonald et al**.

Application/Control Number: 15/794,662                                   Page 5
Art Unit: 3753

The **Ragner et al**. reference discloses a flexible elongated outer tube, fig. 3A,

(32) constructed from a fabric material having a first end and a second end, an interior

of the outer tube being substantially hollow, said flexible elongated outer tube having

a maximal length and maximal diameter.  A flexible elongated inner tube (34) having a

first end and a second end, an interior of the inner tube being substantially hollow, the

inner tube having a relaxed length when not being stretched.  Figs. 1A and 1B disclose

a first coupler (20) secured to a first end of the inner and outer tubes, with the first

coupler constructed to couple the hose to a source of pressurized fluid, and a second

coupler (22) secured to the second end.  **Ragner et al**. discloses that the outer cover

material (32) <u>can</u> be molded on the biasing spring and inner cover (34) to hold the

system together, but that it is not required for the hose to function as a linearly

retractable and extendible hose.  **Ragner et al**. further discloses, col. 4, lines 52-54,

lines 57-59, as well as col. 5, lines 7-9, that the biasing means can be integrated with

the body of the hose or may not be solidly attached to the hose at all and can be

internal to the body of the hose. Col. 4, lines 60 and 61 and col. 5, lines 9-11 disclose

that the biasing means may only be attached at the ends of the hose to operate

properly.  Vinyls and other polymers may be used as cover materials and col. 5, lines

45 and 46 disclose that the inner cover (34) provides most of the pressure support

and may have a mesh of fibers within a <u>more flexible material</u> to help withstand

higher pressures.  Col. 5, lines 61-63 discloses that the cover materials need to be

Application/Control Number: 15/794,662                                    Page 6
Art Unit: 3753

flexible to allow easy stretching and contracting.  **Ragner et al**. further discloses a

flow restrictor (246), sprinkler (24), or nozzle (104) coupled to the second coupler,

whereby upon introduction of a flow of pressurized liquid through the first coupler

into the inner tube and operation of the flow restrictor to at least partially block the

flow of pressured liquid from exiting the inner tube, the inner tube fills with

pressurized liquid resulting in an increase in fluid pressure within the inner tube

interior, and the increase in fluid pressure expands the inner tube longitudinally along

a length and laterally across a width of the inner tube thereby increasing the hose to

an expanded condition against the force of the biasing spring.  Col. 17, lines 40-43

discloses that when the water pressure is turned off, the hose slowly retracts to its

compressed state as water is slowly forced out through the nozzle opening by the

contracting force of the hose.  The inner and outer tubes are of material that will not

kink or become entangled when the inner and outer tubes are in their expanded

condition, as recited in **claims 6 and 15**.  **Ragner et al**. discloses the recited structure

with the exception of specifically disclosing the inner hose formed of an elastic

material.  The **McDonald** reference discloses a self-elongating oxygen hose designed

for the flow of pressurized gas therethrough.  The hose preferably includes an inner

inflatable elastomeric inner tube (30), formed of materials selected from the group

consisting of silicone rubber materials, together with an exterior sheath (36) of woven

or braided material, including Nomex, Kevlar, and nylon, that restricts radial

Application/Control Number: 15/794,662                                    Page 7
Art Unit: 3753

expansion of the tube while permitting axial expansion thereof. **McDonald et al**.

discloses that the sheath is two to three times the length of the inner tube and is only

connected to the inner tube at their ends. The sheath is in a gathered or shirred

condition along the length in an unexpanded state, however, when pressurized gas is

delivered into the tube, it expands in both radial and axial directions with the sheath

serving to inhibit and restrict the extent of the radial expansion while permitting axial

elongation. Col. 3, lines 41-42 disclose that after use, the hose will retract itself and

the device may be restored back into container (42). **McDonald et al**. further

discloses first and second restrictor sleeves (38) secured to first and second tube ends,

that provide gradual transition of laterally outward expansion of the tube when there

is an increase in pressurized fluid within the inner tube interior between first and

second couplers (32, 24), as recited in **claims 5 and 18**. Wherein **Ragner et al**.

discloses that the biasing means is not necessarily a spring, and that the biasing means

may be allowed to freely slide with respect to the hose, it would have been obvious to

one having ordinary skill in the art at the time the invention was made to substitute

for spring and/or inner tube of **Ragner et al**. an inner tube formed of an elastomeric

material that is separate from the outer tube, as suggested by **McDonald et al**. as an

alternative method of forming an elongated extendible and retractable garden hose.

In regard to the limitation recited in **claims 4 and 17**, **McDonald et al**. discloses the

tube being able to stretch up to twice its contracted length, but does not disclose it

being able to stretch up to six times its contracted length.  It would have been obvious

to one having ordinary skill in the art at the time the invention was made to modify

the initial length of the inner hose and/or the elasticity of the inner hose such that it

may stretch up to six times its contracted length depending upon its use and function,

since it has been held that where the general conditions of a claim are disclosed in the

prior art, discovering the optimum or workable ranges and/or values involves only

routine skill in the art.  In regard to the limitation recited in **claims 7 and 12**, the

restrictor sleeves are crimped onto the ends and therefore do not require additional

securing means.  It would have been obvious to one of ordinary skill in the art at the

time the invention was made to substitute for crimping, a securing device that extends

around the outer circumference of the hose wherein it is known in the art that a

securing ring is an alternative means of securing a restrictor sleeve onto ends of

flexible hoses.

6.      Claims 8, 9 and 19 are rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over **Ragner et al.** in view of **McDonald et al.** as applied to claim 1

above, and further in view of U.S. 6,983,767 to **Rickards**.

        The **Ragner et al.**, device, as modified, discloses an extendable and retractable

hose including an outer hose formed of a fabric material, but does not disclose indicia

on the outer tube.  The **Rickards** reference discloses a sleeve for a hose formed of a

rugged, strong, washable material, preferably a nylon material, with the sleeve further

Application/Control Number: 15/794,662                              Page 9
Art Unit: 3753

including indicia that may be screen printed, sewn on, painted on, or otherwise
associated with the sleeve.  The sleeve is secured to an outer side of hose (10).  It
would have been obvious to one having ordinary skill in the art at the time the
invention was made to provide to the outer fabric tube of **Ragner et al.**, as modified,
indicia or a logo, as suggested by **Rickards** in order to advertise the type of hose or
the name of the company using the hose.


Any inquiry concerning this communication or earlier communications from
the examiner should be directed to **Patrick F. Brinson** whose telephone number is
(571)272-4897.  The examiner can normally be reached on M-F 7:30-3:00.

Examiner interviews are available via telephone, in-person, and video
conferencing using a USPTO supplied web-based collaboration tool. To schedule an
interview, applicant is encouraged to use the USPTO Automated Interview Request
(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, **Craig M. Schneider** can be reached on (571) 272-3607.  The fax phone
number for the organization where this application or proceeding is assigned is 571-
273-8300.

Application/Control Number: 15/794,662                                    Page 10
Art Unit: 3753

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR

only.  For more information about the PAIR system, see http://pair-direct.uspto.gov.

Should you have questions on access to the Private PAIR system, contact the

Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like

assistance from a USPTO Customer Service Representative or access to the

automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.

/Patrick F. Brinson/
Primary Examiner, Art Unit 3753

P. F. Brinson
February 2, 2018

# JOHN MORGAN FELAND, III

---

## QUALIFICATIONS

- Expert at UX Design with proven prowess at gesture design and integration in complex applications
- Award winning product designer with a fluency in both consumer empathy and deep technology expertise
- Deep technical knowledge of embedded vision systems, artificial intelligence, autonomous vehicle technologies
- Wildly imaginative and creative approach to solving difficult problems and crafting novel opportunities
- Prowess in long term strategic foresight and product planning, utilizing multidisciplinary trends
- Deep empathy for end users, culling insights from ethnographic, interviews, and other methods
- Patents issued & pending in MEMS sensors, consumer electronic interfaces, UX gestures, and AI insights
- Managed the development of over 100 unique prototype consumer product experiences
- Excellent technical writing and oral presentation skills, including press, investor, and executive interactions

## PROFESSIONAL EXPERIENCE

**I-LAB ENGINEER, Aug 18 to present**                                                    The Nueva School, CA

Teacher at noted private school for gifted students in Silicon Valley.  Courses include engineering and entrepreneurship.

**CEO & FOUNDER, Sep 09 to present**                                                         Argus Insights, CA

Founder of Argus Insights, a novel Experience Analytics firm that provides real-time market intelligence on user experiences with consumer products and services.  Providing evidence to support strategic decision making, Argus Insights offers a comprehensive set of offerings enabling the enterprise deeper understanding of how their products and services impact their target users as well as competitive experience landscapes.  Mixing a blend of Artificial Intelligence sentiment analysis, processing of unstructured consumer data and design thinking methodologies, Argus has helped clients identify millions in cost savings, market potential, and provided recommendations that moved firms from obscurity to acknowledge market leaders.

Key Clients and Projects include:

- Autonomous Vehicle Alliance: Analysis of what UX aspects are driving adoption in autonomous vehicles including consumer perception of semi-autonomous features such as self-parking and adaptive cruise

- Gerber Technology: UX design for industrial cutting tools, using design thinking to lower training requirements and drive up operator effectiveness

- Silicon Labs: Mapping of consumer journey through Smart Home UX and impact of Voice Assistants on multi-user experiences in the home

**FORUM CHAIR, Apr 2017 to Sep 2018**                                                          IoT Forum, CA

Forum chair and moderator for the Internet of Things Forum in Silicon Valley.  Recent topics include Autonomous Vehicles, Industrial IoT, Security, Robotics and Agriculture.

**DISTINGUISHED LECTURER, 2012**                                        Cogswell Polytechnical College, CA

Developed curriculum and taught classes in Entrepreneurship and Robotics.

**CONSULTING ASSISTANT PROFESSOR, Oct 09 to Sep 11**                               Stanford University, CA

Appointment in the Design Group of Mechanical Engineering to teach occasional classes on design innovation.

**EXECUTIVE DIRECTOR, GLOBAL DESIGN INNOVATION, Oct 09 to Dec 2010**               Stanford University, CA

Executive Director of the world renowned ME310 Global Design Innovation course.  With a forty year history, this year long graduate mechanical engineering course has been connecting students from around the world with enthusiastic corporate partners to both develop their design skills and create compelling innovation prototypes for companies.

**CHIEF TECHNOLOGIST, Sep 08 to Sep 09**                                            SK Telecom Americas, CA

Responsible for understanding how the rapidly changing technology landscape would enable SK Telecom to craft new business opportunities in the Americas. My areas of responsibility ranged from NGN wireless technologies (LTE vs WiMaxx, etc), handheld experiences & the interface technologies that enable them (multitouch touchscreens, haptic feedback, smartphone operating systems), as well as evolving influences on the telecommunications market (cloud computing, femtocells, CDN's, LBS, SNS, etc.) Supported SKTA's internal Business Development & Corporate Venture Capital organizations.

**LECTURER IN STANFORD DESIGN GROUP, Dec 2007**                                     Stanford University, CA

Cotaught Strategic Foresight and Design course with Director of the Stanford Center for Critical Foresight.

**USER INTERFACE ARCHITECT & HANDHELD MARKETING MANAGER, Aug 06 to Aug 08**              Synaptics, CA



John Morgan. Feland, III                                                    john.feland@argusinsights.com, 650-868-0114

Developing new interface capabilities based on current and anticipated customer needs. Driving demand for new capabilities with Tier 1 consumer electronic OEM customers. Led efforts to create innovative concepts in the PC Peripherals, Gaming, Multi-finger Touchscreen interactions, and Capacitive Button technologies that consider emerging user needs, current technology trajectories, and evolving market conditions. Member of internal Intellectual Property Team, responsible for reviewing potential internal IP, licensing opportunities, and IP strategy.

END USER RESEARCH AND CONCEPT PROTOTYPING MANAGER, Dec 04 to Aug 06                    Synaptics, CA

Built a team to drive innovation through the ideation & creation of experience prototypes.  New concepts generated over $3 mil in revenue in the first year.  Architected the Onyx, a new mobile phone experience widely heralded as the future of mobile interfaces, winning 2006 international Red Dot Design Concept Award.

SENIOR MECHANICAL ENGINEER, Feb 04 to Dec 04                                         Symyx Technologies, CA

MEMS industrial sensor development.  Responsibilities include customer need-finding, product idea generation, concept prototyping, supply chain development, and detailed component design for a $40 million market.

MENTOR TEACHING AFFILIATE, Winter Quarter 2003-2004                                  Stanford University, CA

Teaching team in the first course for the Stanford University d.School. Studio Head for Interdisciplinary Design Innovation class. Taught business, engineering, & humanities students to design video games for Electronic Arts.

DESIGN STRATEGY CONSULTANT, Jun 02 to Feb 04                                         Trusted Nomad, CA

Worked as an independent contractor to provide innovation training to Finnish product design firms.  Identified potential market opportunities for MEMS sensors for Symyx Technologies that resulted in a new business unit.

ASSISTANT PROFESSOR, ENGINEERING MECHANICS, Aug 99 to Jul 01                         US Air Force Academy, CO

Dramatically redesigned engineering design curriculum.  Received highest instructor enthusiasm ratings for the entire university and highest student evaluations in course history.  Launched first ever Mechatronics course.  Faculty advisor to SAE Mini-Baja, part-time Japanese instructor, and Professional Ethics Advisor to 120 students.

DIRECTOR, MEASUREMENT AND SIGNALS INTELLIGENCE SYSTEMS, Apr 99 to Jul 99            Joint Analysis Ctr, UK

Supervised classified intelligence support for Operation Allied Force in Kosovo.  Worked with interdisciplinary team to translate user needs to system requirements.  Ensured national intelligence assets were leveraged in support of entire theater of operations, ranging from Norway to Iraq.

PROGRAM MANAGER, DEFENSE INTELLIGENCE SYSTEMS, Mar 97 to Apr 99                      National Air Intelligence Ctr, OH

Managed defense technical intelligence mission requirements and software development for $18 billion missile warning satellite program.  Selected to lead eight-person multidisciplinary team transitioning critical imagery support directly to the Warfighter.  Direct oversight of a $4 million software development effort.

PRODUCT DESIGN ENGINEER, Jun 96 to Jan 97                                           IDEO Product Development, CA

Worked as mechatronic design engineer for world's foremost design firm, IDEO Product Development.  Designed and prototyped products ranging from artificial skin bioreactors for Advanced Tissue Sciences to new office lighting concepts for Steelcase Inc.

## EXPERT CONSULTING DURING PAST FOUR YEARS

- *Incase Design Corp. v. mophie, Inc.* Interference No. 105,946 (RES).

- *mophie, Inc. v. Dharmesh Shah, et. al.,*Case No. SACV 13-01321 DMG (JEMx) (C.D. Cal.)

- *mophie, Inc. v. uNu Electronics, Inc.*, Case No. 8:13-cv-01705-CAS (JCGx) (C.D. Cal.)
- *Jawbone, Inc.* v. Fitbit Inc., (C.D. Cal.)
- *Jawbone, Inc.* v. Fitbit Inc., (Federal Trade Commission, D.C.)
- *T*-Mobile USA, Inc. v. Huawei Device USA,  Inc., Case No. C14-1351-RAJ (US District Court, Western District, WA)
- *Zagg Inc., & mophie, Inc v. Anker Technology Co .Ltd., et. al.* , Case No. 8:17-CV-2193  (C.D. Cal.)
- *Thunder Power New Energy Vehicle Development Company Limited, v.* Byton North America Corporation, et. al. , Case No. 3:18-cv-03115-JST, (US District Court, Northern District, CA)
- *Nine Stars Group USA Inc. v. Factory Direct Wholesale, LLC* Case No. 2:18-cv-06471-PSG-PJW, (US District Court, Northern District, CA)
- *ANCORA TECHNOLOGIES, INC., v. LG ELECTRONICS INC. and LG ELECTRONICS U.S.A., INC.,* Civil Action No. 1:20-cv-00034-ADA (United States District Court For The Western District Of Texas Austin Division)



John Morgan. Feland, III                                    john.feland@argusinsights.com, 650-868-0114

## EDUCATION

PHD IN MECHANICAL ENGINEERING, 2005                                    Stanford University, CA
Pursued comprehensive design research that integrates human, business, and technical issues in support of increased innovation performance.  Developed model of design innovation that forecasts downstream corporate performance.  Coursework includes need-finding, decision analysis, marketing, accounting and finance.

MASTERS OF SCIENCE IN MECHANICAL ENGINEERING, 1996                                    Stanford University, CA
Coursework in mechanical design, smart product development, entrepreneurship and program management.

S.B. MECHANICAL ENGINEERING, 1994                                    Massachusetts Institute of Technology, MA
Coursework included product design, Japanese, fluid dynamics, manufacturing methods and thermodynamics.

## AWARDS/HONORS

- Red Dot Design Concept Award winner for the Onyx Mobile Phone Concept, world's first functioning multitouch mobile phone experience (2006)
- Over ten patents issued and pending, two for MEMS Sensors and eight for consumer electronics human interfaces
- Guest Editor of Special Issue on Innovation for the International Journal of Engineering Education (2004)
- ASEE Apprentice Faculty Grant Winner (2003)
- ASME Curriculum Innovation Award, Honorable Mention (2002)
- Air Force Commendation Medal, First Oak Leaf Cluster (2001)
- Top Junior Faculty of USAFA School of Engineering (2001)
- Who's Who in the World and America
- Instructor of the Quarter, Department of Engineering Mechanics (2000)
- Joint Achievement Medal (1999)
- Air Force Commendation Medal (1999)
- Joint Analysis Center Most Valuable Contributor Award during week 5 of Operation Allied Force in Kosovo (1999)
- Merit Award, Lincoln Foundation Design Competition (1996)
- Professor of Aerospace Studies Award for Top Senior Air Force ROTC Cadet from MIT, Harvard, Tufts, & Wellesley (1994)

## SELECTED PUBLICATIONS

**Refereed Publications**

Feland, J, Leifer, L. "The Effects of Electronic Documentation Tools on the Performance Outcome of the Design Process," *Proceedings of the 11th International Conference on Engineering Design*, 1997.

Feland, J., Nowack, M., Leifer, L., "Cost-Performance management through knowledge reuse in large-scale defense projects – vision and proposed system architecture," *Proceedings of Design Reuse, EDC 98*, Brunel University, 1998.

Feland, J., Leifer, L.,  "Requirement Volatility Metrics as an Assessment Instrument for Design Team Performance Prediction," Designing Design Education for the 21st Century, *Mudd Design Workshop II*, 1999.

Feland, J. Leifer, L., Nowack, M., "Requirement Volatility: How Lessons Learned Can Be Applied in the Design of New Requirements," in *Proceedings of the 12th International Conference on Engineering Design*, Munich, Germany, August 24-26, 1999.

Liang, T., Cannon, D.M.C., Feland, J.M., Mabogunje, A., Yen, S., Yang, M.C., and Leifer, L.J., "New Dimensions In Internet-Based Design Capture and Reuse", in *Proceedings of the 12th International Conference on Engineering Design*, Munich, Germany, August 24-26, 1999.

Feland, J and Jensen, D.,"A Simple Approach for Using Myers Briggs Type Indicator Data to Enhance Engineering Education", *Proceedings of the ASEE South West Regional Conference*, Golden, CO, March, 2000.

Jensen, D., Feland, J., Bowe, M., Self, B., "A 6-Hats Based Team Formation Strategy: Development and Comparison with an MBTI Based Approach", *Proceedings of the ASEE Annual Conference*, St Louis, June 2000.

Bowe, M., Jensen, D., Feland, J., Self, B., "When Multimedia *Doesn't* Work: An Assessment of Visualization Modules for Learning Enhancement in Mechanics", *Proceedings of the ASEE Annual Conference*, St Louis, June 2000.



John Morgan. Feland, III                                    john.feland@argusinsights.com, 650-868-0114

Feland, J., Leifer, L.,  "Requirement Volatility Metrics as an Assessment Instrument for Design Team Performance Prediction," Special Issue on Design Education, International Journal of Engineering Design Vol 17, No. 4 and 5. 2001.

Feland, J.," Preliminary Design of a Risk Management Decision Tool in Support of NASA'S Design For Safety Initiative," *Proceedings of the 13th International Conference on Engineering Design*, 2001.

Feland, J., "Building Teammates: Bringing Better Team Skills to Design Courses," *Proceedings of the ASEE Annual Conference*, Montreal, June 2002.

Feland, J., Fisher, C., "Cramming Twenty Pounds into a Five-Pound Bag: Increasing Curricular Loads On Design Students And Enjoying It!" *Proceedings of the ASEE Annual Conference*, Montreal, June 2002.

Feland, J.M., & Fisher, C. (2002). "Cramming twenty pounds more into a sophomore design tool kit: Increasing curricular loads on design students and enjoying it!," *Proceedings of the American Society of Mechanical Engineers International Mechanical Engineering Congress and Exposition*.

Cockayne, B., Feland, J., Leifer, L., "Teaching the "How" of Engineering Innovation," *Proceedings of the ASEE Annual Conference, Montreal*, June 2002.

Emery, K., Feland, J., "The Educators Corner: Online Resources for Entrepreneurship Educators," *Proceedings of the ASEE Annual Conference, Montreal*, June 2002.

Jensen, D., Randell, C., Feland, J., Bowe, M., "A Study of Rapid Prototyping for Use in Undergraduate Design Education," *Proceedings of the ASEE Annual Conference*, Montreal, June 2002.

Moritz, F., Valtingoier, I., Henneke, C. Hatanaka, M., Feland, J. "Distributed Innovation In Sports Equipment – Dojyo Style," *Proceedings of IMAC 2002, The 6th IMAC Workshop*, Tokyo, September 19-21, 2002.

Feland, J., "Intentioned innovation: Bringing design views to the practice of innovation," *Proceedings of INFORMS 2002 Annual Conference*, San Jose, CA, November 2002.

Feland, J., Carter, S.  " Enabling Student Innovation By Leveraging Lessons From Industry," *Proceedings of the ASEE Annual Conference*, Nashville, June 2003.

Feland, J., Fisher, C., Bartolomei, J.,"Utilizing Design Education to Stimulate Life-long Learning Without the Pain," *Proceedings of the 14th International Conference on Engineering Design*, Stockholm, Aug 2003.

Feland, J., "Innovation Impact Map: An Opportunity Evaluation Tool," *Proceedings of the 14th International Conference on Engineering Design*, Stockholm, Aug 2003.

Feland, J., Cockayne, W., Leifer, L., "Comprehensive Design Engineering," *Proceedings of the 14th International Conference on Engineering Design*, Stockholm, Aug 2003.

Cockayne, W., Feland, J., Leifer, L., "Using the Contextual Skills Matrix for PBL Assessment," International Journal of Engineering Education, Vol. 19, No. 5, pp. 701-705, 2003.

Feland, J., Cockayne, W, Leifer, L., "Comprehensive Design Engineering: Designers Taking Responsibility," International Journal of Engineering Education, Vol. 20, No. 3, pp. 416-423, 2004.

Poskela J., Berg P., Pihlajamaa J., Seppälä J., Feland J. 2004. "The Role of Roadmaps in Fuzzy-Front-End Phase of Innovation Process," *Proceedings of IAMOT 2004*, 13th International Conference on Management of Technology, Washington D.C., USA

Feland, J., Guest Editor, "Special Issue on The Entrepreneurial Engineer", International Journal of Engineering Education, Vol. 21 No. 2, 2005.

Feland, J., "Product Capital Model: Measuring the Impact of Design on Corporate Performance," PhD Dissertation, Stanford University, March 2005.

Feland, J. "Virtual Teams in Practice: Tales from the battlefront of the Fuzzy Front End of the Innovation Process," in Higher Creativity for Virtual Teams: Developing Platforms for Co-Creation, eds. MacGregor, S., Torres-Coronas, T. IGI Global (May 31, 2007).

Feland, J., Leifer, L., " Product Social Capital: Measuring the Impact of Design Innovation on Corporate Performance," *Proceedings of the 15th International Conference on Engineering Design*, Paris, Aug 2007.

Berg P., Pihlajamaa J., Nordlund H., Lindroos M., Poskela J., Feland J., "Front End Measurement in Open Innovation," *Proceedings of ISPIM 08*, International Society for Professionals in Innovation Management, Tours, France, June 15-19, 2008.

John Morgan. Feland, III                                    john.feland@argusinsights.com, 650-868-0114

Feland, J., "Touch the Future: Projected-Capacitive Touch Screens Reach for New Markets," <u>Information Display</u>, Vol. 24 No. 7, July 2008.

**Invited Talks**

"What will the next 10 years bring?: Putting Blockchain, AI, Autonomation and other technologies in context"
- National Conference of State Legislatures, 2017

"Consumer Experiences with Early Autonomous Vehicles: Insights Governing Adoption "
- Autonomous Vehicles 2017 Detroit Summit, 2017

"Voice Assistants Impact on the Automotive Experience, Beyond Siri"
- IEEE COMSEC on Connected Cars, 2015

"Origins of Design Thinking: Design for Aliens "
- Design Thinking Unconference, 2011

"Reflecting the flat world in design education through ME310: Global Design Innovation Class"
- Autodesk University Annual Conference, 2010

"The Future Needs Us, By Design"
- Asilomar Microcomputer Workshop, 2010

"Designing Compelling User Experiences"
- Gilder-Forbes Telecosm Conference, 2005
- ME310, Stanford University, 2006, 2007, 2008, 2009, 2010

"Future of Touch Interfaces"
- Gilder Forbes Telecosm Conference, 2007
- Bear Stearns Investor Conference, 2007

"Teamwork and Teambuilding skills workshop"
- Global Entrepreneurial Marketing, Stanford University 2002
- Creativity and Innovation, Stanford University 2003
- Adventures in Design Thinking, Freshman Seminar, Stanford University, 2003, 2004, 2005

**Invited Papers**

Bowe, M., Jensen, D., Feland, J., Self, B., "When Multimedia *Doesn't* Work: An Assessment of Visualization Modules for Learning Enhancement in Mechanics", *Technology Paper: Institute for Information Technology Applications,* US Air Force Academy, CO, (2000).

Self, B., Feland, J., et al,  "The Future of Manned Military Space Missions," *Institute for National Security Studies*, U S Air Force Academy, CO, (2001).

**Media Mentions**

DeGrasse, M., "Another looming 5G challenge: Getting customers to upgrade to a 5G phone," [https://www.fiercewireless.com/devices/5g-coming-but-carriers-need-your-help](https://www.fiercewireless.com/devices/5g-coming-but-carriers-need-your-help), 16 May 2018.

Keys, P.," Who Will Win In The Broken Connected Home Market?," [https://www.forbes.com/sites/phillipkeys/2016/09/01/who-will-win-in-the-broken-connected-home-market/#6b91cf9f102b](https://www.forbes.com/sites/phillipkeys/2016/09/01/who-will-win-in-the-broken-connected-home-market/#6b91cf9f102b), 1 Sep 2016.

"BIG DATA WORRIES AROUND THE INTERNET OF THINGS," [https://www.research-live.com/article/news/big-data-worries-around-the-internet-of-things/id/5005962](https://www.research-live.com/article/news/big-data-worries-around-the-internet-of-things/id/5005962), 22 Apr 2016.

Balakrishnan A., "Apple just made a deal that could reinvent the App Store for a new generation," https://www.cnbc.com/2017/03/25/apple-workflow-deal-the-strategy.html, 25 Mar 2017.

Fong, A., "How the Amazon Echo became an unlikely leader in the smart home war," [https://business.financialpost.com/technology/personal-tech/how-the-amazon-echo-became-an-unlikely-leader-in-the-smart-home-war](https://business.financialpost.com/technology/personal-tech/how-the-amazon-echo-became-an-unlikely-leader-in-the-smart-home-war), 7 Mar 2016.

Buckingham, A., "Who are the winners and losers in the current IoT market?," [https://betanews.com/2016/03/03/who-are-the-winners-and-losers-in-the-current-iot-market/](https://betanews.com/2016/03/03/who-are-the-winners-and-losers-in-the-current-iot-market/), 3 Mar 2016.

D'Onfro, J., "We're hearing about troubles at Nest, the smart-home company Google bought for $3.2 billion," [https://www.businessinsider.com/whats-going-on-at-nest-2016-2](https://www.businessinsider.com/whats-going-on-at-nest-2016-2), 15 Feb 2016.

Jelinek, J., "Smart Home Devices Are Great. Smart Home Apps, Not So Much," [https://techaeris.com/2016/01/26/smart-home-devices-are-great-smart-home-apps-not-so-much](https://techaeris.com/2016/01/26/smart-home-devices-are-great-smart-home-apps-not-so-much), 26 Jan 2016.

Bailey, B., "Apple's iPhone success may be reaching its peak," [https://www.usatoday.com/story/tech/2016/01/25/apples-iphone-success-may-reaching-its-peak/79312844/](https://www.usatoday.com/story/tech/2016/01/25/apples-iphone-success-may-reaching-its-peak/79312844/), 25 Jan 2016.

John Morgan. Feland, III                                                    john.feland@argusinsights.com, 650-868-0114

Sheridan, K., "10 Hot Smartwatches, Fitness Trackers For Your Holiday Gift List," https://www.informationweek.com/mobile/10-hot-smartwatches-fitness-trackers-for-your-holiday-gift-list/d/d-id/1323361, 2 Dec 2015.

Comstock, J., "Report: Consumers want smartwatches, but value fitness tracking features," https://www.mobihealthnews.com/48579/report-consumers-want-smartwatches-but-value-fitness-tracking-features, "18 Nov 2015.

Tibken, S., "Is the iPhone 6S a smash hit? Apple may offer clues Tuesday," https://www.cnet.com/news/was-the-iphone-6s-a-smash-hit-apple-may-offer-clues-tuesday/, 26 Oct 2015.

Feland, J., "Understand what the smart-home consumers really desire," https://www.embedded-computing.com/embedded-computing-design/understand-what-the-smart-home-consumers-really-desire, 2 Oct 2015.

Lima, J., "Smart Home devices disappoint and frustrate consumers," https://www.cbronline.com/internet-of-things/smart-home-devices-disappoint-and-frustrate-consumers-4682482/, 30 Sep 2015.

Daws, R., "Research: Consumers are getting happier with smart home technology, but overall demand is dropping," https://www.telecomstechnews.com/news/2015/sep/30/research-consumers-are-getting-happier-smart-home-technology-overall-demand-dropping/, 30 Sep 2015.

Evans, J., "7 signs of pent-up demand for Apple's latest iPhone," https://www.computerworld.com/article/2982353/7-signs-of-pent-up-demand-for-apple-s-latest-iphone.html, 9 Sep 2015.

Flanagan, N., "Report: wearable demand drops in 2015," https://www.healthcaredive.com/news/report-wearable-demand-drops-in-2015/404868/, 3 Sep 2015.

Snyder, B., "Smartphone 'upgrade fatigue' sets in as new models disappoint," https://www.cio.com/article/2949097/smartphone-upgrade-fatigue-sets-in-as-new-models-disappoint.html, 16 Jul 2015.

Lugmayr, L., "IPHONE DEMAND INCREASES WHILE US SMARTPHONE CONSUMER DEMAND DROPPED," https://www.i4u.com/2015/07/93307/iphone-demand-increases-while-us-smartphone-consumer-demand-dropped, 16 Jul 2015.

Evangelista, B., "Nest refreshes smart home device lineup, but will consumers buy?," https://www.sfgate.com/business/article/Nest-refreshes-smart-home-device-lineup-but-will-6333798.php, 16 Jun 2015.

Comstock, J., "Analysis: Fitbit leads fitness tracker space, but not overall wearable space," https://www.mobihealthnews.com/43717/analysis-fitbit-leads-fitness-tracker-space-but-not-overall-wearable-space, 21 May 2015.

Wilcox, J., " Apple Watch won't be 'wildly successful'," https://betanews.com/2015/04/09/apple-watch-wont-be-wildly-successful/, 9 Apr 2015.

Holt, K., "Beats Debuts Brawn-Friendly Bluetooth Earphones," https://www.technewsworld.com/story/80581.html, 12 Jun 2014.

Taylor, B., "Smartphone Experts vs. Users: Who Knows Better?," http://techland.time.com/2013/10/10/smartphone-experts-vs-users-who-knows-better/, 10 Oct 2013.

Wong, S., "With Addition of HBO Go and WatchESPN, Are We Closer Than Ever to an Apple Inc. HDTV?," http://www.minyanville.com/sectors/technology/articles/With-Addition-of-HBO-Go-and/6/21/2013/id/50454, 21 Jun 2013.

Bonnington, C., "WHY APPLE ADDED LITTLE-KNOWN C SPIRE AS AN IPHONE CARRIER," https://www.wired.com/2011/10/c-spire-gets-iphone-4s/, 19 Oct 2011.

Zachary, G. P., "The Unsung Heroes Who Move Products Forward," New York Times, 30 Sep 2007.

Quinn, M., " Latest technology is at your fingertips, Apple's iPhone may point the way as touch screens replace the keyboard and mouse," Los Angeles Times, 7 Feb, 2007.

http://www.vincentnguyen.com/synaptics-onyx-concept-cellphone-almost-a-reality-2006119.php

http://investor.shareholder.com/synaptics/releasedetail.cfm?releaseid=214336



John Morgan. Feland, III                                    john.feland@argusinsights.com, 650-868-0114

## PATENTS

Hunt, Lewis. 1992. Three zone bed cover with an inflatable human form. U.S. Patent 5,146,634, filed September 11, 1991, and issued September 15, 1992.

Feland, III; John; Le; Thuy Thanh Bich; Huie; Mark Andrew, Hovden; Torbjorn , Acker, Jr.; Phillip Frank, 2015, Proximity sensor device and method with activation confirmation, U.S. Patent 8,947,364, filed 20 Aug 2007, and issued 3 Feb 2015.

Reynolds; Joseph Kurth, Dattalo; Tracy Scott, Trent, Jr.; Raymond A, Feland, III; John M, 2013, Determining actuation of multi-sensor-electrode capacitive buttons, filed 13 Dec 2012, and issued on 16 Jul 2013.

Reynolds; Joseph Kurth Dattalo; Tracy Scott,Trent, Jr.; Raymond A, Feland, III; John M, Baharav; Izhak , Maloney, Jr.; John P, 2013, Determining actuation of multi-sensor-electrode capacitive buttons, U. S. Patent 8,358,226, filed 27 Oct 2008, and issued on 22 Jan 2013.

Zawde; Fidel, Le; Thuy T. B., Feland; John, Trent, Jr.; Ray Alexander, Huie; Mark, 2010, Proximity sensor device and method with adjustment selection tabs, U.S. Patent 7,825,797, filed 2 Jun 2006, and issued on 2 Nov 2010.

Matsiev; Leonid, Kolosov; Oleg, Uhrich; Mark D. Rust; William, Feland, III; John M., Varni; John F., Walker; Blake, 2008, Environmental control system fluid sensing system and method, U.S. Patent 7,350,367, filed 27 Sep 2004, aind issued 1 Apr 2008.

Bennett; James, Dales; G. Cameron, Feland, III; John M., Kolosov; Oleg, Low; Eric, Matsiev; Leonid, Rust; William C., Spitkovsky; Mikhail, Uhrich; Mark, 2007, Portable fluid sensing device and method, filed 20 April 2005, and issued 18 Sep 2007.

## SOFTWARE PROFICIENCY

- MYSQL, Postgres, Ruby on Rails, Javascript, Meteor, React, D3.js, Highcharts, MongoDB
- Microsoft Office Suite, Microsoft Project, Visio
- Solidworks, Autodesk Inventor
- Embedded Microprocessors – BASIC Stamp, Motorola 68HC11, Atmel AVR, BASIC Atom, Arduino, C.H.I.P.

## PROFESSIONAL AFFILIATIONS

American Society of Engineering Education
- Publications Chair for Entrepreneurship Division (1999-2002)
- Session Chair and peer reviewer for annual conference

American Society of Mechanical Engineers, member
- Peer review for Design Theory and Methodology Annual Conference

International Design Society, associate member
- Charter member
- Session Chair and Peer Reviewer for International Conference on Engineering Design

Stanford Center for Critical Foresight
- Member of Board of Advisors

MIT/Stanford Venture Lab
- Executive Board Member At Large

MIT Club of Northern California
- Semiconductor Division Steering Committee

MIT Alumni Association
- Class of 1994 President

## HOBBIES AND ACTIVITIES

Cycling, Gourmet Cooking, Gadgets, Fatherhood, Sailing, Snowboarding, Hiking, Camping, World Travel

